# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

### WEST PALM BEACH DIVISION

**JORDAN KUPPINGER, M.D.**, and
**GERALD MOLLOY, M.D.,**

       Plaintiffs,

v.                                          Case No.: 21-cv-80492-DMM

**JM.JZ ENTERPRISES, INC. d/b/a Coastal
Health Group, a Florida corporation, JONN A.
MCCLELLAN, MICHAEL CUTLER, and CHEIKH
ROBERTSON,**

       Defendants.

_____/

### FIRST AMENDED COMPLAINT

Plaintiffs Jordan Kuppinger, M.D. ("Dr. Kuppinger") and Gerald Molloy, M.D. ("Dr. Molloy") (collectively, "Plaintiffs"), hereby sue JM.JZ Enterprises, Inc. d/b/a Coastal Health Group (the "Corporation"), Jonn A. McClellan ("McClellan"), Michael Cutler ("Cutler"), and Cheikh Robertson ("Robertson") (collectively, "Defendants").

1. This is an action for damages as a result of Defendants' unlawful retaliatory conduct against Plaintiffs and negligent and/or intentional infliction of emotional distress.

2. This action also seeks declaratory and injunctive relief relating to the parties' rights and obligations under the Shareholder Agreement.

### JURISDICTION AND VENUE

3. The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because Plaintiff's claim arises under the laws of the United States, specifically under 31 U.S.C. § 3730(h).

4.     The Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C.§ 1367 because those claims form part of the same case or controversy as the federal claim.

5.     Venue is proper in this district under 28 U.S.C. § 1391(b) because the Corporation's principal place of business is in Palm Beach County, Florida, Defendants McClellan and Cutler are residents of Palm Beach County, Florida, and a substantial part of the events giving rise to the causes of action alleged herein occurred in this district. In addition, the Shareholder Agreement (defined below) for the Corporation provides that "if a court action is instituted between a Shareholder and the Corporation, venue for such action will be in Palm Beach County, Florida  .  .  ." *See* **Exhibit A**, Art. XVI(b).

## PARTIES

6.     Plaintiff Dr. Kuppinger is a board-certified anesthesiologist with fellowship training in Interventional Pain Management.  Dr. Kuppinger has been employed by the Corporation as one of its health care providers.  In addition, Dr. Kuppinger owns 20% of the shares of the Corporation, has been the Corporation's Chief Medical Officer, Medical Director, and has been a director on the Board of Directors for the Corporation.

7.     Plaintiff Dr. Molloy is a board-certified neurosurgeon.  Dr. Molloy is employed by the Corporation as one of its health care providers and also served as a Medical Director.  In addition, Dr. Molloy owns 20% of the shares of the Corporation and is on the Board of Directors for the Corporation.

8.     The Corporation is a Florida corporation, formed on or around 2013, with its principal place of business in Palm Beach County, Florida.  The Corporation is a medical practice that provides medical and injury care throughout various locations in Florida.  The Corporation

has ten (10) or more employees.  As of December 31, 2020, the Corporation had five shareholders: Dr. Kuppinger, Dr. Molloy, McClellan, Cutler, and Robertson.

9.      Defendant McClellan is a resident of Palm Beach County, Florida and is a licensed chiropractor.  McClellan is employed by the Corporation as one of its health care providers and is on the Board of Directors for the Corporation.  As of December 31, 2020, McClellan owned 20% of the shares of the Corporation.  However, pursuant to a "Contribution Agreement" effective January 1, 2021, McClellan transferred his shares to CHG Holding Company, LLC.  *See* **Exhibit B**.  As a result, on January 1, 2021, McClellan ceased to be a shareholder of the Corporation.

10.     Defendant Cutler is a resident of Palm Beach County, Florida.  Cutler is employed by the Corporation in a marketing role and is on the Board of Directors for the Corporation.  As of December 31, 2020, Cutler owned 20% of the shares of the Corporation.  However, pursuant to a "Contribution Agreement" effective January 1, 2021, Cutler transferred his shares to CHG Holding Company, LLC.  *See* Ex. B.  As a result, on January 1, 2021, Cutler ceased to be a shareholder of the Corporation.

11.     Defendant Robertson is a resident of Miami-Dade County, Florida.  Up until November 22, 2020,  Robertson was employed by the Corporation as its Chief Executive Officer and was Chairman of the Board of Directors.  As of November 22, 2020, Robertson retired and resigned from all positions in the Corporation. Robertson continues to be a shareholder of the Corporation owning 20% of its shares.[1]  As a result of his retirement and resignation, however, Robertson is required under the Shareholder Agreement (defined below) to sell all of his shares to

---

[1] If Robertson also signed the Contribution Agreement, like McClellan and Cutler, he too would no longer be a shareholder of Corporation.

the Corporation, or if the Corporation elects not to purchase all of his shares, to the other shareholders on a pro-rata basis (i.e., Plaintiffs).

## GENERAL ALLEGATIONS

12.     On July 1, 2020, the shareholders of the Corporation entered into an "Amended and Restated Shareholder Agreement" (the "Shareholder Agreement"). *See* Ex. A.

13.     At the time the Shareholder Agreement was entered into, the shareholders of the Corporation were Dr. Kuppinger, Dr. Molloy, McClellan, Cutler, and Robertson, and the Board of Directors of the Corporation was composed of all five shareholders, with Robertson serving as Chairman of the Board.  At the time, Robertson was also Chief Executive Officer (CEO) of the Corporation.

*Actions by Shareholders and Directors under Shareholder Agreement*

14.     Among other things, the Shareholder Agreement sets forth the rights and obligations of the Shareholders and describes how the Corporation will be operated among the Shareholders and Board of Directors.

