**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

CASE NO: 21-80492-CV-MIDDLEBROOKS

JORDAN KUPPINGER, M.D., *et al.*,

    Plaintiffs,

v.

JM.JZ ENTERPRISES, INC., *et al.*,

    Defendants.

_____/

## ORDER ON MOTIONS FOR SUMMARY JUDGMENT

THIS CAUSE comes before the Court upon the Parties' Cross Motions for Summary Judgment. Defendants filed a Motion for Partial Summary Judgment as to Count VII on August 27, 2021 (DE 52), and an Amended Motion for Partial Summary Judgment as to Count VII on September 8, 2021 (DE 73). Defendants also filed a Motion for Partial Summary Judgment as to Counts I, II, and VI on August 30, 2021. (DE 56). Plaintiffs responded to both Motions (DE 82; DE 90), and Defendants replied (DE 92; DE 93).

On August 30, 2021, Plaintiffs filed a Motion for Partial Summary Judgment. (DE 59). Defendants responded on September 24, 2021. (DE 87). Plaintiff replied. (DE 95). All three motions are fully briefed. For the following reasons, Defendants' Amended Motion for Partial Summary Judgment as to Count VII (DE 73) is denied; Defendants' Motion for Partial Summary Judgment as to Counts I, II, and VI (DE 56) is denied; and Plaintiffs' Motion for Partial Summary Judgment (DE 59) is denied.

**I.    BACKGROUND**

Plaintiffs filed this action on March 5, 2021, asserting five claims against Defendants under federal and Florida state law. (DE 1 at ¶¶ 14–22). On April 19, 2021, Plaintiffs filed a First

Amended Complaint, which included seven claims against Defendants. (DE 22). Defendants moved to dismiss the First Amended Complaint on May 6, 2021 (DE 24) and filed their Answer and Affirmative Defenses to the First Amended Complaint on September 3, 2021. (DE 67). In my Order on Motions to Dismiss and Strike, I dismissed three counts in the First Amended Complaint with prejudice: Count III, alleging intentional infliction of emotional distress; Count IV, alleging negligent infliction of emotional distress; and Count V, alleging that Defendant JM.JZ Enterprises is vicariously liable for the emotional distress claims against the individual Defendants. (DE 49 at 3–6).

Plaintiffs' four remaining claims fall into three categories. Counts I and II relate to two agreements entered into by Defendant JM.JZ Enterprises (the "Corporation"), one with non-party AiPro, LLC (the "AiPro Agreement") and one with non-party Movedocs.com (the "Movedocs Agreement"). (DE 55, Defendants' Statement of Material Facts, at ¶¶ 1, 7; DE 91, Plaintiffs' Statement of Material Facts, at ¶¶ 1, 7). Count VI arises from the Corporation's alleged conversion of Plaintiff Dr. Kuppinger's medical records and equipment, and Count VII concerns the rights and obligations of the Shareholders under an Amended and Restated Shareholder Agreement (the "Shareholder Agreement") governing the Corporation.

The Corporation, doing business as Coastal Health Group, provides medical and injury care at clinics in Florida. (DE 58, Plaintiffs' Statement of Material Facts, at ¶ 1; DE 88. Defendants' Statement of Material Facts, at ¶ 1). Plaintiffs are connected to the Corporation in at least three ways: (1) as physicians[1] that worked for the Corporation; (2) as shareholders of the

---

[1] Plaintiff Jordan Kuppinger, M.D. ("Dr. Kuppinger") is a board-certified anesthesiologist and Plaintiff Gerald Molloy, M.D. ("Dr. Molloy") is a board-certified neurosurgeon. (DE 58 at ¶¶ 5–6).

Corporation; and (3) as Directors and Officers of the Corporation. (DE 58 at ¶¶ 1–9). The Corporation has five total shareholders: Plaintiffs and the three individual Defendants.