15.     As relevant here, the Shareholder Agreement provides that "the Board of Directors will be responsible for considering major issues of the Corporation which do not, in the opinion of the Board of Directors, appropriately come within the purview of the CEO (e.g., compliance, long and short-term strategies, acceptance of insurance contracts, capital spending and recruiting).  Ex. A, Art. III(a).

16.     The Shareholder Agreement also vests the Board of Directors with voting on the removal of directors and the appointment of officers. *See id*. Art. III(g) ("Any Director may be removed, with or without cause, by the affirmative Super Majority Vote *by the Board*, with prior notice to the removed Director . . . .") (emphasis added); *id*. Art. IV(b) ("Upon any person ceasing

4

to hold an officer position, then the *Board of Directors* will name a person to replace that person.")
(emphasis added).

17.    In order for the Board of Directors to take action or transact business, the
Shareholder Agreement requires that a quorum of directors convene at a meeting.  The Agreement
defines a "quorum" as a "whole number of directors equal to at least two-third (2/3) of the
maximum authorized Board."  The act of the Majority of the directors present at a meeting at which
a quorum is present shall be the act of the Board of Directors.  *Id*. Art. III(j).

18.    The Shareholder Agreement states that "[t]he Board of Directors will consist of not
less than one (1), nor more than five (5), Directors."  *Id*. Art. III(c).

*Unlawful Assignment of Accounts Receivables for Referral of Patients*

19.    On or about September 6, 2020, McClellan signed a "Bulk Irrevocable Assignment
for Collection" on behalf of the Corporation (the "Irrevocable Assignment") with Movedocs.com,
LLC ("Movedocs").

20.    McClellan entered into this agreement with Robertson's and Cutler's knowledge
and assistance, but significantly, kept it hidden from Plaintiffs at the time.  Robertson's and
Cutler's names even appear on the document, as well as Rene Webster ("Webster"), an employee
of the Corporation and McClellan's mother.

21.    In the Irrevocable Assignment, the Corporation agreed to grant an irrevocable
assignment to Movedocs.com, LLC to collect on outstanding accounts receivable. In exchange for
the assignment of accounts receivable, Movedocs agreed to pay the Corporation a lump sum of
12% of the "aggregate Billed Charges" of the accounts receivable (which, notably, is far less than

the Corporations' average collection rate on receivables).[2] The accounts receivable being assigned would be identified in a subsequent "Assignment Agreement."

22.     Significantly, the Corporation had never before (to Plaintiffs' knowledge) assigned or "pre-funded" their accounts receivable.

23.     Later in September 2020, sometime after McClellan signed the Irrevocable Assignment for the Corporation, Cutler arranged for Dr. Kuppinger, Dr. Molloy, Robertson and McClellan to all meet with Cara Valenti, a marketing representative for Movedocs, at a dinner meeting.  The apparent purpose of the meeting was for Ms. Valenti to pitch certain marketing and business generation opportunities for the Corporation.   Specifically, the opportunity that Ms. Valenti offered would involve identifying and referring patients to the Corporation pursuant to certain lead generation capabilities that Ms. Valenti said she had in Colorado, Florida and Nevada. However, at one point during the conversation, Ms. Valenti revealed that her company (or companies with which she was affiliated) also had the capability to pre-fund accounts receivable, and that this type of transaction would be the most beneficial to her from a financial perspective.

24.     Of course, Ms. Valenti, McClellan, Cuter and Robertson already knew that the Corporation had entered into an agreement with Movedocs for that purpose, but no one made any mention of this at the dinner meeting given that it had been kept hidden from Dr. Kuppinger and Dr. Molloy.

25.     When Ms. Valenti offered the pre-funding of accounts receivable, it became clear to Dr. Molloy that what was really being contemplated was the Corporation's assignment of

---

[2] The individual Defendants themselves have taken the position that the Corporation's average collection rate is 300% greater (or 36%).

receivable in exchange for the referral of payments.  Dr. Molloy raised concerns that this would be an unlawful patient brokering scheme.

26.     Plaintiffs made clear that the Corporation would not be doing any business with Ms. Valenti.

27.     Thus, after the dinner meeting, Plaintiffs believed that the Corporation would not proceed to engage in any assignment of accounts receivable with Ms. Valenti.

28.     A couple weeks later, at the insistence of Cutler, Dr. Kuppinger offered to give just the marketing opportunity a try—again, at the time, the individual Defendants had kept the existence of the Irrevocable Assignment hidden from Plaintiffs.

29.     Shortly thereafter, Ms. Valenti visited one of the Corporation's offices to begin training the employees of the Corporation on the patient referral system.

30.     Ms. Valenti was hands on and heavily involved in the implementation of this patient referral system, and the Corporation indeed began receiving patient referrals.

31.     It was not until November 2020 that Plaintiffs learned for the first time that the Corporation, through McClellan, Cutler and Robertson, had *already* agreed to assign accounts receivables to Movedocs and that this assignment of receivables was actually a condition to the marketing and lead generation services offered by Ms. Valenti.  At a meeting between Plaintiffs and Defendants, it was explained to Plaintiffs that the assignment of receivables was required to continue the marketing relationship with Ms. Valenti and/or an entity with which she was affiliated or associated.  In other words, but for the assignment of accounts receivables at a fraction of their value, the Corporation would not receive patient referrals.

32.     Naturally, Dr. Kuppinger and Dr. Molloy were outraged to learn this and made their objection to the transaction abundantly clear and known at that time to Defendants.  Dr. Molloy

again raised concerns in light of the patient brokering and kickback issues implicated by this arrangement.