On October 1, 2020, the Corporation entered into an agreement with AiPro for marketing and lead generation services. (DE 55 at ¶ 1). On October 6, 2020,[2] the Corporation entered into an Agreement with Movedocs.com ("Movedocs"), pursuant to which Movedocs would provide advanced funds to the Corporation in exchange for a portion of its account receivables. (DE 55 at ¶ 7). Plaintiffs contend, and Defendants dispute, that these two agreements are related and "part of a broader arrangement whereby in exchange for receiving patient referrals from AiPro, the Corporation agreed to sell certain accounts receivables for a considerable discount to Movedocs"—i.e., an illegal patient brokering and kickback scheme. (DE 91 at ¶ 2).

About a month later, on November 22, 2020, Defendant Cheikh Robertson sent a letter to the other four shareholders of the Corporation. The letter "serve[d] as [Robertson's] official notice of resignation or 'retirement' as Managing Partner, Chief Executive Officer and Chairman of the Board of JM.JZ Enterprises, Inc." (DE 22-3). Robertson concluded the letter by stating that "[i]t has been the utmost pride and pleasure working with you all." (*Id.*).

The Corporation terminated the employment of Plaintiffs Dr. Kuppinger and Dr. Molloy on February 28, 2021, and March 22, 2021, respectively. (DE 58-5; DE 58-7). The circumstances surrounding those decisions are set forth in more detail below. At some point prior to Plaintiffs' termination, Plaintiffs informed Defendants of their concerns about the alleged patient brokering and kickback scheme. Plaintiffs assert that they objected to the alleged patient brokering scheme

---

[2] The Parties dispute whether the Corporation entered into the Movedocs Agreement on September 6, 2020 or October 6, 2020. (*Compare* DE 55 at ¶ 7 *with* DE 91 at ¶ 7). As Plaintiffs point out, the signature block on the Movedocs Agreement is dated September 6, 2020, but Defendant indicates that this was a typo. (DE 91 at ¶ 7; DE 55 at ¶ 8).

as early as September 8, 2020. (*See* DE 9 at ¶ 55). Defendants, on the other hand, claim that Plaintiffs did not object until February 18, 2021, when they sent a letter to the Corporation through their counsel expressing "concerns that the transaction with Movedocs.com, LLC could implicate unlawful patient brokering issues." (DE 55 at ¶ 7; DE 1-4 at 3).

The conflict between the Parties came to a head four days later on February 22, 2021 when Defendants Robertson, McClellan, and Cutler noticed a special meeting of the shareholders of the Corporation and a special meeting of the Board of Directors set for February 28, 2021. (DE 58-16). The Notice provided that the matters to be discussed at the shareholders meeting were "the removal of Jordan Kuppinger with and/or without cause from the position of Director of [the Corporation] in accordance the [sic] provisions of Florida Statute Section 607.0808(1) and (4)." (*Id.*). At the special meeting for the Board of Directors, the matters to be discussed were "filling the vacancy on the Board of Directors, if any shall exist, in the event of the removal by the Shareholders of Director Kuppinger . . . and the selection of a Chief Executive Officer to fill the vacancy created by the resignation of Cheikh Robertson." (*Id.*).

Pursuant to the Notice, the three individual Defendants met for a shareholders' meeting on February 28, 2021 and voted to remove Dr. Kuppinger from the Board of Directors. (DE 58-5). The three individual Defendants then met as the Board of Directors and (1) confirmed the decision to fire Dr. Kuppinger; (2) filled the vacancy created by Dr. Kuppinger's firing; (3) filled the vacancy created by Defendant Robertson's resignation as Chairman of the Board; and (4) filled the vacancy created by Defendant Robertson's resignation as Chief Executive Officer of the Corporation. (DE 58-7). A few weeks later, on March 22, 2021, the Board of Directors once again convened, this time to vote on the removal of Dr. Molloy from the Board of Directors. (DE 58-

4

10). The three individual Defendants and Rene Webster, who was voted in to fill the vacancy left by Dr. Kuppinger at the February 28 meeting, unanimously voted to fire Dr. Molloy. (*Id.*).