33.     Dr. Kuppinger asked who had agreed to the assignment of receivables, to which Robertson responded that he had signed the paperwork.[3] Dr. Kuppinger requested from Defendants copies of any and all paperwork that had been signed through Ms. Valenti; not surprisingly, Defendants never provided the documents.

34.     Notwithstanding the clear disagreement that had been voiced by Plaintiffs on several occasions, on or around November 25, 2020, McClellan proceeded to sign a second contract with Movedocs, an "Agreement for Assignment of Accounts Receivable" (the "Assignment Agreement"),  In the Assignment Agreement, the Corporation assigned $1.5 million of its accounts receivable in exchange for approximately $185,000.

35.     The Corporation received the $185,000 on November 30, 2020.

36.     As noted above, the Corporation has received patient referrals as a result of the arrangement with and/or involving Movedocs and/or Ms. Valenti.  Among the patients that the Corporation treats are federal health care program beneficiaries.  Thus, Plaintiffs reasonably believe that some of the patient referrals the Corporation has received or would receive under the patient referral arrangement noted above are federal health care program beneficiaries.  For these patients, the Corporation submitted or would submit claims to the United Statement Government for payment from federal funds.

---

[3] The Irrevocable Assignment and the subsequent Assignment Agreement (*see infra* paragraph 34) are in fact signed by McClellan, not Robertson—which Robertson knew of notwithstanding his misrepresentation to the contrary.  Robertson resigned just three days before the date of the Assignment Agreement. *See infra* ¶¶ 46-48.

37.     To be sure, the Shareholder Agreement *requires* each of the shareholders, as applicable, to maintain his qualifications and eligibility to participate in Medicare and any other federal health care program.  *See* Ex. A Art.VII(b)(1) (allowing for removal of shareholder where the shareholder is "excluded, suspended, debarred or otherwise ineligible to participate in Medicare and any other Federal Health Care Programs . . . ."); *see also id.* Art. XV(f) (referring to Corporation's Medicare number).   Indeed, Plaintiffs and McClellan have Medicare/Medicaid numbers.

*Violations of Patient Brokering and Anti-Kickback Laws*

38.     The Corporation's arrangement with and/or involving Movedocs or Ms. Valenti (or associated entities) violates sections 456.054 and 817.505, Florida Statutes.

39.     Section 456.054, Florida Statutes, makes it unlawful for any health care provider to "offer, pay, solicit, or receive a kickback, directly or indirectly, overtly or covertly, in cash or in kind, for referring or soliciting patients."

40.     Similarly, section 817.505, Florida Statutes, makes it unlawful for any person, including any health care provider, to "offer to pay a commission, benefit, bonus, rebate, kickback, or bribe, directly or indirectly, in cash or in kind . . .in any form whatsoever, to induce the referral of a patient or patronage to or from a health care provider or health care facility."

41.     As noted above, McClellan—on behalf of the Corporation and with the knowledge and assistance of Cutler and Robertson—agreed to assign accounts receivable to Movedocs for a fraction of their value in exchange for the referral of patients to the Corporation.  In other words, they agreed to "offer to pay  . . . a kickback … to induce the referral of [] patient[s]."

*Violation of Anti-Kickback Statute*

42.     The Corporation arrangement with and/or involving Movedocs or Ms. Valenti (or associated entities) also violates the Anti-Kickback Statute ("AKS").

9

43.     The AKS prohibits the knowing and willful "offer[] or pay[ment of] any remuneration directly or indirectly, overtly or covertly, in cash or kind to any person" to induce a person to refer patients or generate business involving any item or service payable by federal health care programs. *See* 41 U.S.C. § 1320a-7b (b).

44.     Again, McClellan, with the knowledge and assistance of Cutler and Robertson, knowingly and willingly offered and agreed to the assignment of accounts receivable to Movedocs to induce the referral of patients to the Corporation from an entity affiliated and/or associated either with Movedocs and/or Ms. Valenti herself.

45.     These referred or to-be-referred patients included federal health care program beneficiaries.

*Robertson's Retirement and Resignation*

46.     On November 22, 2020, Robertson fully retired and resigned from all of his positions in the Corporation.  **Exhibit C**.

47.     Thus, as of November 22, 2020, Robertson ceased to be CEO of the Corporation and ceased to have any position on the Board of Directors, whether as a director or as Chairman.

48.     Although Robertson currently remains a shareholder of the Corporation, as a result of his retirement and resignation, he is required under the Shareholder Agreement to sell his shares to the Corporation or, if the Corporation elects not to purchase his shares, to the other Shareholders on a pro rata basis.  *See* Ex. A, Art. VI(a).

*Restrictions on Transfers of Shares*

49.     In the Shareholder Agreement, the shareholders agreed that in order "to secure the continuity and stability of policy and management of the Corporation," they would "impose certain restrictions and obligations on themselves concerning the transfer of Shares of the Corporation." *See id.* at 1.

10

50.     To that end, Article V of the Shareholder Agreement sets forth that transfers of shares are prohibited except in two limited circumstances.  Specifically, Article V(a) provides:

> [N]o Shareholder shall give, bequeath, sell, exchange, assign, pledge, or otherwise transfer, dispose, or encumber, directly or indirectly, voluntarily or involuntarily, any of the Shares at any time owned by him . . . except in accordance with the provision of this Agreement or without the *prior written consent* of all persons or entities subject to the terms and conditions of this Agreement.

*Id*. Art. V(a) (emphasis added).