Plaintiffs initiated this action on March 5, 2021, alleging that Defendants retaliated against them for opposing the alleged patient brokering and kickback scheme established by the AiPro and Movedocs Agreements, and seeking a declaratory judgment of the Parties' rights and obligations under the Shareholder Agreement. (DE 1). Now, Defendants have moved for summary judgment as to Counts I, II, VI (DE 56) and, separately, as to Count VII (DE 73). Plaintiffs have cross-moved for summary judgment as to Counts VI and VII (DE 59). Because material disputes of fact remain as to each of Plaintiffs' remaining claims, the Parties' motions for summary judgment are denied.

## II. LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is material for the purposes of summary judgment only if it 'might affect the outcome of the suit under the governing law.'" *Kerr v. McDonald's Corp.*, 427 F.3d 947, 951 (11th Cir. 2005) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "Genuine disputes are those in which the evidence is such that a reasonable jury could return a verdict for the non-movant. For factual issues to be considered genuine, they must have a real basis in the record." *Ellis v. England*, 432 F.3d 1321, 1325–26 (11th Cir. 2005) (citation omitted).

Under the summary judgment standard, the moving party "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."

5

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). In response, the non-moving party must "go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324. If the non-moving party fails to "establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial[,]" summary judgment is warranted. *Id.* at 322. The party moving for summary judgment bears the burden of establishing that there is insufficient evidence to support the non-moving party's case. *Id.* at 325. Moreover, "[t]he court must view all evidence in the light most favorable to the non-movant and must resolve all reasonable doubts about the facts in favor of the non-movant." *United of Omaha Life Ins. Co. v. Sun Life Ins. Co. of Am.*, 894 F.2d 1555, 1557–58 (11th Cir. 1990) (citation omitted).

### III. DISCUSSION

#### 1. Counts I and II

The False Claims Act prohibits "making false claims for payment to the United States." *United States ex rel. Hunt v. Cochise Consultancy, Inc.*, 887 F.3d 1081, 1086 (11th Cir. 2018). It "provides a way for individuals, and ultimately the United States itself, to bring an action to recover damages for false claims made to the federal government . . . And individuals who are fired or otherwise suffer retaliation because of their investigation of a potential False Claims Act suit can also bring retaliation suits." *Hickman v. Spirit of Athens, Alabama, Inc.*, 985 F.3d 1284, 1285 (11th Cir. 2021). The Florida Private Whistleblower Act provides that "[a]n employer may not take any retaliatory personnel action against an employee because the employee has . . . (3) Objected to, or refused to participate in, any activity, policy, or practice of the employer which is in violation of a law, rule, or regulation." § 448.102(3). Because the same analytical framework is applied to evaluate claims under the False Claims Act as under the Florida Private Whistleblower Act, I will

6

address these claims together. *See Novella v. Wal-Mart Stores, Inc.*, 226 F. App'x 901, 903 (11th Cir. 2007) (explaining that to establish a *prima facie* case for retaliation under the Florida Private Whistleblower Act, a plaintiff must show that he engaged in protected activity—i.e., that he attempted to prevent a violation of a Florida statute—and that he suffered an adverse employment action because of that activity).

To prevail on their retaliation claims under the False Claims Act and the Florida Private Whistleblower Act, Plaintiffs must show that (1) they engaged in lawful acts in furtherance of a False Claims Act action or endeavored to prevent at least one violation of the False Claims Act; and (2) as a result, they were subjected to some form of discrimination in the terms and conditions of their employment. *See United States ex rel. Sanchez v. Lymphatx, Inc.*, 596 F.3d 1300, 1304 (11th Cir. 2010).