51.     In other words, the transfer of shares is permitted only (1) as expressly allowed by the Agreement or (2) with the prior *written* consent of all shareholders.

52.     Article V(b), in turn, identifies the only two transfers that are expressly permitted by the Agreement: (1) Transfer to a Trust; and (2) Transfer to Corporation and other shareholders. *Id.* Art. V(b).

53.     Article V(c) sets forth the consequences of a prohibited transfer of Shares: "In the event of any transfer [in] violation of this Agreement, the transferee of any Shares shall be entitled only to receive any distributions to which the transferor Shareholders of such Shares would have been entitled but for such sale or transfer."  *Id.* Art. V(c).

*McClellan and Cutler Transfer Their Shares*

54.     Shortly before December 30, 2020, McClellan authorized the creation of CHG Holding Company, LLC, a Florida limited liability company (the "Holding Company").

55.     The Holding Company was allegedly formed as a result of a discussion among the directors after receiving advice from certain professionals on implementing an S Corporation "inversion" for tax purposes.

56.     Notwithstanding the contemplated inversion, the shareholders did not all agree in writing, as required by Article V(a) of the Shareholder Agreement, that any shares of the

Corporation could be transferred to the Holding Company.  In fact, Dr. Molloy specifically objected to such a transfer in light of the provisions of the Shareholder Agreement.

57.     Nevertheless, without the prior written consent of all of the shareholders, McClellan and Cutler proceeded to sign and enter into Contribution Agreement between themselves as "Transferors" and the Holding Company as "Transferee."  Under the Contribution Agreement, McClellan and Cutler transferred all of their shares in the Corporation to the Holding Company effective January 1, 2021.  *See* Ex. B.

58.     Since January 1, 2021, McClellan and Cutler (the owners of the Holding Company) have caused the Holding Company to transact business with the Corporation without the approval of Plaintiffs or the Board of Directors.

59.     As a result of their transfer of shares to the Holding Company, McClellan and Cutler ceased to be shareholders of the Corporation.  The Holding Company, in turn, became a 40% shareholder of the Corporation.

60.     Because the transfer of shares to the Holding Company was not permitted under the Shareholder Agreement (and thus is in violation of the Shareholder Agreement), the Holding Company's right as a shareholder is limited to receiving distributions that McClellan and Cutler would have received but for the transfer.  Indeed, the Holding Company does not have, among other things, the right to vote the shares of the Corporation in matters to be voted upon by the shareholders of the Corporation.

*Retaliatory Action Taken Against Dr. Kuppinger and Dr. Molloy*

61.     On February 18, 2021, Dr. Kuppinger and Dr. Molloy, through their counsel, wrote a letter to the Corporation's counsel reiterating their objection to the Corporation's participation in unlawful patient brokering and kickback activity under state and federal law and demanding that an internal investigation be conducted and all appropriate legal action follow.  **Exhibit D**.

62.     Immediately after receiving the February 18 letter—indeed, a mere three days later on February 20, 2021—McClellan, Cutler, and Robertson retaliated by issuing a notice, as "Shareholders and Directors," scheduling a special meeting of the shareholders for February 25, 2021 for the purpose of "remov[ing] Jordan Kuppinger with and/or without cause from the position of Director of Coastal" (the "Notice") (the meeting was later rescheduled to February 28). **Exhibit E**. The Notice also scheduled a special meeting of Board of Directors, to take place immediately after the shareholders' meeting, for the purpose of filling the vacancy on the Board of Directors as a result of Dr. Kuppinger's removal and selecting a Chief Executive Officer to fill the vacancy created by Robertson's resignation.

63.     In light of this clearly retaliatory conduct, Dr. Kuppinger and Dr. Molloy then sent McClellan, Cutler and Robertson a second letter the morning of Saturday, February 27, 2021 (copying the Corporation's counsel). **Exhibit F.** In the February 27 letter, Plaintiffs advised that the intended removal of Dr. Kuppinger as director was unlawful retaliation under both state and federal law, specifically under section 448.102, Florida Statutes, and 31. U.S.C. § 37230(h). Plaintiffs repeated their objections to the Corporation's violation of patient brokering and anti-kickback laws and specifically noted, among other things, that because the Corporation treats patients that are federal healthcare program beneficiaries, the Corporation could also be in violation of the False Claims Act.

64.     The same day, Plaintiffs also sent the Corporation's counsel another letter demanding that counsel ensure the retaliatory conduct immediately cease. **Exhibit G**.

65.     Defendants' retaliation nevertheless continued undeterred.  That very evening, McClellan, Cutler and Robertson caused the physical removal of medical equipment from one of

the Corporation's clinics at which Plaintiffs work in order to prevent both Dr. Kuppinger and Dr. Molloy from seeing and treating the Corporation's patients scheduled to visit that clinic.

66.     The next day, on Sunday, February 28, 2021, McClellan, Cutler and Robertson voted at the shareholders' meeting to terminate Dr. Kuppinger from the Board of Directors.  Then, at the Board of Directors meeting that followed, McClellan, Cutler and Robertson voted to also terminate Dr. Kuppinger's employment with the Corporation.  Significantly, the termination of Dr. Kuppinger's employment was not included as a matter to be voted upon in the Notice.

67.     Dr. Kuppinger's termination as a director and employee was clearly in retaliation for, among other things, the two February 27, 2021 letters sent by Plaintiffs.

68.      Defendants also retaliated against Dr. Molloy for the two February 27, 2021 letters, his objections to other improper practices, and the filing of this lawsuit.

69.     As a result of Defendants having moved the medical equipment out of one of the Corporation's clinics, on Saturday, February 27, Dr. Molloy was not able to treat patients he was scheduled to see there the following Monday, March 1, 2021.