As to the first element, "[i]f an employee's actions . . . are sufficient to support a reasonable conclusion that the employer could have feared being reported to the government for fraud or sued in a qui tam action by the employee, then the complaint states a claim for retaliatory discharge under § 3730(h)." *Id.* Defendants have moved for summary judgment on this claim, alleging that the first element is not satisfied because "Plaintiffs did not have an objectively reasonable belief that [the Corporation] submitted a false claim to the government." (DE 56 at ¶ 3). Without an objectively reasonable belief that the Corporation had submitted a false claim to the government, Defendants argue that Plaintiffs could not have been acting to prevent a potential False Claims Act violation, and the statute does not apply. (*Id.*). Defendants' argument is premised on the assumption that Plaintiffs must have known about a specific false claim actually submitted to the government in order to prevail on this claim. (*Id.* at ¶ 7). Under Plaintiffs' interpretation of the False Claims Act, it is not necessary that a claim have actually been submitted to the government

7

as long as "'there existed at least a distinct possibility' of litigation under the False Claims Act." (DE 90 at 4) (citing *Sanchez*, 695 F.3d at 1303).

Defendants' argument that a plaintiff may only bring a False Claims Act suit if a claim was actually submitted to the Government is foreclosed by binding Eleventh Circuit precedent. In *Sanchez*, the Eleventh Circuit held that it is enough to satisfy this element for Plaintiffs to show that Defendants were aware of a possibility of litigation under the False Claims Act. *Sanchez*, 695 F.3d at 1303–04. Here, as in *Sanchez*, Plaintiffs' "allegations that [they] complained about the defendants' 'unlawful actions' and warned them that they were 'incurring significant criminal and civil liability' would [be] sufficient, if proven, to support a reasonable conclusion that the defendants were aware of the possibility of litigation under the False Claims Act," enabling Plaintiffs to seek relief under the statute. *Id.* While it is true that Plaintiffs are "at a minimum, required to show that the activity they were fired over had *something* to do with the False Claims Act," a reasonable juror could conclude, viewing the facts in the light most favorable to Plaintiffs, that this standard is satisfied.

To satisfy the second prong, Plaintiffs must "show that the harm [they] suffered would not have occurred in the absence of[,] that is, but for [their] protected conduct." *Nesbitt v. Candler Cnty*, 945 F.3d 1255, 1358 (11th Cir. 2020). Defendants allege that Plaintiffs were fired because of a "litany of complaints raised by [the Corporation's] staff" against Plaintiffs, not because of any protected activity Plaintiffs engaged in. (DE 56 at ¶16). Plaintiffs argue that Defendants' proffered reasons for their termination are "factually inaccurate and mere pretext." (DE 90 at 14).

As to this prong, a material dispute of fact exists as to whether Plaintiffs were fired because they engaged in statutorily protected conduct. A reasonable factfinder could conclude, viewing the facts in the light most favorable to Plaintiffs, that Defendants' proffered reasons for Plaintiffs'

8

termination are pretextual. For one, a reasonable factfinder could conclude that the timing between the email from Plaintiffs' counsel to Defendants and the firing of Dr. Kuppinger—a mere four days between the email and Notice calling the shareholders meeting—suggests that Defendants retaliated against Dr. Kuppinger for objecting to the alleged patient brokering scheme. *See, e.g., Faircloth v. Herkel Inv. Inc.*, 514 F. App'x 848, 852 (11th Cir. 2013) (concluding that "one month . . . is not too protracted to infer causation based on temporal proximity"). Moreover, as to Plaintiff Molloy, a reasonable juror could conclude that the minutes from the March 22 shareholders' meeting, which state that one of the reasons for Dr. Molloy's termination was "the legal action against the Corporation and other Shareholders" supports Plaintiffs' claim for retaliation. (DE 90 at 14). Because a reasonable factfinder could conclude that Defendants retaliated against Plaintiffs for engaging in activity protected by the False Claims Act and the Florida Private Whistleblower Act, Defendants' Motion for Summary Judgment as to Counts I and II is denied.

    **2. Count VI**

Both Plaintiffs and Defendants have moved for summary judgment as to Count VI, Plaintiff Dr. Kuppinger's claim for conversion of his medical records and equipment. "Conversion occurs when a person who has a right to possession of property demands its return and the demand is not or cannot be met." *Pain Care First of Orlando, LLC v. Edwards*, 84 So.3d 351, 354 (Fla. 4th DCA 2012). Dr. Kuppinger argues that under Florida Statute § 456.057, he is the owner of his patients' medical records. (DE 59 at 18). Section 456.057(1) provides that the "records owner" is (1) "any health care practitioner who generates a medical record after making a physical or mental examination of, or administering treatment or dispensing legend drugs to, any person" or (2) "any health care practitioner's employer . . . provided the employment contract or agreement between the employer and the health care practitioner designates the employer as the records owner." Fla.