70.     The next day, on Tuesday, March 2, 2021, Dr. Molloy raised the issue with McClellan.  At that time, he also objected to Coastal's improper practice of medicine without an active medical director given Dr. Kuppinger's termination. Dr. Molloy's objection elicited an outburst from McClellan in which McClellan suggested that the Corporation would soon be taking action against Dr. Molloy.

71.     On March 5, 2021, and in furtherance of their prior objections, Plaintiffs filed a lawsuit against Coastal, McClellan, Cutler and Robertson again raising, among other things, Coastal's unlawful participation in a patient brokering and/or kickback scheme, as well as Coastal's unlawful retaliation against Dr. Kuppinger.

14

72.    Coastal was served with this lawsuit on March 7, 2021.

73.    Less than two weeks after being served with the Complaint to Coastal's unlawful act, Defendants retaliated against Dr. Molloy by issuing a notice scheduling a special meeting of the Board of Directors of Coastal for March 22, 2021, for the purpose of discussing and resolving the "removal of Dr. Gerald Molloy from the Board of Directors both with and without cause."

74.    Then, during the special meeting of the Board of Directors on March 22, 2021, McClellan, Cutler, Robertson and Webster voted to "remove Dr. Molloy with cause from his position on the corporate Board of Directors" of Coastal.

75.    Blatantly revealing the clear retaliatory nature of this action, the minutes of the meeting list the reason for Dr. Molloy's termination, in part, as his "Legal Action against the Corporation and other Shareholders".

76.    Dr. Molloy's termination as a Director of Coastal was clearly in retaliation for, among other things, the two February 27, 2021 letters sent by Plaintiffs and Dr. Molloy's exercise of his rights to file a lawsuit against Coastal and its directors/shareholders.

*Infliction of Emotional Distress*

77.    Defendants' intentionally retaliatory actions and other outrageous conduct have caused Dr. Kuppinger severe emotional distress, to the point where Dr. Kuppinger had to be taken to the emergency room on February 28, 2021, shortly after he learned he had been locked out of two of the Corporation's clinics.

78.    McClellan, Cutler, and Robertson know that Dr. Kuppinger suffers from a heart condition.  Since at least September 2020, they have intentionally aggravated Dr. Kuppinger's condition through conduct that has been purposely aimed at causing Dr. Kuppinger distress. McClellan, Cutler and Robertson have repeatedly taken actions on behalf of the Corporation for

their sole benefit and to the detriment of Dr. Kuppinger and Dr. Molloy—all to harass Dr. Kuppinger and Dr. Molloy.  In fact, on January 16, 2021, McClellan openly admitted to Dr. Molloy and Cutler that his goal had been to anger and emotionally harm Dr. Kuppinger to the point where Dr. Kuppinger would decide to leave the practice.

79.     The emotional distress suffered by Dr. Kuppinger as a result of McClellan, Cutler, and Robertson's actions has caused Dr. Kuppinger to suffer from shortness of breath, chest pain, erythema, chronic fatigue, and has aggravated his angina, among other things.

*Conversion of Dr. Kuppinger's Medical Records*

80.     Under Florida law, a health care practitioner who generates a medical record after making a physical or mental examination of, or administering treatment or dispensing legend drugs to, a person is the owner of that record if there is no agreement between the practitioner and his/her employer that specifically designates the employer as the owner.  Fla. Stat. § 456.057(1).

81.     No agreement exists between Dr. Kuppinger and Coastal designating Coastal as the owner of his medical records.

82.     Dr. Kuppinger, through undersigned counsel, has requested from Coastal the immediate return of his medical records on at least seven (7) occasions, including as early as March 10, 2021.

83.     As of the date of this Complaint, Coastal has failed to return any of Dr. Kuppinger's medical records.

84.     Coastal has intentionally withheld these records and has incorrectly claimed—despite being presented with the applicable law—that "the provider (which is Coastal) is and always has been the rightful owner" [of the medical records].

16

85.     In an attempt to further justify its conversion of Dr. Kuppinger's records and avoid its obligation under section 456.057, Fla. Stat., Coastal has manufactured baseless and untrue accusations that Dr. Kuppinger and Dr. Molloy were improperly soliciting Coastal's patients.

86.     Because of Coastal's failure to return the medical records to Dr. Kuppinger, Dr. Kuppinger has been prevented from identifying and completing any outstanding records and his ability to treat patients has been impeded.

87.     Coastal is also improperly in possession of medical equipment belonging to Dr. Kuppinger. This equipment includes, but is not limited to: a Radiofrequency Ablation ("RFA") machine purchased by Mobile Pain Doctors; Stryker RFA Machine (including all cables) and pelican case; GE 9800 Fluoroscopy machine; Oak Works Fluoroscopy table CFPM 400; and Spinal pillows.

88.     None of the aforementioned medical equipment is legally titled to Coastal, nor was it part of Dr. Kuppinger's capital contribution to Coastal.

89.     Dr. Kuppinger has requested the return of his medical equipment no less than four (4) times, including as early as March 10, 2021.

90.     As of the date of this Complaint, Coastal has failed to return Dr. Kuppinger's medical equipment.

91.     This equipment is valued at approximately $100,000.

**COUNT 1**
**VIOLATION OF 31 U.S.C. § 3730(h)**
*(By Plaintiffs against the Corporation)*

92.     Plaintiffs repeat and reallege the allegations in paragraphs 1 through 91 above as if fully set forth herein.

93.     Plaintiffs objected to, reported, and attempted to stop an actual or reasonably suspected violation of the False Claims Act by the Corporation.  Among other things, and as alleged herein, Plaintiffs informed the Corporation's counsel and other directors/shareholders of the unlawful patient referral arrangement with and/or involving Movedocs or Ms. Valenti (and associated entities).