Stat. § 456.057(1). Because Dr. Kuppinger's employment contract did not designate his employer as the records holder, Dr. Kuppinger argues that the medical records belong to him. (DE 59 at 18). Dr. Kuppinger asserts that he "has requested on several occasions, including as early as March 10, 2021, that the Corporation return his medical records to him" and that "the Corporation has . . . failed to do so," constituting an illegal conversion of his property. (DE 59 at 18).

At this stage in the litigation,[3] the Corporation does not contest that Dr. Kuppinger is the owner of his medical records. (*See* DE 88 at ¶ 48). They do dispute his assertion that the Corporation has refused to return his medical records to him. (DE 88 at ¶ 47). Defendants argue that the Corporation "has attempted to work with [Dr.] Kuppinger" to return his medical records, and that the reason that it has been difficult to do so is because he failed to sign any of them. (*Id.* at ¶¶ 46–47). Defendants allege that they have offered Dr. Kuppinger three ways to obtain his medical records: "(i) [Dr.] Kuppinger could come to the [Corporation] office to access Practice Fusion and obtain his medical notes; (ii) [Dr.] Kuppinger could provide the names of the patients whose records he needs and the practice would provide same; or (iii) an independent and neutral third-party could access Practice Fusion and obtain [Dr.] Kuppinger's medical records." (*Id.* at ¶ 47). Dr. Kuppinger classifies these as impermissible "conditions" on the return of his medical records that the Corporation has no right to impose. (DE 59 at 18).

"[T]he essence of conversion is not the possession of property by the wrongdoer, but rather such possession in conjunction with a present intent on the part of the wrongdoer to deprive the person entitled to possession of the property." *Senfeld v. Bank of Nova Scotia Trust Co. (Cayman) Ltd.*, 450 So.2d 1157, 1161 (Fla. 3rd DCA 1984). Here, whether the Corporation intended to

---

[3] Dr. Kuppinger maintains that, earlier in this proceeding, the Corporation asserted that it was the owner of the medical records. (DE 59 at ¶ 48). Because the Corporation is not presently making that argument, I do not consider it here.

deprive Dr. Kuppinger of his medical records by requesting that he either come obtain them himself, provide a list of his patients, or have a neutral third party collect the records is a disputed question of material fact. The Corporation asserts that its offers to facilitate the return of Dr. Kuppinger's medical records show an intent not to deprive him of his property, while Dr. Kuppinger asserts that the imposition of "conditions" on the return of his property reveals the opposite intent. (DE 56 at ¶ 30; DE 59 at 18). Because resolving this dispute requires weighing Defendants' intent and making credibility determinations, this claim cannot be resolved on summary judgment. *See Williams v. Obstfeld*, 314 F.3d 1270, 1277 ("In general, the existence of knowledge or intent is a question of fact for the factfinder, to be determined after trial"); *see also* State *v. Norris*, 384 So.2d 298, 299 (Fla. 4th DCA 1980) ("[I]ntent is usually a question of fact to be determined by the trier of fact."). As such, Plaintiffs' and Defendants' cross-motions for summary judgment as to this claim are both denied.

     Dr. Kuppinger's claim for the conversion of his medical equipment fails for the same reason. Dr. Kuppinger contends that he "purchased certain medical equipment with his personal funds that was then used by the Corporation to treat its patients," that he "requested return of the equipment when he was terminated," and that "the Corporation failed to return the equipment." (DE 90 at 20). The Corporation argues that it is not in possession of any medical equipment belonging to Dr. Kuppinger because the medical equipment at the heart of this claim "was located in an office in Boca Raton, Florida to [sic] which only [Dr.] Kuppinger, and not [the Corporation], ha[d] access to after [Dr.] Kuppinger was terminated." (DE 56 at 19). The Parties thus dispute, as a factual matter, (1) whether the Corporation possesses Dr. Kuppinger's medical equipment based on its location in Boca Raton; and (2) if it does, whether the Corporation intended to deprive Dr.