94.     Because the Corporation treats patients that are federal health program beneficiaries, and because the referred or to-be-referred patients as a result of the Movedocs arrangement include federal healthcare program beneficiaries, Plaintiffs specifically advised the Corporation's counsel and other directors that the arrangement exposes the Corporation to liability under the False Claims Act if the Corporation has submitted claims to a federal healthcare program for payment of kickback tainted services.

95.     Plaintiffs reasonably believe the arrangement with and/or involving Movedocs or Ms. Valenti involves, or would involve, the Corporation's submission of false claims to the United States government, which Plaintiffs attempted to stop.

96.     In exposing, objecting to, attempting to stop, and demanding an internal investigation of the unlawful arrangement with Movedocs, Plaintiffs have engaged in protected activity under section 3730(h).

97.     Defendants knew that Plaintiffs engaged in protected activity because they received Plaintiffs' multiple correspondence and the Complaint reporting, objecting to, and attempting to stop the potential violation of the False Claims Act.

98.     Because of Plaintiffs' objections, Defendants retaliated against Plaintiffs.

99.     To be sure, three days after Plaintiffs' first correspondence reporting the violations of patient brokering and anti-kickback laws, Defendants noticed a shareholder meeting for the sole purpose of removing Dr. Kuppinger as a director.

100.    Then, the very day Plaintiffs sent another letter again reporting and objecting to the unlawful Movedocs transaction and specifically advising of potential violations of the False Claims Act, Defendants McClellan, Cutler and Robertson physically removed medical equipment from the offices at which Plaintiffs work to prevent Plaintiffs from seeing patients. The next day, on February 28, Defendants terminated Dr. Kuppinger as director of the Corporation and, with no notice, also terminated his employment with the Corporation.

101.    In addition, a mere two weeks or so after McClellan threatened to take action against Dr. Molloy for raising additional objections concerning the absence of a medical director and after the filing of the Complaint , Defendants removed Dr. Molloy  as a Director of Coastal.

102.    These adverse employment actions against Dr. Kuppinger and Dr. Molloy were clearly motivated by and solely the result of Plaintiffs' protected activity.

WHEREFORE, Dr. Kuppinger requests the entry of judgment for reinstatement as a director, employee, and Chief Medical Officer and all damages caused by Defendants' retaliatory conduct, including double back pay plus interest, damages for emotional distress and other noneconomic damages, and an award of attorneys' fees and costs. Dr. Molloy  requests the entry of judgment for reinstatement as a director and all damages caused by Defendants' retaliatory conduct, including double back pay plus interest, other noneconomic damages, and an award of attorneys' fees and costs.

**COUNT 2**
**VIOLATION OF FLA. STAT. 448.102(3)**
*(By Plaintiffs against the Corporation)*

103.     Plaintiffs repeat and reallege the allegations in paragraphs 1 through 91 above as if fully set forth herein.

104.     The Corporation employees ten (10) or more employees.  Dr. Kuppinger has been employed by the Corporation as one of its health care providers.

105.     Plaintiffs objected to, reported, and attempted to stop actual violations by the Corporation of Florida patient brokering laws and the federal Anti-Kickback Statute.  Specifically, Plaintiffs sent written notice of the unlawful patient referral arrangement with and/or involving Movedocs or Ms. Valenti (and associated entities) to the Corporation's counsel and other directors, requesting proper action in accordance with the law.

106.     Rather than take any steps to remedy the violations of law, Defendants immediately retaliated against Dr. Kuppinger.

107.     To be certain, three days after Plaintiffs' first correspondence reporting the violations of patient brokering and anti-kickback laws, Defendants noticed a shareholder meeting for the sole purpose of removing Dr. Kuppinger as a director.

108.     Then, the very day Plaintiffs sent another letter again reporting and objecting to the unlawful Movedocs transaction and specifically advising of potential violations of the False Claims Act, Defendants physically removed medical equipment from an office at which Plaintiffs work to prevent Plaintiffs from seeing patients. The next day, on February 28, Defendants terminated Dr. Kuppinger as director of the Corporation and, with no notice, also terminated his employment with the Corporation. In addition, a mere two weeks or so after McClellan threatened to take action against Dr. Molloy for raising additional objections concerning the absence of a medical director and after the filing of the Complaint, Defendants removed Dr. Molloy  as a Director of Coastal.

109.    The adverse employment actions against Dr. Kuppinger and Dr. Molloy were clearly and solely a result of Plaintiffs' objections to and reporting of the Corporation's violations of Florida patient brokering laws and the federal Anti-kickback statute, among other unlawful practices.

WHEREFORE, Dr. Kuppinger requests the entry of judgment for reinstatement as a director, employee, and Chief Medical Officer, all damages caused by Defendants' retaliatory conduct allowable by law, including economic damages, damages for emotional distress, and an award of attorneys' fees and costs. Dr. Molloy  requests the entry of judgment for reinstatement as a director and all damages caused by Defendants' retaliatory conduct, including double back pay plus interest, noneconomic damages, and an award of attorneys' fees and costs.

### COUNT 3
### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
*(By Plaintiff Kuppinger against McClellan, Cutler, and Robertson)*

110.    Dr. Kuppinger repeats and realleges the allegations in paragraphs 1 through 91 above as if fully set forth herein.