Kuppinger of the ownership of his medical equipment. These factual disputes are not appropriate for resolution at the summary judgment stage.

### 3. Count VII

#### a. *Plaintiffs' Motion for Partial Summary Judgment*

In Plaintiffs' Motion for Partial Summary Judgment, as to Count VII, Plaintiffs seek a declaration of four facts under the Shareholder Agreement: First, that Defendant Cheikh Robertson is no longer on the Board of Directors of the Corporation as a result of his retirement and resignation ("Declaration One"). (DE 59 at 1). Second, that Dr. Kuppinger's termination from the Board of Directors by the shareholders was unauthorized and is therefore invalid ("Declaration Two"). (*Id.*). Third, that all attempted acts taken by the Board at and after the February 28, 2021 special meeting of the Board of Directors were unauthorized and are therefore invalid ("Declaration Three"). (*Id.* at 1–2). And, fourth, that Defendants have breached the Shareholder Agreement ("Declaration Four"). (*Id.* at 2).

At the heart of Declaration One is a letter Robertson sent the shareholders of the Corporation on November 22, 2020. By its terms, the letter "serve[d] as [Robertson's] official notice of resignation or 'retirement' as Managing Partner, Chief Executive Officer and Chairman of the Board of JM.JZ Enterprises, Inc." (DE 22-3). Robertson concluded the letter by stating that "[i]t has been the utmost pride and pleasure working with you all." (*Id.*). According to Plaintiffs, by this letter Robinson resigned from all of the positions he held in the Corporation. (DE 59 at 4). According to Defendants, by this letter Robertson only resigned as Managing Partner, Chief Executive Officer, and Chairman of the Board and remained in the Corporation as a director. (DE 87 at 2). The Shareholder Agreement provides that "A director may resign by written notice to the Corporation. The resignation is effective upon its receipt by the Corporation, or a subsequent time

as set forth in the notice of resignation." (DE 22-1 at 7). It is undisputed that the Corporation received Robertson's letter on November 30, 2020, but Defendants contend that the Shareholder Agreement does not govern Robertson's resignation because it controls the resignation of directors and he did not resign as a director. (DE 88 at ¶ 22).

Both Parties assert that the plain language of the Shareholder Agreement supports their position. Plaintiffs argue that Robertson was never an independent director on the Board because the Shareholder Agreement provides that "[i]nitially there will be four (4) Directors," not five. (DE 95 at 1; DE 22-1 at 5). Plaintiffs contend that because Robertson was only Chairman of the Board and not an independent fifth director, his retirement letter severed his ties to the Corporation entirely. (*Id.*). Defendants interpret the Shareholder Agreement differently. They argue that Robertson was *both* Chairman of the Corporation *and* an independent director. (DE 87 at 1). They cite to Exhibit C of the Shareholder Agreement, which lists the Board of Directors as:

| | |
|---|---|
| Cheikh Robertson | Chairman, Director |
| Jordan Kuppinger | Director |
| Jonn A. McClellan | Director |
| Michael Cutler | Director |
| Gerald Mulloy | Director |

(DE 22-1 at 29). Defendants also point out that the roles of director and Chairman are distinct in the Shareholder Agreement, with directors serving fifteen-year terms and the Chairman serving a two-year term. (DE 87 at 3).