111.    Defendants McClellan, Cutler, and Robertson have engaged in intentional conduct that is outrageous and goes beyond all bounds of decency.

112.    McClellan, Cutler, and Robertson repeatedly took actions to purposely harm  Dr. Kuppinger.  For example, they instructed one of the Corporation's schedulers to schedule several of Dr. Kuppinger's patients during a time slot intended for one patient so as to cause unnecessarily long wait times and purposely affect reviews of Dr. Kuppinger's service.

113.    As a direct and proximate result of Defendants' misconduct, Dr. Kuppinger suffered severe emotional distress that forced Dr. Kuppinger to be taken to the emergency room

and that has manifested itself in shortness of breath, chest pain, erythema, chronic fatigue, and aggravated angina, among other things.

WHEREFORE, Dr. Kuppinger requests the entry of judgment for damages against Defendants McClellan, Cutler and Robertson, and such further relief this Court deems just and proper, including punitive damages and attorney's fees.

## COUNT 4
## NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS
### *(By Plaintiff Kuppinger against McClellan, Cutler, and Robertson)*

114.    Dr. Kuppinger repeats and realleges the allegations in paragraphs 1 through 91 above as if fully set forth herein.

115.    Defendants McClellan, Cutler, and Robertson have engaged in negligent conduct that they knew or should have known would cause emotional distress to Dr. Kuppinger.

116.    Defendants McClellan, Cutler and Robertson owed Dr. Kuppinger a duty to refrain from such conduct because of their relationship of trust and confidence as shareholders and directors for the Corporation.  They also owed Dr. Kuppinger a duty to refrain from such conduct because it was clearly foreseeable to them that, in light of Dr. Kuppinger's heart condition of which they knew, he would suffer great distress and his condition would be aggravated by actions taken solely to harass and anger him.

117.    Nevertheless, Defendants repeatedly took actions on behalf of the Corporation to purposely harm  Dr. Kuppinger and Dr. Molloy.  For example, in addition to the retaliatory actions alleged herein, Defendants also instructed one of the Corporation's schedulers to schedule several of Dr. Kuppinger's patients during a time slot intended for one patient so as to cause unnecessarily long wait times and purposely affect reviews of Dr. Kuppinger's service.

118.   As a direct and proximate result of Defendants' misconduct, Dr. Kuppinger suffered severe emotional distress that forced Dr. Kuppinger to be taken to the emergency room and that has manifested itself in shortness of breath, chest pain, erythema, chronic fatigue, and aggravated angina, among other things.

WHEREFORE, Dr. Kuppinger requests the entry of judgment for damages against Defendants McClellan, Cutler and Robertson, and such further relief this Court deems just and proper, including punitive damages and attorney's fees.

**COUNT 5**
**VICARIOUS LIABILITY OF CORPORATION**
*(Against Corporation)*

119.   Dr. Kuppinger repeats and realleges the allegations in paragraphs 1 through 91; 111 through 113 and 115 through 118 above as if fully set forth herein.

120.   Defendants McClellan, Cutler, and Robertson are employees and directors of the Corporation.

121.   Defendants McClellan, Cutler, and Robertson engaged in intentional, reckless, and/or negligent conduct that they knew or should have known would cause emotional distress to Dr. Kuppinger.

122.   In doing so, they acted in the scope of their employment and to allegedly further the interests of the Corporation.  As a result, the Corporation is vicariously liable for the negligent and/or intentional acts of Defendants McClellan, Cutler, and Robertson .

123.   As a direct and proximate result of Defendants' misconduct, Dr. Kuppinger suffered severe emotional distress that forced Dr. Kuppinger to be taken to the emergency room and that has manifested itself in shortness of breath, chest pain, erythema, chronic fatigue, and aggravated angina, among other things.

WHEREFORE, Dr. Kuppinger requests the entry of judgment for damages against the Corporation, and such further relief this Court deems just and proper, including punitive damages and attorney's fees.

## COUNT 6
## CONVERSION
### *(By Dr. Kuppinger Against Corporation)*

124.    Dr. Kuppinger repeats and realleges the allegations in paragraphs 1 through 91 above as if fully set forth herein.

125.    As a health care practitioner, Dr. Kuppinger owns the medical records he generated as a result of examining his patients and/or administering treatment or medications to his patients.

126.    There is no agreement between Coastal and Dr. Kuppinger designating Coastal as the owner of Dr. Kuppinger's medical records.

127.    Dr. Kuppinger requested the immediate return of his medical records, but Coastal has refused.

128.    Coastal has claimed that it is the owner of the medical records and has also fabricated accusations to justify its failure to return the medical records to Dr. Kuppinger.

129.    Dr. Kuppinger is also the owner of certain medical equipment in Coastal's possession, including, but is not limited to: an RFA machine purchased by Mobile Pain Doctors; Stryker RFA Machine (including all cables) with pelican case; GE 9800 Fluoroscopy machine; Oak Works Fluoroscopy table CFPM 400; and spinal pillows.

130.    None of the aforementioned medical equipment is legally titled to Coastal, nor was it part of Dr. Kuppinger's capital contribution to Coastal.

131.    Dr. Kuppinger requested the return of his medical equipment, but Coastal has refused.

132.    As a direct and proximate result of Coastal's failure to provide Dr. Kuppinger with the records and equipment, Dr. Kuppinger has suffered damages amounting to at least $100,000.

WHEREFORE, Dr. Kuppinger requests the return of his medical records and medical equipment and entry of judgment for damages against the Corporation, and such further relief this Court deems just and proper, including punitive damages and attorney's fees.