Identifying the number of directors provided for in the Shareholder Corporation is a question of contract interpretation to be decided as a matter of law. *See Faez v. Wells Fargo Bank, N.A.*, 745 F.3d 1098, 1104 (11th Cir. 2014) ("Traditional contract-interpretation principles make contract interpretation a question of law, decided by reading the words of a contract in the context of the entire contract and construing the contract to effectuate the parties' intent."). Under Florida law, "[w]hen examining a contract, the court

shall consider the plain language of the contract without giving it additional meaning." *Damio v. Marine Hospitality Corp.*, 187 So.3d 890, 891 (Fla. 4th DCA 2016). The plain language of the Shareholder Agreement clearly and unambiguously lists Cheikh Robertson as a director of the Corporation. (DE 22-1 at 29). As such, I conclude that Robertson's role on the Board was both Chairman and director.

While I agree with Defendants that Robertson served as a director of the Board as a matter of law, summary judgment in their favor is not appropriate as to Declaration One. Viewing the facts in the light most favorable to Plaintiffs, a reasonable juror could conclude that Robertson intended to resign from all of his roles with the Corporation by his November 22, 2020 letter. For one, Robertson's conclusion to the letter—that "[i]t has been the utmost pride and pleasure" to work with the other directors and shareholders—lends credence to Plaintiffs' view. (DE 22-3). Robertson's intent when he sent the letter is a disputed question of fact for resolution by the factfinder at trial. *Norris*, 384 So.2d at 299 ("[I]ntent is usually a question of fact to be determined by the trier of fact.").

The remaining Declarations sought by Plaintiffs are similarly riddled with factual disputes that preclude the entry of summary judgment. While contract interpretation is a question of law generally appropriate for resolution at the summary judgment stage, *see Faez*, 745 F.3d at 1104, if a contract is ambiguous, the contract's interpretation becomes a question of fact, precluding summary judgment. *Smith v. Shelton*, 970 So.2d 450, 451 (Fla. 4th DCA 2007). "Whether a document is ambiguous depends on whether it is reasonably susceptible to more than one interpretation . . . true ambiguity does not exist merely because a document can possibly be interpreted in more than one manner." *Id.*

Here, the Shareholder Agreement is ambiguous as to, and the Parties dispute, (1) how directors may be removed from the Board, as pertinent to Declaration Two; and (2) the number of directors required to constitute a quorum for the purpose of removing a director from the Board, as pertinent to Declaration Three. (DE 88 at ¶¶ 12, 14).

Beginning with Declaration Two, the Shareholder Agreement provides that "[a]ny Director may be removed, with or without cause, by the affirmative Super Majority Vote of the Board." (DE 22-1 at 6). According to Plaintiffs, this is the only way to remove a Director from the Board. (DE 59 at 6). According to Defendants, the other avenues for removal set forth under Florida Statute § 607.0808 remain available. (DE 87 at 5). Florida Statute § 607.0808(1) states that "[t]he shareholders may remove one or more directors with or without cause," and Florida Statute § 607.0808(4) further states that a "director may be removed by the shareholders . . . at a meeting of the shareholders called for the purpose of removing the director." Fla. Stat. § 607.0808. As to how these provisions interact with agreements made by private parties, Florida Statute § 607.0732 provides that "[a]n agreement among the shareholders of a corporation . . . is effective among the shareholders of a corporation, even though it is inconsistent with one or more other provisions of this chapter, if it . . . (c) Establishes who shall be directors or officers of the corporation, or their terms of office or manner of selection or removal." Fla. Stat. § 607.0732.

In support of their interpretation of the removal provision of the Shareholder Agreement, Defendants emphasize the use of the word "may." (DE 87 at 6). Defendants argue that "[t]he use of the permissive 'may' rather than a mandatory term such as "shall" or "must" means that Article III(g) provides one way that a Director can be removed (by a

15

Super Majority vote of the Board of Directors), but it does not provide the exclusive way that a Director can be removed." (*Id.*). Plaintiffs argue that, rather than suggesting that the manner of removal is discretionary, the "may" indicates that the removal of a director itself is discretionary, but that the manner is not. (DE 95 at 2). Plaintiffs further support their position by pointing to several other places in the Shareholder Agreement that explicitly incorporate other applicable law. (*Id.*; *see, e.g.,* DE 58-3 at 6 (allowing shareholder action to be taken without a meeting "unless otherwise provided . . . by law.")). I find that both Parties' interpretations of the removal provision of the Shareholder Agreement are reasonable, and as a result the Shareholder Agreement is ambiguous. Thus, summary judgment is not appropriate as to Declaration Two.