**COUNT 7**
**DECLARATORY JUDGMENT**

133.    Plaintiffs repeat and reallege the allegations in paragraphs 1 through 91 above as if fully set forth herein.

134.    Because an actual controversy exists between Plaintiffs and Defendants as to their respective rights and obligations under the Shareholder Agreement, Plaintiffs request a declaratory judgment pursuant to 28 U.S.C. § 2201, as to the following:

a.      McClellan and Cutler transferred their shares in the Corporation to the Holding Company and therefore are no longer shareholders of the Corporation as of January 1, 2021;

b.      McClellan's and Cutler's transfer of shares to the Holding Company was done without the prior written consent of the all of the Shareholders in violation of Article V of the Shareholder Agreement;

c.      As a result of McClellan's and Cutler's transfer of shares to the Holding Company in violation of the Shareholder Agreement, the Holding Company holds 40% of the shares of the Corporation but is entitled only to receive any distributions to which the transferor Shareholder of such Shares would have been entitled but for such sale or transfer, pursuant to Article V(c);

       d.     As a result of his retirement and resignation from all positions in the Corporation, Robertson was no longer Chief Executive Officer or a director of the Corporation as of November 22, 2020;

       e.     The shareholders of the Corporation do not have authority to vote upon the removal of a director;

       f.     In order to obtain a quorum at a Board of Directors meeting, there must be a "whole number of directors equal to at least two-thirds (2/3) of the maximum authorized Board." Assuming Robertson were still a director notwithstanding his resignation (as Robertson claims), a quorum would be four (4) directors.

       g.     Under the Shareholder Agreement, a quorum of directors must be present in order for the Board to consider filling a vacancy on the Board and to appoint an officer.

       h.     The Shareholder Agreement trumps the provisions of Florida Corporation Act as provided in Fla. Stat. § 607.0732.

       i.     The Board of Directors cannot consider or vote upon any action during a meeting that was not identified in the notice of that meeting.

       j.     As a result of Dr. Kuppinger's unlawful and retaliatory removal and termination, Defendants cannot enforce the non-solicitation, non-competition, and non-disclosure provisions of the Shareholder Agreement.

       k.     Because of the Defendants' prior material breaches of the Shareholder Agreement, Defendants cannot enforce the non-solicitation, non-competition, and non-disclosure provisions of the Shareholder Agreement.

135.    A declaration is necessary and appropriate so that Plaintiffs and Defendants may ascertain their respective rights and obligations under the Shareholder Agreement.

WHEREFORE, Plaintiffs request that the Court enter declaratory judgment as requested herein and an order enjoining Defendants from taking any actions inconsistent with their rights and obligations under the Shareholder Agreement.  Plaintiffs also request that, pursuant to the Shareholder Agreement, the Court award Plaintiffs reasonable attorneys' fees.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray for judgment against Defendants as follows:

1.     For reinstatement of Dr. Kuppinger as a director and employee of the Corporation;

2.     For reinstatement of Dr. Molloy as a director of the Corporation;

3.     For damages caused by Defendants' retaliatory conduct in violation of 31 U.S.C, § 3730(h) and Fla. Stat. § 448.102, including economic and non-economic damages and attorneys' fees and costs;

4.     For compensatory and punitive damages caused by Defendants' negligent and/or intentional infliction of emotional distress, and attorneys' fees and costs;

5.     For declaratory judgment as requested herein;

6.     For an order enjoining Defendants from taking any further actions inconsistent with their rights and obligations under the Shareholder Agreement;

7.     For attorneys' fees and costs as permitted under the Shareholder Agreement; and

8.     For such further and additional relief as the Court deems appropriate under the circumstances.

## JURY TRIAL DEMANDED

Dated: April 19, 2021                                        Respectfully submitted,

                                                            *s/Jesus E. Cuza*

Florida Bar No. 428991
Email: jesus.cuza@hklaw.com
*s/ Monica Vila Castro*
Florida Bar. No. 22976
Email: monica.castro@hklaw.com
**HOLLAND & KNIGHT LLP**
701 Brickell Avenue, Suite 3300
Miami, Florida 33131

And

*s/ Philip E. Rothschild*
Florida Bar No. 0088536
Email: Phil.rothschild@hklaw.com
**HOLLAND & KNIGHT LLP**
515 East Las Olas Blvd., Suite 1200
Fort Lauderdale, FL 33301

Telephone: (954) 468-7881
Facsimile: (954) 463-2030

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

WE HEREBY CERTIFY that on April 19, 2021, a true and correct copy of the foregoing

was sent via electronic mailed to all counsel or parties of record on the Service List below.

By:    */s/ Jesus E. Cuza*
                Jesus E. Cuza

## SERVICE LIST

Michael Pike, Esq.
**Pike & Lustig, LLP**
1209 North Olive Avenue
West Palm Beach, Florida 33401
pike@pikelustig.com
Phone: 561- 855-7585
*Attorneys for Defendant JM.JZ ENTERPRISES, INC. d/b/a Coastal Health Group*

John Scarola, Esq.
**Searcy Denney Scarola Barnhart & Shipley, PA**
2139 Palm Beach Lakes Blvd.

West Palm Beach, FL 33409
jsx@searcylaw.com
Phone: 561-686-6300
*Attorneys for Michael Cutler, Dr. Jonn McClellan, and Co-counsel for Cheikh Robertson*

Peter Tappert, Esq.
**Weissman & Dervishi, P.A.**
SunTrust International Center
One Southeast Third Avenue, Suite 1700
Miami, Florida 33131
ptappert@wdpalaw.com
Phone: 305-347-4070
*Attorneys for Cheikh Robertson*