  As to Declaration Three, the Shareholder Agreement defines a quorum as a "whole number of directors equal to at least two-thirds (2/3) of the maximum authorized Board." (DE 22-1 at 6). Plaintiffs assert that, under this provision, a quorum is four directors because the maximum authorized Board is five directors, and two-thirds of five rounded to the next whole number is four. (DE 59 at 8). Defendants contend that, while for normal circumstances a quorum is four directors, because a director cannot vote on his own removal, he is not included as part of the "maximum authorized Board" for purposes of determining a quorum. (DE 87 at 9). As such, Defendants argue, quorum for purposes of removing a director is only three directors because the "maximum authorized Board" is four directors. (*Id.*). I find that neither interpretation is clearly correct under the plain language of the Shareholder Agreement, and, accordingly, the Agreement is ambiguous. Because the Shareholder Agreement is ambiguous, summary judgment is not appropriate as to Declaration Three.

In Declaration Four, Plaintiffs seek, *inter alia*, a declaration that Defendants breached the Shareholder Agreement because of the actions described in Declarations Two and Three (e.g., "[b]y acting in their capacity as shareholders to attempt to remove Dr. Kuppinger from the Board" and "[b]y attempting to act as a Board without a quorum"). (DE 59 at 14). As described above, the Shareholder Agreement is ambiguous in several material respects, and the Parties dispute how I should interpret those ambiguities. Because summary judgment is not appropriate as to Declarations Two or Three, it is not appropriate as to Declaration Four, which necessarily hinges on the resolution of the factual disputes described above.

### b. *Defendants' Amended Motion for Partial Summary Judgment as to Count VII*

Finally, in Defendants' Amended Motion for Partial Summary Judgment as to Count VII, Defendants move for summary judgment in their favor on Plaintiffs' claim that Defendants transferred their shares in the Corporation and are no longer shareholders. (DE 73 at 2). Defendants allege that "[t]ransfer documents executed by [Defendants] were executed in reliance on the agreement of Plaintiffs to transfer their shares pursuant to a corporate restructuring plan and the transfers contemplated were to become effective only upon unanimous shareholder participation in the transfers." (*Id.*). Plaintiffs argue that "it is undisputed that [Defendants] each signed a 'Contribution Agreement'" and that the Contribution Agreement provided that each Defendant "has the full power, legal right, and authority to enter into, executive [sic], delivery and perform" the Agreement," making Defendants bound by their signatures. (DE 82 at 5).

Viewing the facts in the light most favorable to Plaintiffs, a genuine dispute of fact remains as to whether the Parties intended that the transfer of shares be contingent on

transfer by all five shareholders. (*Compare* DE 54 at ¶¶ 1–5 *with* DE 83 at ¶¶ 1–5). Under Florida law, "intent is a question of fact that should not be decided on a summary judgment [motion]." *Sanders v. Wausau Underwriters Insurance Company*, 392 So.2d 343, 345 (Fla. 5th DCA 1981). Because a reasonable factfinder could conclude that Defendants intended to be bound by the Contribution Agreements they signed "notwithstanding the absence of other signatures," Defendants' Amended Motion for Partial Summary Judgment as to Count VII is denied. (DE 82 at 6).

## IV. CONCLUSION

Accordingly, it is **ORDERED AND ADJUDGED** that

(1) Defendants' Motion for Partial Summary Judgment as to Counts I, II, and VI (DE 56) is **DENIED**.

(2) Defendants' Amended Motion for Partial Summary Judgment as to Count VII (DE 73) is **DENIED**.

(3) Plaintiffs' Partial Motion for Summary Judgment (DE 59) is **DENIED**.

**SIGNED** in Chambers at West Palm Beach, Florida, this 18th day of October, 2021.

Donald M. Middlebrooks
United States District Judge

cc:   Counsel of Record