```
                  UNITED STATES DISTRICT COURT
                 SOUTHERN DISTRICT OF FLORIDA
                      FORT PIERCE DIVISION
                 CASE NO. 21-80492-CIV-REINHART

JORDAN KUPPINGER M.D.
and GERALD MOLLOY, M.D.,

              Plaintiffs,           WEST PALM BEACH, FLORIDA

         vs.                           NOVEMBER 19, 2021

JM.JZ Enterprises d/d/a
COASTAL HEALTH GROUP,
                                         PAGES 1 - 108

              Defendants.
_____/


               TRANSCRIPT OF EVIDENTIARY HEARING
             BEFORE THE HONORABLE BRUCE REINHART
                UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

FOR THE PLAINTIFFS:      PHILLIP ROTHSCHILD, ESQ.
                         JESUS CUZA, ESQ.
                         Holland & Knight
                         515 East Las Olas Blvd.
                         Suite 1200
                         Fort Lauderdale, FL  33301


FOR THE DEFENDANTS:      JACK SCAROLA, ESQ.
                         Searcy Denney, et al
                         2139 Palm Beach Lakes Blvd.
                         West Palm Beach, FL  33409

                         ANDREW BOLOY, ESQ.
                         MICHAEL PIKE
                         Boloy & Lustig
                         1209 North Olive Avenue
                         West Palm Beach, FL  33401



REPORTED BY:             DIANE M. MILLER, RMR, CRR, CRC
                         Official Court Reporter
                         United States District Court
                         (772)467-2337
                         diane_miller@flsd.uscourts.gov
```

1                    P-R-O-C-E-E-D-I-N-G-S

2          THE COURT:  Good afternoon, everybody.  Have a seat,

3     please.

4          MR. SCAROLA:  Good afternoon, Your Honor.

5          THE COURT:  Okay.  We are here on case number

6     21-80492, Jordan Kuppinger and Gerald Molloy versus JM.JZ

7     Enterprises, et al.

8          Let's start with appearances, please.  Let's start

9     with counsel for the plaintiffs.

10         MR. ROTHSCHILD:  Good afternoon, Your Honor.  Phil

11    Rothschild from Holland & Knight, along with Jesus Cuza from

12    Holland & Knight.

13         MR. CUZA:  Good afternoon, Your Honor.

14         THE COURT:  Good afternoon.  And as far as I'm

15    concerned, you can all take your masks off, whatever you are

16    comfortable doing.

17         For the Defense?

18         MR. SCAROLA:  Thank you, Your Honor.  Jack Scarola --

19         THE COURT:  Good afternoon.

20         MR. SCAROLA:  -- and Andrew Boloy, and Michael Pike.

21    Messrs. Boloy and Pike and I share responsibility for the

22    representation of the entity that is JM.JZ Enterprises,

23    referred to as Coastal Health.

24         Here as corporate representative of Coastal is

25    Mr. Webster, and as an individual defendant, Dr. John

1  McClellan.

2          THE COURT:  Good afternoon, all of you.

3          MR. SCAROLA:  Just one further clarification, Your

4  Honor, and that is that while we share responsibility for the

5  representation of JM.JZ, I am counsel for the individual

6  interests of the individually named Defendants.

7          THE COURT:  I recall that from the mediation.  Thank

8  you, Mr. Scarola, for clarifying that.

9          Okay.  So we are here today on the plaintiffs' motion

10 to enforce the settlement agreement.  I have reviewed all of

11 the filings at docket entry 125, 131, 132.  Maybe I have some

12 other numbers missing, but I have reviewed all of the

13 pleadings, trust me.

14         So let me start with this:  Turning to Mr. Rothschild

15 and Mr. Cuza, any additional evidence you want to offer?  I

16 have reviewed all of the exhibits attached to both sets of

17 pleadings, some draft settlement agreements, some emails,

18 things of that nature.

19         Is there any other evidence the plaintiffs would like

20 to offer?

21         MR. ROTHSCHILD:  No, Your Honor.  I just want to make

22 sure we did file the reply.

23         THE COURT:  Yes.  I don't recall the number, but I

24 did review the reply.

25         MR. ROTHSCHILD:  I think it is 133.

1          THE COURT:  Yes, here it is.  It is in my stack of

2  paper, I did review it.

3          Anything from the defendant you would like to offer?

4          MR. SCAROLA:  Your Honor, it is our position that the

5  burden of proof in this matter rests upon the plaintiff, and we

6  will wait to determine whether we want to present any evidence

7  based upon what is offered by the plaintiff in support of the

8  motion.

9          THE COURT:  All right.  Well, they just rested, so do

10  you want to offer any evidence or not?

11          MR. SCAROLA:  If they are resting and relying solely

12  upon argument, Your Honor, then we do not have any evidence to

13  present at this point in time.

14          THE COURT:  To be clear, just so the record is

15  100 percent clear, I'm taking judicial notice of all of the

16  attachments that both sides attached to their -- so the emails

17  that went back and forth, the draft agreements that went back

18  and forth, I'm accepting that in the record.  To me, that's the

19  evidentiary record, so when I say is there any other evidence,

20  that's what I mean.

21          MR. SCAROLA:  Your Honor, we also submitted

22  affidavits as part of our response, and I assume that Your

23  Honor is accepting those as well, is that correct?

24          THE COURT:  Is there any objection to the Court

25  considering the affidavits?

1          MR. ROTHSCHILD:  No, Your Honor.

2          THE COURT:  Yes, I'm accepting those.  Then I will

3     state that we don't have any further evidence, wonderful.

4          Okay, let me turn to argument.

5          Let me turn to the plaintiffs.  I received your -- I

6     guess before -- what I would like to do is kind of focus on it

7     this way:  It would be helpful for me to understand what we

8     agree that we have agreed on and what we agree we haven't

9     agreed on because there may be terms that -- I think there is

10    consensus among the parties that certain terms that have been

11    proposed by each side were not accepted by the other side, but

12    the plaintiffs' position is despite that, there is an

13    enforceable settlement agreement and I believe the defendants'

14    position is as a matter of law, there is not.

15         It would help me in sorting it out to just understand

16    what are the terms that we agree we have agreed on and what are

17    the terms that we agree we haven't agreed on.

18         I know, Mr. Rothschild, in your reply, you were kind

19    enough to provide me with a chart, as well as when the

20    defendants' responded, they, on page six and seven of docket

21    entry 131, in nice bold lettering, laid out the ones that they

22    thought had not been agreed to.

23         Let me just start with the plaintiffs, and you can

24    use either one of those platforms or compare them for me, what

25    are we still agreeing to disagree about?

1              And you can stay seated, counsel, if that's easier

2    for you, just speak into the microphone so the court system can

3    pick up your voice.

4              MR. CUZA:  Can we make sure the mics are on?

5              THE COURT:  Mr. Cuza, just lean a little closer and

6    see if we pick up your voice.

7              MR. CUZA:  No.

8              THE COURT:  Okay.

9              MR. CUZA:  Thank you, Your Honor.

10             THE COURT:  Now we can hear you.

11             MR. CUZA:  Your Honor, if we go to the chart that we

12   submitted with the reply, we can go one by one.

13             THE COURT:  Just for the record, we are on docket

14   entry 133, pages seven through nine.  Let me make sure defense

15   counsel is looking at the same document that we are all looking

16   at.

17             At this point, I'm not asking you to advocate whether

18   these are material terms or how they affect, I just want to get

19   a baseline to work from.  Please go ahead.

20             MR. CUZA:  Your Honor, the first item, 2.1 million,

21   to Kuppinger, that's agreed to.

22             The second item, the $400,000 payable immediately

23   upon closing, that's agreed to.

24             The third item, $50,000 payable monthly immediately

25   after signing, that's agreeable, that's agreed to.

1          The fourth item, which is the balance of the 2.1

2    payable within six months of closing and transferring the

3    shares, that's agreed to.

4          The fifth item, 100 percent of the company shares

5    will be used as collateral, we believe it is agreed to.

6          Your Honor, if you look -- and I'm not going to do

7    argument, I'm just going to tell the Court why we believe it is

8    agreed to.

9          THE COURT:  Actually, don't even go that far.  Let me

10   ask Mr. Scarola and Mr. Pike.

11         I believe you do not agree that that term is agreed

12   to, am I correct, Mr. Scarola?

13         MR. SCAROLA:  You are correct.

14         THE COURT:  So there is a disagreement as to whether

15   there is agreement there.  We will come back to argument on all

16   of this, I just want to get the ground rules.

17         Let me stop for a second.

18         Mr. Scarola, Mr. Pike, at least as to the first four

19   items that Mr. Cuza says there is agreement on, do you agree

20   that those terms were mutually agreed to?

21         MR. SCAROLA:  Your Honor, I think it is very

22   important that the Court understand that it is our position

23   that nothing was agreed to until everything was agreed to,

24   reduced to writing and executed.

25         THE COURT:  Okay.

 1           MR. SCAROLA:  That's -- I think it's an essential

 2   qualification that I preface my comments with.

 3           THE COURT:  I appreciate that.  Let me phrase it

 4   differently.

 5           Were those terms still being negotiated when the

 6   negotiations broke down or had the parties contingently agreed

 7   to those terms, subject to other agreement?

 8           MR. SCAROLA:  There was a contingent agreement, Your

 9   Honor, except that there is an ambiguity with regard to how

10   those payments were to be applied; that is, was it going to be

11   Kuppinger's compensation, was it going to be Molloy's

12   compensation, was it going to be compensation to both of them.

13           THE COURT:  So you dispute some ambiguity as to those

14   four.

15           MR. SCAROLA:  Yes, sir, that is correct.

16           THE COURT:  Okay.  Back to plaintiffs' counsel.

17           MR. CUZA:  Your Honor, the next point, which would be

18   number six, where the individual defendants are also

19   responsible for payment in addition to Coastal, we believe it

20   had been agreed to and defendants are disputing that.

21           THE COURT:  Okay.  Next one.

22           MR. CUZA:  The next item, which we are going to

23   identify as number seven, Your Honor, Kuppinger cannot compete

24   with Coastal for two years with the exception of Zativa Life,

25   that, Your Honor, has been agreed to.

```
 1            THE COURT:  Mr. Scarola, Mr. Pike, do you agree that
 2     there was a contingent agreement, to use your term, as to the
 3     two year provision regarding Zativa?
 4            MR. SCAROLA:  There was a contingent and tentative
 5     agreement subject to a review of the specific language as the
 6     plaintiffs' themselves expressly stated in the last exchange
 7     with regard to that topic.  So they said they needed to see the
 8     language.
 9            THE COURT:  So there was an agreement -- from your
10     perspective, there is a contingent agreement in principle
11     subject to nailing down the language, is that a fair way to put
12     it?
13            MR. SCAROLA:  I think that's a fair way to put it,
14     Your Honor.
15            THE COURT:  Understood.  Back to plaintiff.
16            MR. CUZA:  So, Your Honor, the next points have to do
17     with Molloy, the 2.1 million to be paid to Molloy as a starting
18     point, that was agreed to.
19            THE COURT:  Okay.
20            MR. CUZA:  The $400,000 to be paid at closing, this
21     is the same $400,000 that applies to Kuppinger.  It's -- the
22     agreement was for Kuppinger and Molloy to decide how they were
23     going to split the $400,000.
24            The next item is $50,000 to be paid monthly.  Once
25     again, agreed to, this $50,000 and to be divided by Kuppinger
```

1    and Molloy as they agree amongst themselves.

2            The balance of the 2.1 million, Your Honor, after a

3    reduction, if any, the Court concludes applies as a result of

4    the evidentiary hearing that's scheduled for December 16th and

5    December 17th, the remaining amounts are to be paid within six

6    months of the transfer of shares, that was agreed to as well.

7            The reduction of the 2.1 is what we are going to try

8    before the Court on December 16th, and 17th.  The reduction,

9    based on what has been agreed to in writing, Your Honor, is

10   capped at 1.355.

11           I understand that they disagree with that, Your

12   Honor.  Again, it is in writing, so I just want to make sure

13   that I am answering Your Honor's questions.

14           THE COURT:  Okay.  Your position is it is agreed on,

15   right?

16           MR. CUZA:  Yes, Your Honor.

17           THE COURT:  Understood.  And the last one, the

18   validity of the noncomplete, is going to be arbitrated.  My

19   recollection is that was correct, that was, in fact, what I

20   agreed to arbitrate.

21           MR. CUZA:  That's correct, Your Honor, again

22   scheduled for December 16 and 17.

23           THE COURT:  Let me pause there for a second and

24   circle back to defense counsel.

25           As to the first couple of provisions, counsel,

```
 1    relating to the payments, you had said earlier there was

 2    some -- it had not yet been fully resolved how that money would

 3    be allocated as between Dr. Kuppinger and Dr. Molloy.  Do you

 4    agree with plaintiffs' counsel that the agreement was you would

 5    make a payment to them and it was between them how they divvy

 6    the money up?

 7              MR. SCAROLA:  At one point during the negotiations,

 8    Your Honor, that was the discussion and an agreement with

 9    regard to that isolated term, assuming other terms were agreed

10    upon.

11              THE COURT:  Okay.  Same for both doctors, right?

12              MR. SCAROLA:  Yes, Your Honor, that's correct.

13              THE COURT:  So items I guess one through four on both

14    sides of the chart, it is the same position, am I correct?

15              MR. SCAROLA:  Yes, Your Honor.  However, it needs to

16    be understood that obviously, the division between Kuppinger

17    and Molloy was dependent upon a determination as to how much

18    was payable to Molloy, if anything.

19              So, for example, Kuppinger can't decide to give

20    everything to Molloy and frustrate our position that Molloy is

21    owed less than what Kuppinger allocates to Molloy.  So that --

22              THE COURT:  Why, why do you care?  Why is it material

23    to you what happens to the money once you pay it, as long as

24    you get to reduce the settlement amount by the amount that you

25    paid?
```

1          MR. SCAROLA:  That is the point, sir.  If they come

2     to an agreement, for example, that $400,000 is to be allocated

3     to Molloy, and as it turns out Molloy is not owed $400,000,

4     then we still have an indebtedness to Kuppinger that is not

5     reduced by $400,000 and we have paid $400,000 more to Molloy

6     than what Molloy is owed.

7          THE COURT:  Maybe I'm misunderstanding how this

8     works.  My thought was the way the settlement would be is you

9     owe 2.1 million to Kuppinger, plus something maybe to Molloy,

10    somewhere between zero and 2.1.

11         MR. SCAROLA:  Yes, sir.

12         THE COURT:  You make a payment at the time of

13    settlement and you pay $400,000.

14         MR. SCAROLA:  Yes, sir.

15         THE COURT:  What do you care who gets it?  Why is

16    that material to your client as long as now all you know is you

17    owe 1.7, plus somewhere between zero and 2.1?

18         As long as you haven't paid more than 2.1 million,

19    why is it material to you who got the money?

20         MR. SCAROLA:  I don't want Kuppinger coming back and

21    saying, You gave me the ability to allocate that $400,000, it

22    was allocated to Molloy, I received nothing, you still owe me

23    2.1.

24         THE COURT:  Okay, I understand your concern.  I don't

25    see how -- I'll leave it at that, I understand your concern.

1          Let's continue on.  I understand your position, and I
2    think this was the position during the mediation, is if they
3    want to arbitrate the amount owed on the indebtedness, you may
4    want to argue and you want to reserve the right to argue that
5    he is owed zero.

6          MR. SCAROLA:  Yes, sir.

7          THE COURT:  And they want to cap it at 1.3 million, I
8    understand that had been unresolved when I left you all on the
9    day of the mediation, I'm familiar with that issue.

10          MR. SCAROLA:  Your Honor, may I express a concern,
11    and it may be hyper technical, but I want to be sure that we
12    are not running afoul of any restrictions with regard to the
13    use of information exchanged in the course of mediation.

14          THE COURT:  Yes, go ahead.

15          MR. SCAROLA:  And I understand that we are in a
16    rather unique position because we are arguing matters that were
17    the subject of communications that occurred during the course
18    of mediation, but the local rules, rule 16 point --

19          THE COURT:  1G2.

20          MR. SCAROLA:  1G2, thank you very much, sir.

21          THE COURT:  Which relates to non-court mediation, but
22    go ahead.

23          MR. SCAROLA:  If that's what Your Honor's
24    understanding of the local rule is, then obviously my argument
25    doesn't make any difference.

```
 1            THE COURT:  Well, I looked at the rule.  It seems to

 2    relate to court and next mediation.  It doesn't talk about --

 3    and maybe that's an oversight, but by its four corners, it

 4    doesn't seem to me to say anything about mediation with the

 5    court and maybe that doesn't matter at the end of the day.

 6            MR. SCAROLA:  It may not, but I want to make sure

 7    that our position is that the rule would restrict the use of

 8    any communications that occurred during the course of

 9    mediation.  The only thing that is admissible with respect to

10    mediation is a written settlement agreement if one occurs.

11            THE COURT:  Okay, I understand.

12            MR. SCAROLA:  I don't want to, by virtue of my

13    silence, to waive our position in that regard.

14            THE COURT:  And you put it in writing, and I'm

15    familiar with it.  Obviously I looked at the rule because I

16    read your pleadings.

17            So Mr. Cuza, do you want to respond to that?  I'll be

18    happy to hear from you.

19            MR. ROTHSCHILD:  Excuse me, Your Honor, Phil

20    Rothschild.

21            THE COURT:  Yes.

22            MR. ROTHSCHILD:  Your Honor, on the Thursday of that

23    week, both sides signed a consent to magistrate jurisdiction,

24    so I'm not sure if there is some objection coming, just in case

25    that's where this argument was going.
```

```
 1          THE COURT:  The argument, as I understand it, is

 2    this:  That I should not be considering as a quantum of

 3    evidence anything that was said during the mediation.

 4          I think that is the argument the other side is

 5    making, and I don't know that ultimately that matters, because

 6    what matters more, I think, is what was said after the

 7    mediation, not during the mediation.  Do you have a position on

 8    that, counsel?

 9          MR. CUZA:  Your Honor, we agree that what is relevant

10    and what we are relying on were the representations to Judge

11    Middlebrooks and the representations to Your Honor after we had

12    the conference call with Judge Middlebrooks.

13          THE COURT:  Okay.  I guess it's this, folks:  I can

14    unring that bell if I have to, but does anybody object to the

15    fact that I'm aware that when we concluded our session, there

16    were still issues being discussed by the parties?

17          I think my parting phrases to you was something like,

18    You have a date with Judge Middlebrooks tomorrow at noon, I

19    suggest you resolve these issues by then.

20          Is anyone taking the position we had a completed,

21    final settlement agreement when we all parted ways on

22    October 19th?

23          MR. CUZA:  No, Your Honor.

24          MR. SCAROLA:  Nor are we, sir, I think it was very

25    clear that was not the case.
```

1          THE COURT:  Beyond that, to the extent it informs my

2   understanding of some of the issues that were in dispute, I

3   hope it is okay with you that I just remember the context.

4          But to the extent -- and I think this is what that

5   rule is directed to and also what some other evidence rules are

6   directed to, I don't think either party made any factual

7   concessions that I will hold -- A, I don't know that you made

8   any factual concessions at all; but B, to the extent you did, I

9   will not consider those.

10          MR. SCAROLA:  I will also comment, Your Honor, that

11  my recollection of what occurred before Your Honor is in exact

12  accord with what Your Honor stated occurred before Your Honor,

13  so there is no dispute in that regard.

14          THE COURT:  But everybody has preserved their

15  positions on that.  I'm telling you right now, I'm aware of it,

16  but I really don't think -- other than, again, it

17  contextualizes what comes afterwards for me.  Because I just

18  happened to have been there, I'm not going to hold against

19  anybody anything that was said at the mediation, all right, so

20  we have clarified that.

21          Let me go back to working through this list.  So I

22  think I have now at least addressed all of the issues that the

23  plaintiffs believe been have agreed to and I have now an

24  understanding from the defense which ones there was, in their

25  view, a contingent agreement upon and which ones there were

```
 1   not.
 2            MR. CUZA:  Your Honor, all the way to the end of
 3   Molloy, then there are additional nonessential terms.
 4            THE COURT:  Right, and we are going to get to those
 5   now.  But I'm assuming, as to those, it is the position of the
 6   parties that obviously, they are not -- these are the
 7   nonessential terms that are not yet resolved.
 8            MR. CUZA:  Your Honor, some of them, the
 9   documentation supports that they have been resolved.
10   Defendants might have an issue with that.
11            THE COURT:  Then why don't you walk me through them,
12   counsel.
13            MR. CUZA:  Okay.  So Your Honor, the next point,
14   which I'm just going to refer to it as .4-14, is whether any
15   assignment, sale or factoring of Coastal Health Group's
16   accounts receivable is permissible without applying all or a
17   part of it -- of the proceeds to reduce the settlement payments
18   to Dr. Kuppinger and Dr. Molloy.
19            THE COURT:  If I recall from looking at some of the
20   drafts that went back and forth, the proposal was that if they
21   factored anything and got some cash on hand, they were
22   obligated to use that cash in the first instance to pay the
23   settlement agreement.
24            MR. CUZA:  Yes, Your Honor, that's in the October 19
25   agreement.
```

```
1            THE COURT:  I understand the issue.  Your position is

2   that was agreed to, and Mr. Scarola, your position is it was

3   not agreed to.

4            MR. SCAROLA:  Yes, Your Honor.  If I might clarify

5   that, the written settlement agreements exchanged are not the

6   same as the description that is included in this chart because

7   the written settlement agreement does not require the

8   application of proceeds derived from factoring accounts

9   receivable to the, quote, "reduction" of the settlement payment

10  to Dr. Kuppinger and Dr. Molloy.

11           Under the terms of the settlement agreement as

12  proposed by the plaintiffs, if there was any factoring, the act

13  of factoring triggered an obligation to fully pay any remaining

14  balance, regardless of the proceeds derived from the factoring.

15           THE COURT:  Okay.  So --

16           MR. SCAROLA:  So we --

17           THE COURT:  Hold on.

18           MR. SCAROLA:  Yes, sir, I'm sorry.

19           THE COURT:  I want to make sure I understand the

20  hypothetical, so I'm going to put it to Mr. Cuza, since it is

21  his proposal.

22           MR. CUZA:  Yes.

23           THE COURT:  If what I hear correctly from

24  Mr. Scarola, let's say the amount owed was 2 million dollars,

25  so 2 million is left owing under the settlement agreement and
```

1   they factored $800,000 worth of -- they got $800,000 in cash

2   for factoring accounts receivable, your position was they have

3   to take the entire 800,000 and give it to you?

4         MR. CUZA:  Your Honor, our position -- yes, that's

5   our position.  Only the 800, they don't have to obviously pay

6   the entire amount.

7         THE COURT:  No, I understand.  But let's stay with my

8   same hypothetical; they owe you 2 million and now they factor

9   and they get 4 million dollars, they have to pay you in full

10  out of the 4 million.

11        MR. CUZA:  Yes, Your Honor, and they keep the rest.

12        THE COURT:  You're first in line, you get paid before

13  anybody else, that was your proposal.

14        MR. CUZA:  Yes, Your Honor.

15        THE COURT:  And your position is you never agreed to

16  that.

17        MR. SCAROLA:  What we did agree to was we would apply

18  the net proceeds of any factoring to reduce, in Your Honor's

19  hypothetical, the 2 million dollar indebtedness, but if we got

20  less than 2 million dollars, we were not obliged to apply both

21  the factoring net proceeds and pay the difference between those

22  proceeds and the 2 million dollars.  And if you look at the

23  language in the settlement agreement that they proposed,

24  factoring triggered an obligation to pay the full 2 million

25  dollars, regardless of how much was obtained through the

1    process of factoring.

2            THE COURT:  But I think Mr. Cuza said that's not what

3    they are asking for.

4            MR. CUZA:  No, Your Honor.  If there is a

5    misunderstanding with regards to that, I think we have

6    clarified it.

7            THE COURT:  So maybe that issue is resolved.

8            MR. CUZA:  Yes, Your Honor.

9            THE COURT:  At least as to what they were asking for.

10   Whether you agree to it is a different question.  It sounds to

11   me like what they were asking for may not have been what you

12   were hearing and now he has clarified that.

13           MR. SCAROLA:  It wasn't what I was reading.

14           THE COURT:  Okay.

15           MR. SCAROLA:  We can look at what the agreement

16   itself says.

17           THE COURT:  Again, I understand.

18           MR. CUZA:  Your Honor --

19           THE COURT:  I'm just trying to figure out what can

20   be -- I mean, my hope would be you all would sit down and

21   figure out a way to negotiate this deal.  If you can't do that,

22   fine, I'll rule, but let's narrow what the issues are.

23           MR. CUZA:  Your Honor, with regards to that issue, I

24   think we just mooted that issue because we agree.

25           THE COURT:  So assuming we could memorialize it

1   correctly, you agree to the position that Mr. Scarola is taking

2   substantively?

3           MR. CUZA:  Absolutely, Your Honor.

4           THE COURT:  Good.  Next.

5           MR. CUZA:  Okay.  Whether a breach of the

6   non-disparagement provision would be considered a material

7   breach of the settlement agreement.

8           Your Honor, this is an issue of law.  We have agreed

9   that there is going to be non-disparagement agreement, our

10  clients do not intend to breach it.  The -- if it is a material

11  breach or it is not a material breach, Your Honor, again, it is

12  an issue of law, this isn't an issue of fact.

13          THE COURT:  Can you help me out?  In looking through

14  all of the paperwork, Mr. Cuza, what was the proposal here?

15          Was there a proposal to add language which

16  specifically said that Dr. Kuppinger and Dr. Molloy agree that

17  a breach of the non-disparagement clause is a material breach?

18  I couldn't find -- sorry.  In my review of the document, I

19  couldn't find a specific reference to the non-disparagement

20  clause.

21          MR. CUZA:  Your Honor, with regards to those details,

22  Your Honor might recall I have been in trial and --

23          THE COURT:  Absolutely.  Mr. Rothschild can -- I'm

24  happy to hear from him as well.

25          If anyone can point me to what is the provision of

1   the paperwork that was going back and forth that's implicated

2   here.  Mr. Pike, Mr. Scarola, Mr. Boloy, please feel free to

3   speak up.

4          MR. SCAROLA:  There is an express provision in the

5   agreement, Your Honor, I'll find it in just a moment.

6          THE COURT:  I appreciate that.

7          MR. SCAROLA:  It requires that that term -- violation

8   of that term is a material breach.

9          THE COURT:  Okay.  So the defendants wanted to not

10  have to litigate the question of whether it was material or

11  not, you wanted a concession by the plaintiffs that if they

12  breached -- if they were determined to have breached the

13  non-disparagement clause, you wouldn't have to fight the fight

14  about whether it was material.

15         MR. SCAROLA:  Correct, Your Honor.

16         THE COURT:  That was purpose of the provision,

17  however it was raised, and the plaintiffs object to that on the

18  grounds it is unnecessary because it either is material or it

19  isn't.

20         MR. CUZA:  Your Honor, one has to understand the

21  facts to determine if it is material or if it isn't material.

22         THE COURT:  So that's a disputed issue, but at least

23  we know what the issue is.

24         MR. PIKE:  Your Honor, I --

25         THE COURT:  Use the microphone, Mr. Pike, so our

1    court reporter can hear you.

2            MR. PIKE:  Answering your specific question, it is

3    Exhibit 4, page ten.

4            THE COURT:  Exhibit 4 to what, I have a lot of

5    different --

6            MR. PIKE:  To our response in opposition.

7            THE COURT:  Docket entry 131-4, what page?

8            MR. PIKE:  Page ten, section ten, non-disparagement.

9            THE COURT:  I see it there, thank you very much,

10   Mr. Pike.  For the record, docket entry 131-4, page ten, and it

11   looks like it bleeds over to page 11.  I understand what the

12   dispute is there, it sounds like there is a legitimate dispute

13   over that issue.

14           Mr. Cuza, please continue.

15           MR. CUZA:  Your Honor, the next issue, which I'm

16   going to refer to as number 16, it literally has to do with

17   words.  Your Honor, there is a --

18           THE COURT:  I remember this issue, this issue came up

19   at the very end of the mediation and was not resolved by the

20   time we left, but I'm familiar with the issue.

21           MR. CUZA:  And we have gotten closer, Your Honor.

22   There is a specific sentence that they want to add, Your Honor,

23   that my clients cannot accept because it simply is incorrect,

24   it is factually incorrect.

25           Our position, Your Honor, is that issue, consistent

1   with the agreement reached with specifically Judge

2   Middlebrooks, is that issue was an issue for you to resolve,

3   Your Honor, and whatever language you believe is appropriate,

4   my clients will comply with.

5          THE COURT:  Okay.  Let me turn to the defense.

6          I guess one is a procedural question and one is just

7   a substantive question.  I wasn't there before Judge

8   Middlebrooks, I saw there was a reference in there about if we

9   can't work it out, we will let Judge Reinhart work it out.

10         Mr. Scarola, do you agree if this issue came -- this

11  provision or this sort of issue is what that discussion was

12  targeted to?

13         MR. SCAROLA:  Your Honor, there were --

14         THE COURT:  You need to use the microphone.

15         MR. SCAROLA:  There were two different discussions

16  with regard to submitting issues to Your Honor for resolution.

17         THE COURT:  Okay.

18         MR. SCAROLA:  One discussion focused on wordsmithing

19  issues that the parties considered ancillary and not central to

20  the agreement and in order to assure that this case could get

21  resolved and not breakdown over nonessential words, we agreed

22  that we would arbitrate language issues before the Court.

23         THE COURT:  Okay.

24         MR. SCAROLA:  However, there was a separate

25  discussion with regard to the submission of issues to Your

1    Honor.

2            Judge Middlebrooks entered an order following the

3    calendar call and in that paperless order, Judge Middlebrooks

4    said, You are going to do one of two things because I need to

5    be sure this case is off my calendar.  You are either by noon,

6    and I think it was the following day, you are either going to

7    voluntarily dismiss these proceedings because you have come to

8    an enforceable written agreement or you are going to submit to

9    the jurisdiction of the magistrate and these matters will be

10   tried before Magistrate Judge Reinhart.

11           THE COURT:  Or you will go to trial on Monday in

12   front of me.

13           MR. SCAROLA:  Or you will go to trial on Monday, and

14   the parties -- the parties picked door one, not door two.  And

15   door one included the option of either being settled in writing

16   the following day and voluntarily dismissing the pending claims

17   or submitting whatever remained unresolved before the

18   magistrate.

19           THE COURT:  Okay.

20           MR. SCAROLA:  And as Your Honor, I'm sure, has seen

21   from the exchange of correspondence, we kept telling the other

22   side, as the witching hour of noon approached, You need to get

23   us the settlement agreement that you said you were going to

24   draft so that we can review it or there is no settlement unless

25   we have agreed in writing and all issues currently pending will

1    be tried before Judge Reinhart.

2          THE COURT:  I saw that, that's fine.  Thank you.

3          So let me circle back though to this specific issue.

4    Mr. Cuza says there is this language that has been negotiated

5    that they reference here as the language included in the

6    settlement agreement relating to what the plaintiffs learned

7    after discovery, I remember we had a brief discussion about

8    that at the end.  I don't believe I got involved in that other

9    than it came up at the end of the day and I told you to work it

10   out.

11         Mr. Cuza's position is that is an issue that if you

12   can't ultimately reach resolution on, should be submitted to me

13   and I would just decide.  Do you agree that's where we are,

14   Mr. Scarola, or that's not where we are?

15         MR. SCAROLA:  Almost.  It was extremely important to

16   the defendants in this case that their reputation be restored.

17         THE COURT:  I recall.

18         MR. SCAROLA:  How the reputation got restored could

19   become a matter subject to resolution by Your Honor if we got

20   close enough with language that restored the defendants'

21   reputation, so it is not a yes or no response.

22         I believed that at the conclusion of our discussions

23   before Your Honor, we were close enough so that it was likely

24   we were going to get this issue resolved.  As it turned out, I

25   think that the defendants -- excuse me, the plaintiffs

1    continued to back away from a position that would have amounted

2    to a full exoneration.

3           THE COURT:  Okay.  Well, again, they are entitled to

4    their position as to what they can accurately and truthfully

5    sign, I don't know, I'm not there.

6           My question, again, is more the procedural one.  So

7    assuming for the sake of discussion that we reach the point

8    where that issue has to be resolved, okay, I conclude that that

9    issue just needs to be resolved, do you agree that I resolve

10   it?

11          MR. SCAROLA:  Yes, we do agree, assuming everything

12   else is agreed to in writing, executed by the parties and the

13   only thing that remains is how --

14          THE COURT:  How we memorialize that concept.

15          MR. SCAROLA:  -- how the defendants' reputation is

16   going to be exonerated, than we do agree that the specific

17   words to be used would be arbitrated in binding arbitration

18   before Your Honor.

19          THE COURT:  Mr. Cuza, any comment?

20          MR. CUZA:  Your Honor, I don't agree with the word

21   arbitrate for this issue.  This issue is pretty

22   straightforward; we submit the language to Your Honor and we

23   advise Your Honor the reasons for each parties' position and

24   Your Honor makes a decision.

25          THE COURT:  Okay, but I would be -- it would be

```
 1   arbitrated in the sense of me being the arbiter, not
 2   arbitration as in a traditional quasi-judicial proceeding.
 3            MR. CUZA:  I agree with that, Your Honor.
 4            THE COURT:  So I think the parties at least
 5   procedurally agree that that issue -- if that issue has to be
 6   resolved by someone other than the two of you, then it comes to
 7   me and I decide it.  Okay, I understand that.
 8            Go on, Mr. Cuza, I think we were on to the next one.
 9            MR. CUZA:  Item 17, where the plaintiffs would be
10   required to cooperate in good faith with Coastal's collection
11   of its accounts receivable.
12            Your Honor, this was never discussed.
13            THE COURT:  Okay.
14            MR. CUZA:  It's not in the emails, Your Honor, so our
15   position is that --
16            THE COURT:  It is nothing I could or should order --
17   could find to be material because it was never raised.
18            MR. CUZA:  It is not in the documents.
19            THE COURT:  Okay.  Next issue.
20            MR. SCAROLA:  Does Your Honor want a separate
21   response?
22            THE COURT:  Not yet.
23            MR. SCAROLA:  Thank you, sir.
24            MR. CUZA:  Whether Kuppinger would be required to
25   relinquish any claims to medical equipment in possession of the
```

 1  defendants, again, Your Honor, this is something that simply

 2  wasn't discussed at all.

 3         THE COURT:  No to prejudice you in any way, shape or

 4  form, but assuming that the parties found it in their hearts to

 5  have further discussions, are these two topics that at least

 6  you could have -- your client would at least consider as part

 7  of a negotiation in this case?

 8         MR. CUZA:  Your Honor, the answer is yes.  This is

 9  what we are focused on avoiding.  The relationship needs to

10  completely end so that we don't keep coming back to Your Honor,

11  and this has nothing to do with Your Honor.

12         So our clients are willing to have discussions with

13  Your Honor and defendants, where Your Honor is involved, where

14  we try to resolve this, the answer is yes.

15         THE COURT:  Okay.  And again, Mr. Scarola, you can

16  respond, but I take it whether it was raised or not raised or

17  incorporated or not incorporated, it was never resolved.

18         Is it your position it was raised at some point and

19  just never got resolved?

20         MR. SCAROLA:  If it is the last entry on this chart,

21  Your Honor, that issue was not raised until the plaintiffs

22  inserted relinquishment of the defendants' possession of that

23  equipment as a condition of the agreement; that is, we didn't

24  insert it.  We had the equipment, a general release was going

25  to allow us to keep the equipment, and the defendants -- excuse

1   me, I'm just --

2           THE COURT:  You are just so used to being the

3   plaintiff, I know.

4           MR. SCAROLA:  I understand, thank you.

5           The plaintiffs inserted in the written settlement

6   agreement for the first time the requirement that this 80 to

7   $100,000 worth of equipment was going to go back to

8   Dr. Kuppinger.

9           THE COURT:  Again, I'm not holding this against

10  anyone, I'm trying to refresh my memory.

11          Mr. Cuza, if I recall from the mediation that we had,

12  is this equipment that Dr. Kuppinger takes the position he paid

13  for and that's why he wanted it back?

14          MR. CUZA:  Yes, Your Honor.

15          THE COURT:  Okay.  So I understand how that

16  organically may have come up in the back and forth between the

17  parties.

18          MR. SCAROLA:  Just so that Your Honor has that in

19  context, it was the defendants' position that Dr. Kuppinger

20  did, indeed, pay for the equipment, but part of his buy in to

21  Coastal was the contribution of the equipment.

22          THE COURT:  Okay.

23          MR. SCAROLA:  If you remember, he wasn't paying cash

24  to get in.

25          THE COURT:  That, I don't remember, but I won't

```
 1    dispute it.  If that's what the facts were, the facts were.

 2            I do recall there was some mention during our

 3    mediation that he had gone out-of-pocket for some equipment.

 4    Where that flowed after that, again, it would seem to me, those

 5    two -- that topic in particular -- and again, whether it was

 6    negotiated or not, that's something that, if the parties went

 7    back -- could find it in their hearts to get back to the table

 8    could be reasonably negotiated.

 9            MR. SCAROLA:  Let me also, if I could, Your Honor,

10    comment on the requirement of good faith cooperation --

11            THE COURT:  Yeah.  Let me --

12            MR. SCAROLA:  -- regarding accounts receivable.

13            THE COURT:  Yes, help me understand.  I assume that's

14    something like, These are medical billings, they might need a

15    doctor to certify something or sign some medical records or he

16    forgot to sign a CMS form and you need reasonable cooperation

17    to perfect the paperwork.

18            MR. SCAROLA:  It goes a little beyond that, sir.  In

19    order to place it in context, Your Honor needs to understand

20    the nature of Coastal's business.

21            The primary focus of Coastal's business is to provide

22    healthcare services to injured litigants who do not have either

23    the cash to pay for those services or insurance coverage to pay

24    for those services in full, so that the services are often

25    rendered pursuant to a letter of protection.
```

```
 1              So the accounts receivable are many millions of

 2     dollars, in the neighborhood of $20 million to use a round

 3     figure; $20 million that is only going to be collected if

 4     litigants are successful in litigating their claims, deriving

 5     proceeds and being able to pay the lien arising out of that

 6     letter of protection out of the litigation proceeds.

 7              Now, Dr. Kuppinger and Dr. Molloy were among the

 8     healthcare providers whose services gave rise to those letters

 9     of protection.  In order for Coastal to be able to collect,

10     Dr. Kuppinger and Dr. Molloy's cooperation in the litigation is

11     essential.  They need to respond to subpoenas, they need to

12     conference with plaintiffs' counsel, otherwise, we don't get

13     paid.

14              THE COURT:  Understood.

15              MR. SCAROLA:  So they have the ability to frustrate

16     our ability to collect accounts receivable unless they

17     expressly agree to cooperate in good faith in following up on

18     the obligations that are predicates to collecting on those

19     letters of protection.

20              Now, what also needs to be understood and what was

21     expressly included in this provision is they get to charge for

22     those services.  This is nothing that they are being asked to

23     do for free, they get to charge, and they get to charge the

24     reasonable community going rate with regard to every conference

25     and every deposition that they give.
```

```
 1              We wanted to be sure that that was clearly
 2    understood.  It would, from our perspective, be part of an
 3    implied covenant of good faith and fair dealing.  They can't
 4    frustrate our ability to collect the accounts receivable that,
 5    one, formed the basis for calculating their buyouts; and two,
 6    formed the basis of our ability to be able to fund those
 7    buyouts.
 8              THE COURT:  Understood.
 9              MR. SCAROLA:  So that's an overview of what that is
10    about.
11              THE COURT:  So it is more than just, you know,
12    executing paperwork.  I have had plenty of cases with letters
13    of protection, I understand how it all works.
14              Again, I turn to Mr. Cuza.  I can't imagine that is
15    an existential term that couldn't be worked through at some
16    level.
17              MR. CUZA:  No, Your Honor.  If we get to the
18    specificity that we are getting into now and we're specific,
19    Your Honor, we can absolutely work it out.  There is no
20    question that neither of my clients are interested in trying to
21    frustrate their ability to collect, that simply doesn't exist.
22              So if they need our clients to perform certain
23    services and obviously they are going to be compensated for the
24    services, Your Honor, it really is a nonissue.
25              THE COURT:  Okay.
```

1          MR. CUZA:  But we have to get into the specifics.

2          THE COURT:  Understood.  I think we have now gone

3    through all of the laundry list that plaintiffs had prepared.

4          Defense, this may overlap, but I think there are one

5    or two additional ones I want to cover, but I want to give you

6    a fair opportunity.

7          In docket entry 131, pages six and seven, you listed

8    eight essential terms that you asserted had not been resolved,

9    so I want to give you the same opportunity I gave Mr. Cuza to

10   go through those and just tell me whether you think they are

11   agreed to or not agreed to.

12         So the first one is whether the settlement would be

13   collateralized only with -- which I assume it's Dr. Molloy and

14   Dr. Kuppinger's shares in the company or 100 percent of the

15   shares in the company.

16         Mr. Cuza, do you agree that is an unresolved issue?

17         MR. CUZA:  Your Honor, I'm at page six of their

18   response, Your Honor, is that where you are?

19         THE COURT:  Section B, as in boy, on page six.

20         MR. CUZA:  So Your Honor, point number one, it is

21   covered in what we have discussed already.

22         THE COURT:  Okay.

23         MR. CUZA:  Point number two is covered in what we

24   have discussed already.

25         MR. SCAROLA:  I'm sorry, before we get past one --

```
 1              THE COURT:  Hold on.
 2              Mr. Cuza, point number one, I wasn't sure -- I don't
 3    recall that we actually discussed that today.
 4              MR. CUZA:  Your Honor, if you look at the --
 5              THE COURT:  Yes, it is, 100 hundred percent of the
 6    company's shares will be used as collateral, I see it.  I
 7    understand there is a disagreement about that.
 8              MR. CUZA:  Right.
 9              THE COURT:  I saw that in the documents, I saw a
10    draft that went back with a red line and then the red line was
11    changed back and the red line was changed back, so clearly
12    there was no meeting of the minds up to a point on that.
13              MR. SCAROLA:  And Your Honor, it may be because there
14    is a misunderstanding with regard to what we are talking about
15    when we are talking about collateral.
16              THE COURT:  Okay, talk.
17              MR. SCAROLA:  If I might explain that.
18              THE COURT:  Sure, please.
19              MR. SCAROLA:  There is collateral for the loan that
20    Coastal anticipated obtaining in order to fund the buyout of
21    the shareholder interest of Dr. Kuppinger and Dr. Molloy.
22              THE COURT:  If I can stop you for one second, so I
23    can stay with you.
24              So in other words, to fund this settlement, Coastal
25    was going to go out into the market and borrow some money and
```

1  post some collateral against that loan.

2          MR. SCAROLA:  Correct.  We needed to get a commercial

3  lender to say, I'll lend you money, and we reasonably

4  anticipated that commercial lender is going to say, We want a

5  lien on all of your assets, which includes 100 percent of the

6  stock of Coastal.

7          THE COURT:  Okay.

8          MR. SCAROLA:  There's a second, quote, unquote,

9  "collateral" issue, and that is the security on the note to pay

10 Kuppinger and Molloy.

11         Our position was Kuppinger and Molloy's indebtedness

12 is not secured by 100 percent of the stock of Coastal.  If

13 Kuppinger and Molloy don't get paid their security, they get

14 their 40 percent back or whatever portion of the 40 percent is

15 not paid for.  So I think that may be the disconnect here, was

16 in the failure to specify which collateral was being discussed.

17         THE COURT:  Okay.  So your position would be, you

18 would agree that they can have a security interest that if --

19 forget how we phrase it legally; if they don't get paid, what

20 they can take back is that portion of their ownership interest

21 they have not already been paid for.

22         MR. SCAROLA:  Correct, sir, not 100 percent of the

23 stock of Coastal.

24         THE COURT:  And that would be subordinated to the

25 commercial loan, because presumably they would have to pledge

 1   their 40 percent.

 2           MR. SCAROLA:  That's right, sir, they would need to

 3   subordinate their lien interest to the commercial lender's

 4   loan.

 5           THE COURT:  Let me pause you there.

 6           Mr. Cuza, is this news to you or is this something --

 7           MR. CUZA:  Your Honor, this is news to us, but let me

 8   give what I suspect is a logical answer.

 9           Your Honor, if they are going to secure a loan to pay

10   my clients, there is no question my clients are going to

11   subordinate their collateral.  In fact, the moment they get

12   paid out, they don't have the collateral any more, they release

13   that collateral.  So if that is the issue, Your Honor, it's an

14   issue which is pretty simple to address.  The -- so that's

15   that.

16           The next issue, Your Honor, when we are talking about

17   collateral and using 100 percent of the shares, clearly as a

18   matter of law, we are only entitled to collect, right, the

19   amount necessary to cover the debt, right?

20           So hypothetically speaking, we have 100 percent of

21   the shares, they owe our clients 4 million dollars, the shares

22   are worth 8 million dollars, Your Honor, we don't get to keep

23   100 percent of the shares.  At the end of the day, we get to

24   access the collateral, the collateral is sold, right, we

25   collect our 4 million dollars and whatever is left reverts back

1   to them.

2         So our clients' intent, Your Honor, is simply to make

3   sure that the parties are honoring their obligations.  They

4   have an agreement where they are going to pay X amount, let's

5   make sure that everything is in place so that agreement is

6   complied with.  We don't want more than that.

7         So the collateral does not work, as a matter of law,

8   the way that Mr. Scarola appears to believe it works.  Again,

9   Your Honor, unfortunately, it is not a factual issue.

10         THE COURT:  I understand.

11         MR. CUZA:  It is a legal issue.

12         THE COURT:  I understand.  If I'm hearing you

13   correctly, in some respect what you are saying is, whatever --

14   assuming your client is trying to execute on collateral, it is

15   never going to be more than 40 percent of the value of the

16   company, unless the value of the company drops.  On their best

17   day, before they are paid a penny, the best they can do is take

18   40 percent of the company.

19         MR. CUZA:  If 40 percent is enough to cover the debt,

20   then, Your Honor, they take the 40 percent, they sell it.  It

21   is not like they are going to keep the shares, Your Honor.

22         The -- and whatever amount is collected from it, then

23   our clients receive their amounts and the difference goes to

24   the defendants.

25         Your Honor, let me give you another hypothetical.

```
 1   Let's say, for example, the value of the company goes up and

 2   with 20 percent of the shares, you sell 20 percent of the

 3   shares and that's sufficient to pay off our clients, then

 4   20 percent of the shares is going to be enough.  We are not

 5   going to -- we are not going to access more than the amounts --

 6   the percentage of ownership interest that's necessary, right,

 7   in order for our clients to collect the amounts that are owed

 8   to our clients.

 9              THE COURT:  Okay, I understand.

10              MR. SCAROLA:  If I may, Your Honor.

11              THE COURT:  Am I right, Mr. Scarola, your problematic

12   scenario only kicks in if the value of the company drops, such

13   that the 40 percent would be worth more than what the amount is

14   owed to -- the other way around.

15              MR. SCAROLA:  Less.

16              THE COURT:  Less, right.

17              MR. SCAROLA:  That's exactly the circumstance.

18              THE COURT:  Okay.

19              MR. SCAROLA:  They would have the ability, as they

20   have proposed the agreement, to execute on 100 percent of the

21   shares of Coastal if 100 percent of the shares were necessary

22   in order to satisfy the debt.

23              THE COURT:  Okay.

24              MR. SCAROLA:  The value of the collateral as of the

25   time that the agreement is entered into is not the key issue.
```

1   The key issue is how much do they get when they liquidate

2   whatever it is they have a right to liquidate, and we don't

3   want them coming back to take any more than the 40 percent that

4   they contend they owe.

5             THE COURT:  Okay.  I'm not mediating today, I

6   understand the argument, I think the issues are framed, and if

7   you all want to continue to discuss that, you can discuss that.

8   I understand what the disagreement is.

9             Okay.  The next issue is whether all of the

10  defendants or just the corporate defendant is going to be

11  jointly and severally liable for any settlement.  I understand

12  there is disagreement about that, correct, Mr. Cuza?

13            MR. CUZA:  Yes, Your Honor.

14            THE COURT:  Okay.  Mr. Scarola, agreed?

15            MR. SCAROLA:  There is absolutely a disagreement

16  about that, yes, sir.

17            THE COURT:  Okay.  The next one I think we talked

18  about, to me that is whether Coastal can argue that for

19  whatever legal reasons, it doesn't owe Dr. Molloy anything.

20            MR. SCAROLA:  Correct.

21            THE COURT:  Or maybe it's the other way around, I

22  forget how the flow of funds goes there, but there is a loan to

23  him that's due back.

24            MR. SCAROLA:  To pay for the shares that he --

25            THE COURT:  That he owns.

```
 1              MR. SCAROLA:  -- claims that he holds.

 2              THE COURT:  Then there is just some dispute as to

 3    whether you -- Coastal wants to be able to take the legal

 4    position that he is owed nothing; that the loan basically --

 5    that the loan balance liquidates whatever interest he has for

 6    whatever legal reasons, and the plaintiffs want to preserve and

 7    say no.  On his worst day, he still gets 1.3 million dollars

 8    back, is that right?

 9              MR. SCAROLA:  On his worst day, he would get the

10    difference between 1.350 and 2.1.

11              THE COURT:  Is that correct, Mr. Cuza?

12              MR. CUZA:  Yes, Your Honor, that's correct.

13              Your Honor, there is one clarification that I want to

14    make.

15              THE COURT:  Sure.

16              MR. CUZA:  When Your Honor says that we disagree, we

17    disagree with regards to whether it has already been agreed to.

18              THE COURT:  Correct.

19              MR. CUZA:  All right, because our position is it is

20    agreed to if it's in writing and it's enforceable.

21              THE COURT:  Correct.  I'm just -- I understand that's

22    your legal position, and I understand there are legal

23    positions, but right now I'm not really focusing on the legal

24    position.

25              I'm trying to understand -- assume we had nothing in
```

1   writing at all prior to today, what are we fighting about,

2   that's all I'm trying to resolve right now.

3          MR. CUZA:  I understand, Your Honor.

4          THE COURT:  That's without prejudice to either side,

5   preserving all of their legal arguments, so that's fine.

6          The next one, I think we talked about.  That's the

7   factoring of proceeds, I understand that's not resolved as we

8   sit here today.  Maybe it is resolved as a matter of law, but

9   it is not resolved of as a matter of fact, maybe that's the

10  best way to put it.

11         Non-disparagement, we looked at that, the language,

12  we looked at that.

13         Medical equipment, we looked at that and the

14  cooperation in good faith on the receivables, we looked at

15  that.  Okay.

16         Where do we go from here, folks?  It seems to me like

17  none of these issues should be existential, that you all should

18  be able to negotiate this out, but if you don't want to or you

19  can't, I'll rule on the motion.

20         I mean, I have read the briefings, I'm familiar with

21  the law.  I don't know that I need to have extensive argument

22  on how these facts apply to the legal principles at stake here,

23  but I'll be happy to hear from -- it is the plaintiffs' motion,

24  so I'll be happy to hear argument from you, Mr. Cuza, on that.

25         MR. CUZA:  Your Honor, Mr. Rothschild is going to be

 1   doing the argument.

 2             THE COURT:  Sure.  Mr. Rothschild.

 3             MR. ROTHSCHILD:  I guess I should -- if Your Honor

 4   has specific questions, I would be happy to start there.

 5             THE COURT:  My main thing -- the hardest thing I have

 6   is just reconstructing the timeline because I've got some of

 7   the emails from them and some from you and some that were

 8   embedded in threads and all of that, but I was able to

 9   eventually reconstruct the timeline, so before I rule on this,

10   I will go back and walk through the timeline, but if you would

11   walk through it with me, I'll be happy to allow you to do that.

12             MR. ROTHSCHILD:  That's exactly where I was going to

13   start.

14             So we had the settlement conference on October 19th.

15   That night, we had Mr. Cuza's email at 11:24 P.M., it is

16   sealed, but it's docket entry 125-4 --

17             THE COURT:  Okay.

18             MR. ROTHSCHILD:  -- at the end of the thread.  It is

19   also in docket entry 133-1, the first exhibit to the reply.

20             Then the next morning, before the calendar call, we

21   have Mr. Pike's email at 10:48 A.M.

22             And then after his email, but before the calendar

23   call, Mr. Cuza and Mr. Pike have two telephone conferences and

24   they discuss the Zativa activities of Dr. Kuppinger.

25             THE COURT:  Hold on, help me out with this record.

1    Where do I find Mr. Pike's email at 10 -- 11 A.M., roughly?

2              MR. ROTHSCHILD:  So 125-3 is one place where it is,

3    it is Exhibit C to our motion.

4              THE COURT:  I see, okay.  I remember reading that

5    email, I see it here, yes, okay.

6              MR. ROTHSCHILD:  Okay.  And then the telephone

7    conference is referenced on page nine of our motion, which is

8    125.

9              THE COURT:  Okay.

10             MR. ROTHSCHILD:  And our position is that was

11   resolved that barring the Zativa activity that Dr. Kuppinger

12   was already doing, that my understanding is everyone knew he

13   was doing, that he could continue doing what he was doing with

14   Zativa and that he was fine with having a nonsolicitation

15   agreement.  And we believe, as we then get to the calendar

16   call, that that's one of the two issues where Mr. Pike makes a

17   reference to Judge Middlebrooks that we just need language.

18             So then we get to the calendar call and here again,

19   we can -- you know, the words are pretty clear.  I mean, I

20   think it's a short transcript, Your Honor can read it.

21             THE COURT:  I did.

22             MR. ROTHSCHILD:  You know, Judge Middlebrooks

23   specifically asked Mr. Cuza, You said tentative, what does that

24   mean?  And Mr. Cuza explains, Look, the material terms are

25   agreed to.

```
 1          Towards the bottom of page six, top of page seven,
 2   Mr. Pike says, Material terms are agreed to and just a couple
 3   of provisions regarding, quote, "language" are what is
 4   resolved -- or what's not resolved.
 5          And we believe the calendar call transcript is
 6   critical to understanding that there is a sufficient writing to
 7   enforce, that all Counsel made that representation to Judge
 8   Middlebrooks that there was a sufficient writing.
 9          Judge Middlebrooks -- everybody in this district
10   knows you don't get off that trial calendar unless you assure
11   him, and he asked for assurances and everybody gave him
12   assurances that there was a sufficient writing to resolve the
13   case that can be enforced, but we believe the transcript kind
14   of speaks for itself, so I apologize for going over it again.
15          THE COURT:  Make your full argument, please.
16          MR. ROTHSCHILD:  So after the calendar call, Mr. Cuza
17   has an email that same afternoon back to Mr. Pike, and that
18   is -- so that's at 4:28 P.M., that is at 125-4.  It is probably
19   in another place, too, but it's in 125-4 that is in color,
20   where Mr. Cuza has cut and pasted back what he had from the
21   night before, with the addition of Mr. Pike's email and their
22   conversation before the calendar call, so we believe the
23   agreement is there by the end of the day of the calendar call.
24          We don't believe that the defendants' declarations
25   are really worth much.  They are what we would consider
```

```
 1    self-serving and they cannot retroactively affect the
 2    settlement that was reached between counsel on behalf of the
 3    parties at the end of the day of the calendar call.  And we do
 4    cite -- I don't believe defendants have made this argument, but
 5    there is case law, the Murchison case, M-U-R-C-H-I-S-O-N, 13
 6    F.3d 1483 that makes -- that has some very similar facts to
 7    this case, and that the party can't undo what their counsel
 8    did.  So that's really the brief timeline.
 9            Now, what happens after that is we go ahead and put
10    it in writing and then some of these issues come up, but our
11    position is that the agreement was already enough to be
12    enforced by the time that happened.
13            Then as Mr. Scarola pointed out, Judge Middlebrooks
14    issued his order, that is at 116, which comes out the night of
15    October 20th.  And the parties at that point -- you know,
16    frankly, we were somewhat stuck, we didn't have a written
17    agreement with the other side, we believe there was sufficient
18    agreement to be enforced, so we took the option of consenting
19    to magistrate jurisdiction, believing, as both sides had
20    represented to Judge Middlebrooks, that whatever was not
21    resolved -- that all of the material terms were resolved and
22    any of the, quote, "ancillary" disputes could be decided by
23    Your Honor, Magistrate Judge Reinhart.
24            So we felt pretty good there was a deal.  Ultimately,
25    the other side said, no, there wasn't, so we filed our motion
```

1    to enforce.  I mean, we think the case law that we have

2    through -- at page 12 through 15 of our motion at 125 lays out

3    for Your Honor the authority you have, based on the evidence

4    you have before you, to enforce those terms that were agreed to

5    that we just spent the last hour laying out for you.

6            THE COURT:  So I know in reading some of the

7    correspondence, and I'll go over this with the other side as

8    well, their position was that when they got the written

9    proposed settlement agreement, it contained terms that had

10   never been discussed before.  How do you respond to that?

11           MR. CUZA:  Your Honor, if I may.

12           THE COURT:  Yes, Mr. Cuza.

13           MR. CUZA:  Your Honor, there is no question that the

14   representations made to Judge Middlebrooks and Your Honor is

15   that as of calendar call, the parties had in writing what they

16   had agreed to with regards to the material terms.

17           There is also no question that Judge Middlebrooks was

18   focused on getting assurances from the parties that there is

19   sufficient in writing as to the material terms to enforce the

20   terms of a settlement.

21           The -- our position is the documents that are

22   actually relevant to the issue at hand are the documents that

23   were issued on October 19th, the date that the parties reached

24   or advanced on the agreement.  In fact, if you look at the

25   October 20th email that Mr. Pike issued, that morning, twice he

```
 1    talks about, In accordance with the agreement reached
 2    yesterday, October 19th.
 3              So our focus, Your Honor, is enforcing the material
 4    terms of the settlement agreement, which are those that existed
 5    by the time that we spoke to Judge Middlebrooks and we spoke to
 6    Your Honor --
 7              THE COURT:  All right.  So --
 8              MR. CUZA:  -- that day.
 9              I'm sorry, Your Honor.
10              THE COURT:  No, go ahead.
11              MR. CUZA:  I cannot address specifically other
12    language that were included in the settlement agreement.
13    Unfortunately, Your Honor, again, as you know, I have been in
14    trial, so I don't know the details of the settlement -- the
15    draft of the settlement agreement that was drafted after the
16    parties reached an agreement.
17              But I will say this, Your Honor:  There are two
18    things that are extremely important that demonstrate, or at
19    least one of them -- the other issue is important -- how
20    regrettable the situation at hand is in terms of the
21    representations to this Court and the respectfully outrageous
22    backtracking.
23              THE COURT:  We will get to that in a second.  Let me
24    pause you before we go there, okay.
25              You want me to enforce the terms that were agreed to
```

1   and in your view were in effect at the time everybody stood in

2   front of Judge Middlebrooks, correct?

3          MR. CUZA:  Your Honor, yes, and there were --

4          THE COURT:  What are the terms that you believe I

5   need to -- if I were going to write it right now, write an

6   order, These are the material terms, this is the settlement,

7   the parties are now bound by it, what do you believe those

8   terms are?

9          MR. CUZA:  I can tell you exactly what the terms

10  were, Your Honor.

11         If we go back to page seven of our motion -- I'm

12  sorry, the reply.

13         THE COURT:  The reply, I got it.

14         MR. CUZA:  The 2.1 million for Kuppinger, that's been

15  agreed to.

16         The $400,000 -- and I can tell you exactly where it

17  is, Your Honor.

18         THE COURT:  That's okay, just tell me what you think

19  the terms are.

20         MR. CUZA:  The $400,000 to be paid at closing, agreed

21  to; the $50,000 to be paid monthly, agreed to; the 2.1 million

22  dollars to be fully paid within six months after the closing

23  and transfer of shares, agreed to; the 100 percent of the

24  shares as collateral, although they are disagreeing with that,

25  if you go to the October 19th email, you will see it there.

1           You will see their response to the October 19th email
2   on October 20th, and they do not object or state that we did
3   not agree to what is in the October 19th email.  In fact, their
4   October 20th email reinforces that an agreement had been
5   reached the day before.
6           THE COURT:  Okay.
7           MR. CUZA:  But with regards to that issue, Your
8   Honor, let me also add this, right, because this issue we can
9   easily resolve it, okay.
10          We are just interested in making sure that we have
11  enough where they comply with the agreement.  So for us it is
12  not really about 40 percent, it is not about 100 percent, it's
13  not about 20 percent.
14          THE COURT:  I understand, but I'm not here to
15  negotiate that.  Just tell me what the terms are you want me to
16  enforce.
17          MR. CUZA:  So --
18          THE COURT:  It is basically this?
19          MR. CUZA:  That one, Your Honor, even though we have
20  an agreement, okay, we can -- we can address separately.  But
21  the agreement is there, Your Honor.  If you look at the
22  October 19th email, you will see it is there in black and
23  white; you will see they didn't object to it on October 20th.
24          THE COURT:  Okay.
25          MR. CUZA:  Whether the individual defendants are

```
 1    liable, Your Honor, look at the October 19th email, it is there
 2    in black and white.
 3              THE COURT:  Because it references the parties?
 4              MR. CUZA:  Well, Your Honor, it references more.  If
 5    you go to the October 19th email -- I can take you there, Your
 6    Honor, if you want me to.
 7              THE COURT:  Give me the docket entry again, please.
 8              MR. CUZA:  Your Honor, we have a book with the
 9    emails, would that make it easier?
10              THE COURT:  I have it in front of me, if you put it
11    on the record, I can find it quickly.
12              MR. ROTHSCHILD:  125-4.
13              THE COURT:  125-4, thank you.  I have it, Mr. Cuza,
14    go ahead.
15              MR. CUZA:  Okay.  Your Honor, if you go to paragraph
16    one, two, three, four, if you go to paragraph four, look what
17    it says:  In the event of a breach, Jordan is okay with
18    providing defendants a five day curing period.  Should
19    defendants not cure their breach, if any, after the five day
20    curing period, the breach will be material and defendants will
21    be obligated to pay Jordan all amounts due to Jordan under the
22    agreement.  Your Honor, it is there.
23              THE COURT:  Okay.
24              MR. CUZA:  And you will see, Your Honor, in their
25    response on October 20th, they didn't object to that particular
```

```
 1    provision.  What they had an issue with, they raised.
 2             So once again, Your Honor, respectfully, this goes to
 3    Judge Middlebrooks' questions, which he was extremely focused
 4    on; do the parties have in writing in the emails sufficient so
 5    that he can enforce the settlement agreement if it falls apart
 6    during the final drafting, and both parties said yes a number
 7    of times.
 8             And by the way, Your Honor, at the time, both parties
 9    were being candid with the Court.  That has changed
10    significantly, which is a problem.
11             THE COURT:  Yeah.  Again, I'm aware of your position
12    on that.
13             MR. CUZA:  And -- okay.
14             Your Honor, the next one, Kuppinger cannot compete
15    with Coastal for two years, with the exception of the Zativa
16    Life, for whom he had continued to provide services, that's
17    agreed to, Your Honor.  It is in their October 20th email, and
18    our response to the October 20th email.
19             Your Honor, this one is extremely important, and let
20    me tell you why.  Before we had calendar call, we received
21    Mr. Pike's email of October 20th, and what they proposed in the
22    email was that Dr. Kuppinger could not continue to provide
23    services to Zativa Life, which he had all along.
24             I told Mr. Pike this specifically, and I'm sure he is
25    not go to deny this, I told him, This is the deal breaker,
```

1    okay.  We have calendar call at 1:00, so you can go back to

2    your clients, right, because we all know how Dr. Kuppinger is

3    going to respond to this.

4            Mr. Pike called me back and then told me they don't

5    have a problem with Dr. Kuppinger providing the services that

6    he had been providing to Zativa, right, but they wanted a

7    nonsolicitation.  I told them to draft a nonsolicitation as

8    long as he can do what he is currently doing, we don't have a

9    problem.

10           Your Honor, when Mr. Pike represented to Judge

11   Middlebrooks that there were two issues that we had discussed

12   and, in fact, agreed on, that we had to work on the language,

13   he was being truthful with Judge Middlebrooks.

14           THE COURT:  Okay.

15           MR. CUZA:  This was one of the issues, Your Honor,

16   which only had to do with the language associated with the

17   nonsolicitation agreement.

18           THE COURT:  Okay.  What was the other one?

19           MR. CUZA:  Your Honor, the other one had to do with

20   the one that we have discussed with the Court, which is what is

21   it that our client is going to sign, which is a statement that

22   they are going to be able to use publicly.  It is not -- that

23   statement is not going to be confidential.

24           Those are the only two issues that were left in terms

25   of language.  We had agreed that Dr. Kuppinger's noncompete was

 1  going to continue, but Zativa was going to be carved out, and

 2  we had agreed that our clients would provide, right, language

 3  that is reasonable, but truthful.

 4          THE COURT:  Okay, I understand.

 5          Let me turn to the other side and let me start with

 6  the hearing in front of Judge Middlebrooks, where Mr. Pike

 7  says, "The material terms have been agreed to."  What, what

 8  were the material terms that Mr. Pike was referencing had been

 9  agreed to on page six of the transcript?

10          MR. SCAROLA:  Your Honor, because I anticipated

11  precisely that question from the Court, I would ask permission

12  to approach the bench.

13          THE COURT:  Has the other side seen whatever it is

14  you are going to give me?

15          MR. SCAROLA:  I am about to hand it to them.

16          THE COURT:  Please do.  Mark it as Exhibit 1.

17          MR. SCAROLA:  Your Honor --

18          THE COURT:  Hold on.

19          Go ahead, Mr. Scarola.  I'll mark this as Exhibit 1.

20      (Evidence marked as Exhibit No. 1.)

21          MR. SCAROLA:  This is a comprehensive list of the

22  essential terms that it was our good faith belief had been

23  agreed to as of the time of the conference before Judge

24  Middlebrooks.

25          THE COURT:  Okay.  Before you go into this, does

```
 1    Mr. Pike adopt this as his sworn statement, that this was what
 2    he was relating to when he made that statement to Judge
 3    Middlebrooks?
 4              MR. SCAROLA:  I'll allow Mr. Pike to respond to that
 5    question, Your Honor.
 6              THE COURT:  Mr. Pike, do you adopt this as the
 7    statement of what it was you were referencing when you said to
 8    Judge Middlebrooks, "The material terms have been agreed to."
 9              MR. BOLOY:  One second, Your Honor.
10              THE COURT:  I'm sorry?
11              MR. PIKE:  One second, Your Honor, I'm just reading
12    it again.
13              I would have to add to it, Your Honor.  Mr. Cuza is
14    correct about Zativa in some fashion.  Zativa was first brought
15    up by Mr. Cuza, not by our side.
16              It was our position that Zativa was going to be
17    prevented under the noncompetition agreement.  Mr. Cuza did
18    come back and say to myself and my team that it would be a deal
19    breaker and as a result, the more specific statement that was
20    said was that Mr. -- Dr. Kuppinger would be able to work for
21    Zativa in the limited fashion of providing medical director
22    services, which is what he was providing initially.
23              THE COURT:  Okay, but that was a conversation that
24    occurred after the calendar call.
25              MR. PIKE:  That was a conversation that occurred
```

 1    after the calendar call, but I wanted to correct Mr. Cuza in

 2    that regard because it wasn't all services, it was medical

 3    director services.

 4           THE COURT:  All right.  Mr. Cuza, was that the

 5    agreement you reached in the subsequent conversation?

 6           MR. CUZA:  Your Honor, it wasn't subsequent, it was

 7    before calendar call.  Our position was, This is a deal

 8    breaker, we need to resolve it before calendar call because we

 9    are going to trial.

10           Your Honor, the conversation -- and Mr. Pike -- I

11    don't think Mr. Pike would misrepresent the truth with regards

12    to something like this.

13           So I am absolutely sure -- I don't think we have to

14    go to phone records, but I'm sure we can go to phone records

15    and it will confirm this.

16           Your Honor, what we did -- what we did after the

17    calendar call, right, was we sent the email on October 20th;

18    it's the email on October 20th, which we sent at 4:28, okay.

19           If you look at the email of October 20th at 4:28,

20    which was before we have the conference call with you, Your

21    Honor, all right, if you see in red the second bullet point, it

22    addresses our position.

23           But the point is I do not believe -- and Mr. Pike can

24    correct me if I'm wrong, I do not believe that we have a

25    disagreement with regards to that particular issue.

```
 1          MR. PIKE:  No, I just want it to be very clear that,

 2    first of all, we are working off memory here, but I do believe

 3    the telephone call occurred before calendar call.  It wasn't me

 4    that said that it occurred after calendar call, that was Judge

 5    Reinhart.

 6          THE COURT:  Maybe I misunderstood, okay.

 7          Back to this, so --

 8          MR. SCAROLA:  Thank you, Your Honor.  And while we

 9    are talking about Zativa and the Court's --

10          THE COURT:  Hold on.  Before we get there, I just

11    want it on the record that Mr. Pike is, with the clarification

12    he is giving me, adopting Exhibit 1 as his statement to this

13    Court as to what he was referencing when he said to Judge

14    Middlebrooks, quote, "The material terms have been agreed to,"

15    end quote.

16          MR. PIKE:  I would also have to add -- and for the

17    record, I'm flipping through documents, tracing a timeline, but

18    if I'm being specific in front of this Court, I believe that I

19    would concur with Mr. Scarola, when Your Honor was going back

20    and forth between Mr. Cuza and Mr. Scarola, on page seven of

21    Mr. Cuza and his clients' reply, I would also state that I

22    believe the figures, the monetary figures were agreed to.

23          THE COURT:  Counsel, let me be clear.  I consider

24    that statement to Judge Middlebrooks to be crucial and I'm

25    either going to get testimony under oath as to exactly what
```

1    Mr. Pike meant when he said it --

2            MR. PIKE:  I can tell you.

3            THE COURT:  Excuse me.

4            MR. PIKE:  Yes.

5            THE COURT:  Okay.  I am seriously considering whether

6    I just need to recess this hearing, allow you to prepare, we

7    will come back, you will testify, you will be cross-examined by

8    Mr. Cuza, and I will make findings, and it may well be that

9    Mr. Cuza has to testify, maybe, but that's the road we are

10   heading down, folks.

11           I'm not accepting unsworn representations from

12   anybody.  We are going to have evidence in this case, that's

13   why I asked at the beginning if anybody had any evidence they

14   wanted to introduce, okay.

15           So if you are not 100 percent sure what you are

16   telling me about exactly what you meant to Judge Middlebrooks,

17   then I caution you not to.

18           So I will ask Mr. Scarola again, what exactly did

19   Mr. Pike mean, and where can I find it in the existing record

20   of evidence, when he said, "The material terms have been agreed

21   to"?

22           MR. SCAROLA:  Your Honor, I don't think -- excuse me.

23           I don't think you are going to find in evidence what

24   Mr. Pike's subjective intent was.  This outline was intended to

25   encapsulate what the defendants' subjective beliefs were as of

1    the time of the hearing.

2              I will tell Your Honor, for whatever value it may

3    have, that these were my beliefs on behalf of the individual

4    defendants.

5              THE COURT:  Okay.  Unless you are testifying under

6    oath, it has no value to me.

7              MR. SCAROLA:  I'm prepared to do that, sir.

8              THE COURT:  Okay.  Well, would you like to take the

9    stand?

10             You are going to testify to what Mr. Pike meant,

11   that's going to be your testimony?

12             MR. SCAROLA:  No, sir, no, no.

13             THE COURT:  What you thought or what your clients

14   thought is irrelevant to me at this moment.

15             A direct representation was made to a United States

16   District Judge, I want to know what the person who said it was

17   thinking when they said it.  I want it under oath and I want it

18   subject to my being able to evaluate credibility because if you

19   stand in front of a district judge and say, "The material terms

20   have been agreed to," and seven days later file a pleading and

21   say, We don't have an agreement, that to me is extraordinarily

22   serious and I need to develop a full factual record on that.

23             MR. SCAROLA:  We understand that, Your Honor, and if

24   what the Court is suggesting is that you want to recess this

25   proceeding and take sworn testimony at a later time, we will be

1   happy to cooperate with Your Honor, whichever way you choose to

2   proceed.

3          THE COURT:  Unless Mr. Pike is prepared to testify

4   today, that's what I'm saying.  I want sworn testimony as to

5   exactly what that meant, as well as when he then said, "There

6   are probably a couple of provisions that need to be discussed,"

7   I want to know what they are, okay.

8          And, "As long as we get the last few terms in, we

9   have a deal," I want to know what they are.

10          "I believe that we have an agreement and the

11   substantial terms have been agreed, with the exception of two

12   substantial terms that we are waiting on the semantics of the

13   language," I want to know what they are and I want to know what

14   Mr. Pike meant when he said that to Judge Middlebrooks.

15          MR. SCAROLA:  Yes, Your Honor, understood, and we are

16   happy to return at Your Honor's convenience and address those

17   issues.

18          THE COURT:  We will.  Let me also ask, in reviewing

19   the correspondence -- and Mr. Scarola, at this point, this -- I

20   will accept a representation from you on this point.  On docket

21   entry 125-2, page four, it says you sent an email on

22   October 28th at 1:58 P.M. to counsel.

23          It says, quote, "The revisions you have made to our

24   draft proposal materially changed the terms of the proposal in

25   ways that were neither discussed with us, nor contemplated by

```
 1    our clients."
 2              Can you tell me what you are referring to?
 3              MR. SCAROLA:  Yes, sir.
 4              THE COURT:  I tried to look at the agreements, I
 5    couldn't understand what it was you were referencing, so could
 6    you kindly do that.
 7              MR. SCAROLA:  Yes, sir.
 8              Your Honor, if the Court turns to Exhibit 4 of our
 9    reply --
10              THE COURT:  Let me find it, your response.  So it is
11    131-4, sorry, let me find it.
12              Okay, I believe I have now found it.  Thank you.
13              Yes, I have it, Mr. Scarola.
14              MR. SCAROLA:  The red entries.
15              THE COURT:  I don't have it in color.  I have --
16    maybe it is underlined or --
17              MR. BOLOY:  Your Honor, I have a copy for you.
18              THE COURT:  If you can tell me the page numbers, I
19    think I can figure it out.
20              MR. SCAROLA:  Page one of 18.
21              THE COURT:  So I see there are some areas crossed out
22    and some areas that are underlined, so if you want to tell me
23    which ones are in red, I think I can work with that.
24              MR. SCAROLA:  I think everything crossed out and
25    everything underlined isn't in red.
```

```
 1            THE COURT:  Okay, I can follow along.  What are the
 2   ones you were referencing in your email on the 28th?
 3            MR. SCAROLA:  Yes, sir.
 4            The first changes, from our perspective, were the
 5   requirement that the individual defendants would be guarantying
 6   the payment of the indebtedness to Dr. Kuppinger and to
 7   Dr. Molloy to the extent such indebtedness existed.
 8            THE COURT:  As I recall, the way that it was
 9   incorporated in the agreement was to the definition of Coastal
10   parties as opposed to Coastal Health System?
11            MR. SCAROLA:  Coastal Health Group is defined in 1C
12   and the original definition included employees, agents,
13   et cetera.
14            THE COURT:  But then up above in the prefatory
15   language, it defines Coastal parties as all of the individual
16   defendants and as I recall, the language that you were
17   scratching out in the settlement -- in paragraph two, sub A and
18   similar, was changing Coastal parties, which would incorporate
19   all of the individuals, to Coastal Health Group, which would be
20   the corporate entity, am I correct?
21            MR. SCAROLA:  That's correct, Your Honor, those
22   changes --
23            THE COURT:  So that's how you effectuated that
24   change?
25            MR. SCAROLA:  Those changes are reflected on page two
```

 1   of 18, paragraph 2A, and in a number of other locations as

 2   well.

 3          THE COURT:  Understood, okay.  So that was one, what

 4   are the other new issues that were raised?

 5          MR. SCAROLA:  Those same changes are reflected in 2B,

 6   2C, 2D.  And the next change is the change that has been

 7   discussed with regard to the $1,355,000 alleged ceiling on the

 8   reduction, that's at page two of 18, paragraph 2D --

 9          THE COURT:  Okay.

10          MR. SCAROLA:  -- towards the bottom.

11          THE COURT:  Uh-huh.

12          MR. SCAROLA:  That same change is carried through in

13   subparagraph E as well, where we talk about any reduction

14   determined by Magistrate Judge Reinhart.

15          THE COURT:  You don't need to point out to me every

16   place that it carries through, I'm trying to identify what the

17   subject matter areas of the changes are.

18          So it is the individual liability, it's the 1.3

19   million dollar issue.  What were the other ones you were

20   referencing?

21          MR. SCAROLA:  Then there is the change with regard to

22   the collateral issue that we discussed.

23          THE COURT:  Give me one example where that is.

24          MR. SCAROLA:  3A.

25          THE COURT:  Thank you.

```
 1              MR. SCAROLA:  And Your Honor may recall my discussion
 2    about the obligation to fully satisfy the --
 3              THE COURT:  This has to do with the factoring of
 4    the --
 5              MR. SCAROLA:  Yes, sir, it does, and that language
 6    appears in paragraph 3B, where we have crossed out the
 7    defendant -- excuse me, the plaintiffs' insertion of the
 8    language, "The settlement payment owed to Dr. Kuppinger and
 9    Dr. Molloy must be fully satisfied out of said assignment, sale
10    or factoring transaction."
11              THE COURT:  I see it.
12              MR. SCAROLA:  Okay.  In subparagraph E, Dr. Kuppinger
13    acknowledged that $4,500 in cash had been taken by him, a
14    payment made by a patient during the period of time that he was
15    employed by Coastal, and an additional $11,496.08 cash payment,
16    and --
17              THE COURT:  Hold on.  That's something that you were
18    adding, this isn't something they have added, correct?
19              MR. SCAROLA:  That's something we have added as --
20              THE COURT:  That's not what I'm focusing on right
21    now.  I'm focusing on you wrote an email on October 28th at
22    2:00 in the afternoon saying they made changes you hadn't
23    discussed, that's what I'm focused on --
24              MR. SCAROLA:  Yes, Your Honor.
25              THE COURT:  -- not changes you subsequently made to
```

 1  send back to them.

 2          MR. SCAROLA:  Because in subparagraph D of that same

 3  paragraph, they referenced the Coastal parties will return the

 4  Stryker radio frequency ablation machine.

 5          THE COURT:  That's the equipment.

 6          MR. SCAROLA:  Yes, sir, that's the equipment.

 7          THE COURT:  Okay.

 8          MR. SCAROLA:  And that was an addition that had never

 9  previously been discussed.  The general release was going to

10  include release of that Stryker radio frequency ablation

11  machine.

12          THE COURT:  Okay.

13          MR. SCAROLA:  The next paragraph is the Zativa Life

14  paragraph.

15          THE COURT:  Where is that located?

16          MR. SCAROLA:  This is 4A, Your Honor.

17          THE COURT:  4A, okay.

18          MR. SCAROLA:  And Your Honor will recall when you

19  were just looking at the October 28 email, that the statement

20  is made in that email that Dr. Kuppinger is in agreement in

21  principle to this concept that there will be a limited

22  exclusion of Zativa Life from the noncompetition provision, and

23  he expressly states, "We need to see the language."

24          THE COURT:  Okay.

25          MR. SCAROLA:  We have added the fact that the

1    dismissal of the pending claims will be with prejudice.

2         THE COURT:  Again, I'm not interested in what you

3    added, I want to know what you were objecting to that they

4    added.

5         MR. SCAROLA:  Yes, sir.  They have added an ability

6    to raise a breach claim in respect to Dr. Kuppinger.

7         THE COURT:  Where is that, what paragraph?

8         MR. SCAROLA:  Paragraph 6A.  I think I just said

9    Kuppinger, I meant Molloy, Your Honor.

10        THE COURT:  Well, they have added that I would

11   resolve that issue.

12        MR. SCAROLA:  Well, what they added was whether the

13   Coastal parties breached the shareholder agreement or their

14   obligations with Dr. Molloy.

15        THE COURT:  Well, that's under the predicate of they

16   have agreed -- the parties agree that that issue will be

17   resolved by me.  So to you, that was a new provision not

18   previously discussed.

19        MR. SCAROLA:  That's correct, sir.

20        THE COURT:  6A, small I.

21        MR. SCAROLA:  6A, small I.  And then at the bottom --

22        THE COURT:  There is the 1.3 million, I see that.

23        MR. SCAROLA:  Yes, sir, that's the 1.3 million.

24        Your Honor, they added a prevailing party attorneys'

25   fees provision in paragraph 25 that had not been the subject of

```
 1   any prior discussion.

 2           And then Exhibit A, Your Honor, is the dispute with

 3   regard to the exoneration.

 4           THE COURT:  But again, there was -- that was not new,

 5   that was just they proposed the language, right?  That was not

 6   a new concept, that concept had been discussed.

 7           MR. SCAROLA:  It was not a new concept.

 8           THE COURT:  So thank you, you have clarified for me

 9   when you referenced in your email terms that they had changed.

10           Now go to the next sentence, "You have also omitted

11   provisions that are essential to preserving Costal's ability,"

12   et cetera.

13           MR. SCAROLA:  Yes, sir.

14           THE COURT:  What are the provisions you previously

15   discussed and asked for that were omitted from this document

16   that you were referencing in this email?

17           MR. SCAROLA:  In paragraph 2D, the added language at

18   the bottom of that paragraph that is underlined, Your Honor, is

19   a clarification of the dispute with regard to the 1.355 million

20   dollars.

21           THE COURT:  To be clear, had you asked for that

22   clarification prior to them sending you this draft document and

23   it simply was not included or is that something you added once

24   you saw their document?

25           MR. SCAROLA:  I can't -- I can't respond to that
```

1   question because I don't have a specific recollection, Your

2   Honor.

3          THE COURT:  Okay.  What I'm focused on is your email

4   says they have omitted provisions from this draft.  It seems to

5   me to omit something, you have to know that it's requested, so

6   that's what I'm trying to drive to.

7          What did you ask for that you expected was going to

8   be in this agreement that wasn't in this agreement?

9          MR. SCAROLA:  The provision in paragraph 3A that is

10  underlined.

11         THE COURT:  Okay.  About the, May pledge the

12  collateral to secure a loan, okay.

13         MR. SCAROLA:  Yes, sir.

14         THE COURT:  This has to do with the lien to the third

15  party.

16         MR. SCAROLA:  Yes.

17         THE COURT:  So you had discussed that with them ahead

18  of time and they omitted that from the draft.

19         MR. SCAROLA:  There was substantial discussion with

20  regard to the limited funds available to Coastal, the need to

21  be able to finance and the cooperation that we would need from

22  them in order to raise the funds necessary to pay off the

23  indebtedness.

24         THE COURT:  So 3A1 was omitted, what else?

25         MR. SCAROLA:  The language in 3D and E, Your Honor.

```
 1              THE COURT:  That was discussed ahead of time and not

 2   included?

 3              MR. SCAROLA:  That was discussed ahead of time.

 4   There was to be a mutual exchange of releases and the claims on

 5   both sides with regard to previously identified assertions of

 6   entitlement were to be abandoned as part of that general

 7   release.

 8              THE COURT:  I just want to be clear.  It is one thing

 9   to say, We are going to do a general release of all the claims

10   we have against each other.

11              It is another to say, We are going to do a general

12   release and it's going to specifically include the medical

13   equipment and the monies related to Ms. Taylor and the monies

14   related to Mobile Pain Docs.

15              MR. SCAROLA:  Both of those things were the subject

16   of express discussion.

17              THE COURT:  Okay, thank you.  So that was omitted,

18   thank you.  What else?

19              MR. SCAROLA:  The limitation on the Zativa Life

20   exclusion that is reflected in the underlined language.

21              THE COURT:  Paragraph 4A.

22              MR. SCAROLA:  4A was the subject of specific

23   discussion.

24              THE COURT:  Okay.

25              MR. SCAROLA:  The fact that the claims in the pending
```

1   litigation would be dismissed with prejudice was the subject of

2   specific discussion.

3             THE COURT:  Where is that, I'm sorry?

4             MR. SCAROLA:  That is in paragraph 4B.

5             THE COURT:  B, as in boy, thank you.

6             MR. SCAROLA:  Correct.

7             THE COURT:  With prejudice, okay, thank you.

8             MR. SCAROLA:  D, Your Honor, had been the subject of

9   discussion; however, my recollection is there was not an

10  express agreement with regard to what would happen with that

11  property.

12            THE COURT:  Okay, let me stop you.  As to the

13  previous couple of items, you have pointed out to me paragraph

14  3A, sub I; 3D, as in dog; 3E; 3A, as in alpha, and 3B, and your

15  position is not only have they been discussed, they had been

16  agreed to?

17            MR. SCAROLA:  I need to take them one at a time, I'm

18  sorry, Your Honor.

19            THE COURT:  Yeah, go ahead.

20            MR. SCAROLA:  Would you identify those for me again?

21            THE COURT:  3A1, which had to do with the

22  collateralization of the third party loan.

23            MR. SCAROLA:  Subject to specific discussion, yes.

24            THE COURT:  But was it agreed to?

25            MR. SCAROLA:  Yes, sir.

```
 1              THE COURT:  Had the parties reached agreement on that

 2    term?

 3              MR. SCAROLA:  It was our understanding it was agreed

 4    to.

 5              THE COURT:  Was that agreement reached before or

 6    after the calendar call?

 7              MR. SCAROLA:  My recollection is that it was before.

 8              THE COURT:  Okay.  How about 3D, as in dog, relating

 9    to the medical equipment and the cash payments, were those

10    agreed to?

11              MR. SCAROLA:  Yes, sir, those were agreed to.

12              THE COURT:  Before or after the calendar call?

13              MR. SCAROLA:  Before, as part of the general release.

14              THE COURT:  No, no.  Were they specifically discussed

15    and agreed to before the calendar call?

16              MR. SCAROLA:  There were specific discussions about

17    what was going to happen with the money and what was going to

18    happen with the medical equipment and the agreement was that

19    there would be an exchange of general releases, the result of

20    which was that each of those claims would be respectively

21    abandoned by the parties making the claims.

22              THE COURT:  Okay.  4A, having to do with the

23    nonsolicitation, I think I have heard from the parties kind of

24    the timeframe on that.  It seems to me that was at least agreed

25    preliminary -- preliminarily agreed to in principle before the
```

```
 1   calendar call, with the understanding it would be resolved
 2   thereafter, I understand that one.
 3           The with prejudice dismissal, was that agreed to
 4   before the calendar call?
 5           MR. SCAROLA:  Your Honor, I don't think that there
 6   was ever a specific discussion of the fact that the dismissal
 7   would be with prejudice, but implicit in the discussion of a
 8   general release was the concept that they can't dismiss the
 9   claims and bring them back again.
10           THE COURT:  Okay, understood.  All right.
11           I stopped you there briefly, but go ahead, you were
12   going through what you were referencing in your October 28
13   email, when you said you had provisions that had been omitted
14   that were essential to Coastal.  Please proceed.  Thank you for
15   letting me interrupt.
16           MR. SCAROLA:  I don't have a specific recollection as
17   I sit here right now about the interest in the JJ CC
18   properties.
19           As I told Your Honor previously, the provisions of
20   4E, the good faith and reasonable cooperation, were not the
21   subject of specific discussion prior to the calendar call, but
22   were assumed to be part of an implied covenant of good faith
23   and fair dealing, and there was a general discussion about
24   noninterference in the business of Coastal.
25           THE COURT:  Okay.
```

```
 1              MR. SCAROLA:  5B is a parallel provision to the same
 2   provision with regard to Dr. Kuppinger.
 3              THE COURT:  B, as in boy?
 4              MR. SCAROLA:  B, as in boy.
 5              THE COURT:  That's the dismissal with prejudice,
 6   okay.
 7              MR. SCAROLA:  That's correct.
 8              THE COURT:  Okay.
 9              MR. SCAROLA:  And 5D is the parallel provision to the
10   good faith provision we just discussed with regard to
11   Dr. Kuppinger.
12              THE COURT:  Okay.
13              MR. SCAROLA:  6AI defines the scope of the issues to
14   be arbitrated, which were the subject of specific discussion at
15   the time of the conference with Your Honor, where it was agreed
16   that all parties would preserve all claims and all defenses
17   with regard to Dr. Molloy's stock ownership.  That carries over
18   to subparagraph B.
19              Seven is the general release language.
20              THE COURT:  I don't think anybody is disagreeing with
21   regard to a general release.  Maybe you were wordsmithing the
22   language, but I don't think anybody has ever disputed that the
23   parties were contemplating a mutual general release.
24              MR. SCAROLA:  The provision with regard to disclosure
25   to financial advisers and lenders.
```

```
 1                THE COURT:  I'm sorry, paragraph?

 2                MR. SCAROLA:  Paragraph 9.

 3                THE COURT:  Okay.  Had that been discussed and agreed

 4    to prior to the calendar call?

 5                MR. SCAROLA:  I don't recall whether it was prior to

 6    the calendar call, Your Honor, in connection with the

 7    negotiation of the specific written language.

 8                THE COURT:  Okay.  Had it been specifically

 9    requested prior -- whether it had been agreed to or not, had it

10    been requested prior to your email on October 28th?

11                MR. SCAROLA:  I don't recall that, Your Honor, but it

12    is a standard exception to confidentiality and I don't believe

13    that it was ever the subject of a dispute, but --

14                THE COURT:  Okay.

15                MR. SCAROLA:  Non-disparagement was the subject of

16    prior agreement.

17                THE COURT:  Okay.

18                MR. SCAROLA:  And --

19                THE COURT:  So your position is that was omitted.

20                MR. SCAROLA:  That was omitted, yes, sir.

21                THE COURT:  Okay.

22                MR. SCAROLA:  The language with regard to successors

23    and assigns, I don't recall being the subject of any discussion

24    or any dispute.

25                THE COURT:  I just -- you know what you meant when
```

1    you wrote the email that provisions have been omitted that are

2    essential to your client, I'm just trying to identify what they

3    are.

4            MR. SCAROLA:  Yes, sir.

5            Paragraph 13 had been discussed and agreed to, but

6    was not included in the draft sent to us.

7            THE COURT:  Hold on.  Okay, that's everybody is going

8    to bear their own attorneys' fees in this litigation.

9            Paragraph 25 was who would bear the cost of any

10   enforcement litigation.

11           MR. SCAROLA:  Yes, sir.

12           THE COURT:  Again, it was omitted, it had been agreed

13   to, but it was not explicitly included.

14           MR. SCAROLA:  Correct.

15           THE COURT:  Okay.

16           MR. SCAROLA:  I don't recall discussion prior to our

17   getting involved in the drafting process with regard to

18   paragraph 14.

19           THE COURT:  Okay.  Was that objectionable to your

20   client?

21           MR. SCAROLA:  No, sir, we are the ones that added the

22   language.

23           THE COURT:  Okay.

24           MR. SCAROLA:  I don't believe that the waiver

25   language was specifically discussed, that was an addition that

 1  we made.

 2          THE COURT:  Okay.  Again, if it was never

 3  specifically discussed, I don't consider it to have been

 4  omitted to the detriment of your client.  Again, I'm trying to

 5  drill down on what you were referring to in your email.

 6          MR. SCAROLA:  Well, Your Honor, I would consider the

 7  waiver provision to be a standard provision in an agreement

 8  such as this and the failure to include it, even in the absence

 9  of a discussion, would be an omission.

10          THE COURT:  Okay.  Well, did you pick up the phone

11  and call Mr. Cuza and say, Hey, I think that is a standard

12  provision, can we include it, or did you jump to the next

13  paragraph, which is, Tell the magistrate judge we have an

14  impasse?

15          MR. SCAROLA:  I didn't pick up the phone and speak to

16  Mr. Cuza, Your Honor.  In light of all of the disagreements

17  that we had and the inability to be able to resolve those, I

18  sent the communications that I sent.

19          THE COURT:  Understood.  Okay.

20          MR. SCAROLA:  The same is true with regard to the

21  exercise of remedies language, the same is true with regard to

22  the no admission language.

23          THE COURT:  So your position is there was no

24  agreement on any of these terms?

25          MR. SCAROLA:  There was no specific discussion with

1    regard to those terms.

2         THE COURT:  You are saying there was no discussion

3    about them, they were material to your client and the other

4    side's omission of them was detrimental to your client, and

5    those had not been resolved prior to the calendar call, at

6    which Mr. Pike told Judge Middlebrooks all of the material

7    issues had been resolved.

8         MR. SCAROLA:  Your Honor --

9         THE COURT:  That's what you are telling me.

10        MR. SCAROLA:  Your Honor, what I'm saying is those

11   provisions are standard provisions in an agreement such as

12   this, and they were omitted from this agreement.

13        THE COURT:  Were they material to your client?

14        MR. SCAROLA:  Yes, sir, they were material to our

15   client and they were assumed to have been agreed to because

16   they are standard provisions.

17        THE COURT:  All right.

18        MR. SCAROLA:  And I'll go on to --

19        THE COURT:  So if they are standard provisions, why

20   did you hesitate to ask the other side to simply add the

21   standard provisions?

22        MR. SCAROLA:  I didn't hesitate to ask the other side

23   to add these standard provisions.

24        THE COURT:  Where did you ask them -- where did you

25   ask them to add them, Mr. Scarola?  I see your email at 1:58,

1   then I see an email back to you, Please tell us what you mean

2   by this sentence in your email, and you don't answer their

3   question.

4           MR. SCAROLA:  Your Honor, there were subsequent

5   revisions that were sent after this exchange, so we did

6   respond.

7           THE COURT:  And where are those?

8           MR. SCAROLA:  Between October 22nd and October 27th,

9   for a five day period of time.

10          THE COURT:  No, I'm talking about October 28th and

11  29th.  On October 28th, you sent them an email saying, You have

12  put in some stuff that we can't live with and you haven't put

13  in stuff that we need, and they say, Okay, tell us what it is,

14  and you won't tell them.

15          MR. SCAROLA:  Well --

16          THE COURT:  Why not?

17          MR. SCAROLA:  Your Honor, that is not accurate

18  because I did tell them.

19          THE COURT:  Where?

20          MR. SCAROLA:  And I told them in writing.

21          THE COURT:  Where, where?

22          MR. SCAROLA:  In the exchanges of settlement drafts

23  that we provided to them.  We are looking at the first of two

24  and then we get -- then we get a counterproposal back from

25  them, which is Exhibit Number 5 to our response.  And Your

1    Honor will see that some of the terms that I have identified

2    with regard to number 4 are not objected to, but some of them

3    remained objected to, and new terms are inserted.  So that's

4    what was being referred to in that exchange of emails.

5            THE COURT:  All I know is I see an email on 10/28

6    saying, Please list all the revisions that, quote, "change the

7    terms of the proposal in ways that were neither discussed with

8    us," you, "nor contemplated by your clients," close quote.

9            And one hour -- I'm sorry, three hours and 54 minutes

10   later is an email saying, "We are done.  There is no agreement,

11   our previous offers are withdrawn."

12           So was there an exchange of drafts in between those

13   emails?

14           MR. SCAROLA:  The exchange of drafts, Your Honor, are

15   the drafts reflected at tab four and tab five, Exhibit 4 and

16   Exhibit 5.

17           THE COURT:  Do those have a timestamp on them?

18           MR. SCAROLA:  They don't have a timestamp on them,

19   but I believe that they were all exchanged electronically and

20   the times can be identified, sir.

21           MR. PIKE:  I can identify the times for you, Your

22   Honor, and the dates.

23           THE COURT:  All I want to know is where the exchange

24   between 10:28 A.M. on November 1st and 2:12 P.M. November 1st

25   is.

```
1              MR. BOLOY:  No, Your Honor.  The first settlement
2    draft was sent by Mr. Newman on October 22nd, our revisions
3    were sent on October 25th, and their revisions to our revisions
4    were sent on October 26, and at that point, we realized that
5    those revisions -- we were not going anywhere and they were
6    unacceptable to our clients.
7              That counteroffer was unacceptable to our clients,
8    that would be Exhibit 5 to our response, and that is
9    plaintiffs' revisions to our initial revisions, and that is
10   what is referenced by Mr. Scarola in his email.
11             THE COURT:  This is the 131-5?
12             MR. BOLOY:  That's correct, Your Honor.
13             THE COURT:  Which was sent on October 26th?
14             MR. BOLOY:  That's correct, Your Honor.
15             THE COURT:  Okay.  Let me go back to Mr. Cuza for a
16   couple of questions.
17             Mr. Cuza, I want to give you a chance to respond to
18   the topics that Mr. Scarola just went through in 131-4.
19             MR. SCAROLA:  Your Honor, before we go there, may I
20   have an opportunity to address what I consider to be a
21   significant issue that we have not yet focused on?
22             THE COURT:  Sure.
23             MR. SCAROLA:  Thank you.  And may I have permission
24   to approach the bench again?
25             THE COURT:  You may.  What is the issue that we
```

1    haven't addressed yet?

2         MR. SCAROLA:  Your Honor, the issue is dealt with in

3    the summary that I have provided to the Court.  We have been

4    focusing on whether there were material terms that remained

5    unresolved between the parties because I think both sides

6    acknowledge that there is no ability to enforce an agreement if

7    material terms remain unresolved.

8         There is a second important issue, and that is that

9    as the plaintiffs have acknowledged in their reply, absent an

10   expressed intent by the parties that no binding contract exists

11   until negotiations are reduced to a formal writing, the lack of

12   a formal document does not negate the existence of a binding

13   contract.

14        That is the authority that they cite at page 11 of

15   their motion to enforce the settlement agreement, relying on

16   *Rolsafe International, LLC*.

17        There was an express intent by the parties that no

18   contract exists until negotiations are reduced to a formal

19   writing, and what I have done in this submission to Your Honor

20   is to outline the evidence that clearly demonstrates the

21   existence of an agreement on both sides that there was no

22   binding contract until negotiations were reduced to a formal

23   writing.

24        THE COURT:  That's wonderful.  When I get around to

25   argument, I'll let you make your argument, we are not there

```
 1   yet.

 2            MR. SCAROLA:  Thank you, sir.

 3            THE COURT:  Let me go back to Mr. Cuza and back to

 4   docket entry 131-4.

 5            MR. CUZA:  Your Honor, I don't have the agreement

 6   with me.  I was taking notes, I can go over my notes.

 7            THE COURT:  That's okay, I'll walk you through the

 8   questions I have, just like I did with Mr. Scarola, that's

 9   fine.

10            MR. CUZA:  Thank you, Your Honor.

11            THE COURT:  Do you have the document in front of you,

12   sir?

13            MR. CUZA:  Okay, Your Honor, I have it on the screen.

14            THE COURT:  Okay.  Starting on page three, section

15   3A, as in alpha, this was one of the provisions that the other

16   side says had been discussed and was omitted from the draft.

17            Do you agree that it had been discussed and agreed

18   upon and omitted from the draft?

19            MR. CUZA:  Talking about 3B?

20            THE COURT:  3A, sub 1, the pledge of the collateral.

21            MR. CUZA:  Your Honor, this was not to my -- it

22   wasn't discussed with me, I can tell you that much.

23            THE COURT:  But nevertheless, you accepted that

24   language, did you not, in the next draft that went back?

25            MR. CUZA:  Your Honor, again, I wasn't involved in
```

1    the process, so I'm going to need assistance here.

2            THE COURT:  No problem.  I'll look at 131-5, which I

3    think is the next provision, it looks like you accepted that

4    change.

5            MR. NEWMAN:  I'm sorry, Your Honor, what was the

6    provision again?

7            THE COURT:  3A, sub 1.  It says, "The Coastal parties

8    will not transfer all or any part of the collateral, but may

9    pledge the collateral to secure the loan," that was accepted as

10   of October 26th, was it not?

11           MR. NEWMAN:  That's correct.

12           Your Honor, I think it is important to note many of

13   the provisions that Mr. Scarola just referenced to you seem to

14   be based off an old draft, because some of them had been

15   accepted prior.

16           THE COURT:  Okay.

17           MR. NEWMAN:  And you will see that as you go through.

18           MR. ROTHSCHILD:  Your Honor, may I direct your

19   attention to an exhibit that is in reference to the questions

20   that you are asking Mr. Cuza now?

21           THE COURT:  Sure.

22           MR. ROTHSCHILD:  In our response in opposition,

23   Exhibit 7, there is an email from Mr. Newman.  I think that

24   everybody has taken the position here that when you do not

25   contest a change when it is going back and forth from one

 1    revision to the next draft, you have accepted it.

 2            But all of the parties, including Mr. Newman, says in

 3    his email of October 22nd, 2021 at 6:27 P.M., it says, "Please

 4    see an attached draft of the settlement agreement, but please

 5    note that we reserve the right to change any portion of what we

 6    are providing until we get the final draft."

 7            THE COURT:  Okay.  What I'm exploring is how, if on

 8    October 26th it was communicated to the defendants that a

 9    change had been accepted, Mr. Scarola can send an email on

10    October 28th, saying, We object to that provision, which isn't

11    in here any more.

12            Likewise, paragraph 4A relating to the limitations on

13    the Zativa, that had been accepted before October 28th, had it

14    not?

15            I'm looking at 131-5, my understanding from the

16    pleading is 131-5 was sent on October 26th, am I incorrect

17    about that?

18            MR. NEWMAN:  You're correct, Your Honor.

19            THE COURT REPORTER:  Who said that?

20            MR. NEWMAN:  I'm sorry, this is David Newman of

21    Holland & Knight on behalf of the plaintiffs.

22            THE COURT REPORTER:  Can you rise when you speak,

23    you're behind them and I can't see you.

24            THE COURT:  Thank you, Mr. Newman.

25            I'll go back through it myself.

```
 1              MR. BOLOY:  Your Honor, I want to ensure that our
 2    first draft that was sent on October 25th, my email to
 3    Mr. Newman says -- similar to Mr. Newman's initial email
 4    sending the first draft, "The revised settlement has not been
 5    reviewed by our clients," so our clients hadn't even reviewed
 6    it yet, "but it is drafted in a manner that will likely be
 7    approved by our clients."
 8              THE COURT:  I'm aware.
 9              Here is he what I would like to do, we have been
10    going for awhile and I want to give the court reporter a break.
11    Let's take a ten minute break, we will come back at 3:20.
12              We will be in recess for ten minutes.
13         (Recess was had at 3:11 p.m.; and the proceedings
14    resumed at 3:23 p.m.)
15              THE COURT:  Okay.  Just a couple of housekeeping
16    things before we start.  The second document that was handed up
17    by counsel for the defense, I'm just going to mark it as
18    Exhibit 2 for purposes of the hearing, so we have a record of
19    that.
20         (Evidence marked as Exhibit No. 2.)
21              THE COURT:  So here's where I think we need to go,
22    folks.  I think I have been somewhat inconsistent about my
23    accepting representations, requiring testimony, wanting
24    evidence under oath, not wanting evidence under oath, things of
25    that nature and I think I need to fix that.
```

```
1            So what I'm going to do is we are going to recess, I

2     am going to have you all come back on the 17th because we

3     already have 17th set aside.  I have a trial that week, so I

4     want to make sure we're done with that.

5            Come back on the 17th, we will have an evidentiary

6     hearing and I will allow the parties to offer testimony.  It

7     may be Mr. Cuza, Mr. Pike, other people, I don't know, but here

8     are the topics I think are germane to my decision that I

9     need -- that I would like to give you an opportunity to fully

10    develop a record on.

11           If you want to rest on the record we have, that's

12    fine, but I want to give you a full opportunity to develop the

13    record, and I'll tell you these are the issues that I'm

14    interested in:

15           What was agreed to by the parties before the calendar

16    call in front of Judge Middlebrooks, that's category one; what

17    discussions were had, what agreements were reached.

18           Number two, what was discussed as potential terms but

19    not agreed to before the calendar call, so it was still in flux

20    at the time of the calendar call.

21           And number three, what issues were raised after the

22    calendar call that had not been specifically raised before the

23    calendar call.

24           So it may be that the parties believed that, you

25    know, for example a general release includes, you know, the
```

1    return of property, but if that wasn't specifically talked

2    about, I want to know that and I want to know when those issues

3    were raised because I think that informs the decisions that I

4    have to make, so we will come back at 10:00 o'clock on

5    December 17th for that purpose.

6            In the meantime, just for my planning purpose, I need

7    to just get some guidance from you all.  If I determine to deny

8    the motion, then we have to set the case for trial.  I know --

9    and I haven't obviously made a decision yet, but obviously we

10   are not going to try the case before the first of the year,

11   given that I'm not going to even resolve this issue until the

12   middle of December, so I apologize.  I should have some time

13   during the beginning of the year to try the case if we have to.

14           So I know -- so I have one question about count

15   seven, which is the declaratory judgment count, is that a jury

16   or nonjury determination?

17           MR. CUZA:  Your Honor --

18           THE COURT:  That's me, and I'm not asking for a

19   definitive answer.  If you know the answer, tell me, but I

20   don't know the answer to that question because it seems some of

21   it is -- go ahead.

22           MR. CUZA:  As of the moment that we had the

23   conversation with you on October 20th, it's a nonjury

24   evidentiary hearing, where you have the final say and it's not

25   appealable.

```
 1              THE COURT:  No, no, not under the settlement

 2    agreement; no, no, not under the settlement agreement.

 3              If I deny your motion, now we are back to the amended

 4    complaint, we are going to trial on the amended complaint.  So

 5    my question is, if we have a trial on the amended complaint,

 6    does count seven go to the jury, or does it go to me?

 7              MR. CUZA:  Your Honor, we need to look at that

 8    because count seven raises a number of issues.  So we need to

 9    go back, look at the issues and see which ones go to you and

10    which ones go to the jury.

11              THE COURT:  That would be helpful, and both sides

12    could look at that question.  Obviously we don't have to cross

13    that bridge right now, until I rule on the motion, but that is

14    at least something I've been thinking about.

15              MR. BOLOY:  Your Honor, if I may, I believe it would

16    be docket entry 221, which would be the amended restated

17    shareholder agreement, where all parties to this litigation

18    expressly waive a jury trial.

19              That issue was to be brought before the Court

20    potentially at the calendar call because we had that issue, and

21    we wanted to assert that issue expressly for count seven, so

22    there may be an issue as to whether this case will proceed as

23    strictly a jury trial or a nonjury trial.

24              THE COURT:  Okay.  Plaintiffs.

25              MR. ROTHSCHILD:  I'm not sure what counsel means by
```

1    strictly.  I mean, we are entitled to a jury trial on our count

2    one and two, so you can have some claims go to a jury and some

3    claims go to the court in the same trial.

4            The other thing I would just quickly point out, Your

5    Honor, we had discovery motions.

6            THE COURT:  Right, I'm going to get to that in a

7    second.  Thank you, Mr. Rothschild, you got farther down my

8    list than I did, but I'm aware.

9            Let me circle back on that issue.  Is it the

10   plaintiffs' position that it is a jury trial on counts one and

11   two, and a nonjury trial on all remaining counts, or do you

12   believe you are entitled to a jury trial on more than just the

13   first two counts?

14           MR. CUZA:  Your Honor, on count seven, we need to

15   look at count seven to see what are the issues.

16           THE COURT:  I mean, some of those have to do with

17   interpretation of the partnership agreement, and some of them

18   don't.

19           MR. CUZA:  Right.  So there is no question that

20   counts one and two goes to the jury.  There is no question that

21   some of the issues that are raised in count seven fall under

22   the agreement and the agreement does provide that it is a

23   nonjury trial, but I have to go back, Your Honor, and look at

24   count seven and review it with specificity to see what --

25           THE COURT:  That's fine.

```
 1              MR. BOLOY:  Your Honor, if I may respond to that, the
 2    same -- in count one and count two, the plaintiffs are seeking
 3    attorneys' fees based upon the shareholder agreement, which
 4    they state in their complaint the wherefore clause and the
 5    relief for attorneys' fees based on the shareholder agreement,
 6    yet they are wishing to exercise their right to attorneys'
 7    fees -- prevailing attorneys' fees pursuant to the amended
 8    shareholder agreement, yet do not want to abide by their
 9    explicit waiver of a jury trial concerning any shareholder
10    against the corporation.
11              THE COURT:  Let me put it this way:  The complaint
12    itself is at docket entry 22.
13              MR. BOLOY:  It attaches the --
14              THE COURT:  I understand, I'm just looking at docket
15    entry 22.
16              Is there a jury trial demand in there, Mr. Rothschild
17    or Mr. Cuza?
18              MR. CUZA:  I'm pretty sure there is.
19              THE CLERK:  Page 27.
20              THE COURT:  Page 27 my law clerk tells me.
21              MR. CUZA:  I'm pretty sure there is.  I haven't
22    looked at the complaint in a long time, but I'm pretty sure
23    there is.
24              THE COURT:  Yes, jury trial demanded right there in
25    bold and underlined letters in all caps, how could I miss it?
```

1          Okay.  So if the defendants believe that the

2    plaintiffs are not entitled to a jury trial, you need to file a

3    motion, frame the issue and I'll resolve it if I have to, but

4    thank you for identifying that issue.

5          Again, you don't necessarily need to file that motion

6    now, we can talk about that the next time we get together, but

7    you should all start thinking about that as a possibility.

8          The other point I have, Mr. Rothschild, and I think

9    this is where you were going, is I know there was some issue

10   prior to the mediation about your assertion that there had been

11   some late production of documents, as I recall, and the

12   plaintiffs wanted some additional discovery.

13         MR. ROTHSCHILD:  Yeah.

14         THE COURT:  Can you refresh me where we are on that?

15         MR. ROTHSCHILD:  Well, I did not look at that before

16   today, but I do know that I think it is more than just -- if I

17   remember correctly -- and again it is all in the record,

18   whatever we had filed.

19         THE COURT:  Again, it was in front of Judge

20   Middlebrooks at the time, so I didn't read it.  Is there a

21   motion to compel or a motion of some kind requesting --

22         MR. ROTHSCHILD:  And for sanctions, because there

23   were productions made, we didn't get documents; eventually, we

24   got some documents.  Then there was a deposition where a

25   witness said certain documents exist, we never got those, and

```
 1   so that's -- again, it is laid out in the motion, I don't --
 2            THE COURT:  So you filed your motion.  Is it fully
 3   briefed, and did the defense get a fair chance to respond and
 4   reply and it is fully briefed?
 5            MR. BOLOY:  Yes, Your Honor, it is fully briefed;
 6   however, the defense does have a motion to strike Mr. Pike from
 7   the trial witness list and motion for sanctions, also.
 8            THE COURT:  Okay, that's fine.  Obviously, since it
 9   wasn't my case until recently, I haven't kept up with what is
10   in the docket.  I will take a look at that motion, determine
11   whether I need argument or whether I can just rule on the
12   papers.  There is a motion to strike.
13            I was going to ask, turning to the plaintiffs first,
14   are there any other pending motions or anything before the
15   Court that I need to catch up on?
16            MR. ROTHSCHILD:  Other than the ones we've discussed,
17   no.
18            THE COURT:  Mr. Scarola or --
19            MR. SCAROLA:  I don't believe so, Your Honor, no.
20            MR. ROTHSCHILD:  Your Honor, may I ask a housekeeping
21   question?
22            THE COURT:  You may.
23            MR. ROTHSCHILD:  Originally you told us to keep
24   December 16 and 17.
25            THE COURT:  Here's my concern, and you tell me how
```

```
 1   you want to proceed.  I have a slip and fall case going to

 2   trial on December 13th, that Monday.  I thought it was going to

 3   settle and they didn't settle today at their mediation, so I

 4   have to keep that open.

 5           My concern is I don't want to tie you all up on

 6   Thursday if the jury, or if I'm going to be in trial

 7   proceedings.

 8           I can't imagine that whatever additional proceedings

 9   we have in this case will take more than a day, if we start

10   promptly at 10:00 A.M.  So I'm happy to -- so I'll release you

11   from the 16th, if that's what you are asking me, I don't want

12   to waste everybody's time.

13           MR. ROTHSCHILD:  Thank you, Your Honor.

14           THE COURT:  Any other housekeeping matters from the

15   Plaintiff, any other questions or clarifications before we

16   recess for the day?

17           MR. CUZA:  No, Your Honor.

18           THE COURT:  From the defense, anything further, any

19   issues or clarifications?

20           MR. SCAROLA:  I will only alert the Court that I have

21   just been subpoenaed as a witness in a New York Federal

22   proceeding involving Ghislaine Maxwell.

23           THE COURT:  I'm not surprised to hear that.

24           MR. SCAROLA:  I am.

25           THE COURT:  I didn't say I was happy, but I'm not
```

1   surprised.

2        MR. SCAROLA:  I was very surprised, I was very

3   surprised.  They are going to let me know when I'm needed and

4   I'll let them know about this conflict.

5        THE COURT:  Let me make this as clear as can be:  If

6   Judge Nathan needs you in New York for a jury trial in that

7   case, I will reschedule my hearing, so you can feel free to

8   tell whoever subpoenaed you I'm not going to stand in the way.

9        MR. SCAROLA:  Thank you.

10       THE COURT:  I would like you to get it over with,

11  too, so I don't want to hold you up.

12       MR. SCAROLA:  If I have got to be compelled to go to

13  New York at the defense's expense, that's probably not a bad

14  time.

15       THE COURT:  Not a bad time of year, Christmastime is

16  a good time to be in New York.

17       It's good to see you all again.  Thank you for your

18  work today, I'll see you back on the 17th.

19       MR. BOLOY:  Thank you very much, Your Honor.

20    (PROCEEDINGS ADJOURNED AT 3:33 P.M.)

21

22

23

24

25

1

**C-E-R-T-I-F-I-C-A-T-E**

2

I hereby certify that the foregoing is

3

an accurate transcription and proceedings in the

4

above-entitled matter.

5

*11/30/2021*                          */s/DIANE MILLER*

6

DATE                          DIANE MILLER, RMR, CRR, CRC
Official Court Reporter

7

United States District Court
101 South U.S. Highway 1

8

Fort Pierce, FL  34950
772-467-2337

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Friday, November 19, 2021.

KUPPINGER vs. JMJZ Enterprises d/b/a Coastal Health    Page 96

Case 9:21-cv-80492-BER   Document 136   Entered on FLSD Docket 11/30/2021   Page 96 of 108

**MR. BOLOY: [11]**
55/9 61/17 80/1
80/12 80/14 85/1
88/15 90/1 90/13
92/5 94/19

**MR. CUZA: [90]**
2/13 6/4 6/7 6/9
6/11 6/20 8/17
8/22 9/16 9/20
10/16 10/21 15/9
15/23 17/2 17/8
17/13 17/24 18/22
19/4 19/11 19/14
20/4 20/8 20/18
20/23 21/3 21/5
21/21 22/20 23/15
23/21 27/20 28/3
28/9 28/14 28/18
28/24 29/8 30/14
33/17 34/1 34/17
34/20 34/23 35/4
35/8 37/7 38/11
38/19 40/13 41/12
41/16 41/19 42/3
42/25 47/11 47/13
48/8 48/11 49/3
49/9 49/14 49/20
50/7 50/17 50/19
50/25 51/4 51/8
51/15 51/24 52/13
53/15 53/19 56/6
82/5 82/10 82/13
82/19 82/21 82/25
87/17 87/22 88/7
89/14 89/19 90/18
90/21 93/17

**MR. NEWMAN:**
**[5]** 83/5 83/11
83/17 84/18 84/20

**MR. PIKE: [11]**
22/24 23/2 23/6
23/8 55/11 55/25
57/1 57/16 58/2
58/4 79/21

**MR.**
**ROTHSCHILD:**
**[25]** 2/10 3/21
3/25 5/1 14/19
14/22 43/3 43/12
43/18 44/2 44/6
44/10 44/22 45/16

51/12 83/18 83/22
88/25 91/13 91/15
91/22 92/16 92/20
92/23 93/13

**MR. SCAROLA:**
**[195]**

**THE CLERK: [1]**
90/19

**THE COURT:**
**[330]**

## $

**$1,355,000 [1]**
63/7
**$100,000 [1]** 30/7
**$11,496.08 [1]**
64/15
**$20 [2]** 32/2 32/3
**$20 million [2]**
32/2 32/3
**$4,500 [1]** 64/13
**$400,000 [12]**
6/22 9/20 9/21
9/23 12/2 12/3
12/5 12/5 12/13
12/21 49/16 49/20
**$50,000 [4]** 6/24
9/24 9/25 49/21
**$800,000 [2]** 19/1
19/1

## .

**.4 [1]** 17/14
**.4-14 [1]** 17/14

## /

**/s/DIANE [1]** 95/5

## 1

**1.3 [3]** 13/7 63/18
66/23
**1.3 million [2]**
41/7 66/22
**1.350 [1]** 41/10
**1.355 [1]** 10/10
**1.355 million [1]**
67/19
**1.7 [1]** 12/17
**10 [1]** 44/1
**10/28 [1]** 79/5
**100 [3]** 34/14 35/5
49/23
**100 percent [12]**
4/15 7/4 36/5

36/12 36/22 37/17
37/20 37/23 39/20
39/21 50/12 58/15
**101 [1]** 95/7
**108 [1]** 1/7
**10:00 [1]** 93/10
**10:00 o'clock [1]**
87/4
**10:28 [1]** 79/24
**10:48 [1]** 43/21
**11 [3]** 23/11 44/1
81/14
**11/30/2021 [1]**
95/5
**116 [1]** 46/14
**11:24 [1]** 43/15
**12 [1]** 47/2
**1200 [1]** 1/15
**1209 [1]** 1/21
**125 [3]** 3/11 44/8
47/2
**125-2 [1]** 60/21
**125-3 [1]** 44/2
**125-4 [5]** 43/16
45/18 45/19 51/12
51/13
**13 [2]** 46/5 75/5
**131 [3]** 3/11 5/21
34/7
**131-4 [5]** 23/7
23/10 61/11 80/18
82/4
**131-5 [4]** 80/11
83/2 84/15 84/16
**132 [1]** 3/11
**133 [2]** 3/25 6/14
**133-1 [1]** 43/19
**13th [1]** 93/2
**14 [2]** 17/14 75/18
**1483 [1]** 46/6
**15 [1]** 47/2
**16 [4]** 10/22 13/18
23/16 92/24
**16th [3]** 10/4 10/8
93/11
**17 [3]** 10/22 28/9
92/24
**17th [7]** 10/5 10/8
86/2 86/3 86/5
87/5 94/18
**18 [3]** 61/20 63/1
63/8
**19 [2]** 1/6 17/24

**19th [10]** 15/22
43/14 47/23 48/2
49/25 50/1 50/3
50/22 51/1 51/5
**1:00 [1]** 53/1
**1:58 [2]** 60/22
77/25
**1C [1]** 62/11
**1G2 [2]** 13/19
13/20
**1st [2]** 79/24
79/24

## 2

**2 million [5]** 19/8
19/19 19/20 19/22
19/24
**2.1 [8]** 7/1 9/17
10/7 12/10 12/17
12/18 12/23 41/10
**2.1 million [5]**
6/20 10/2 12/9
49/14 49/21
**20 percent [4]**
39/2 39/2 39/4
50/13
**2021 [3]** 1/6 84/3
95/5
**20th [13]** 46/15
47/25 50/2 50/4
50/23 51/25 52/17
52/18 52/21 56/17
56/18 56/19 87/23
**21-80492 [1]** 2/6
**21-80492-CIV-REI
NHART [1]** 1/2
**2139 [1]** 1/18
**22 [2]** 90/12 90/15
**221 [1]** 88/16
**22nd [3]** 78/8
80/2 84/3
**2337 [2]** 1/25 95/8
**25 [2]** 66/25 75/9
**25th [2]** 80/3 85/2
**26 [1]** 80/4
**26th [4]** 80/13
83/10 84/8 84/16
**27 [2]** 90/19 90/20
**27th [1]** 78/8
**28 [3]** 65/19 72/12
79/5
**28th [8]** 60/22
62/2 64/21 74/10

78/10 78/11 84/10
84/13
**29th [1]** 78/11
**2:00 [1]** 64/22
**2:12 [1]** 79/24
**2A [1]** 63/1
**2B [1]** 63/5
**2C [1]** 63/6
**2D [3]** 63/6 63/8
67/17

## 3

**33301 [1]** 1/15
**33401 [1]** 1/21
**33409 [1]** 1/18
**34950 [1]** 95/8
**3:11 [1]** 85/13
**3:20 [1]** 85/11
**3:23 [1]** 85/14
**3:33 [1]** 94/20
**3A [7]** 63/24 68/9
70/14 70/14 82/15
82/20 83/7
**3A1 [2]** 68/24
70/21
**3B [3]** 64/6 70/14
82/19
**3D [3]** 68/25
70/14 71/8
**3E [1]** 70/14

## 4

**4 million [4]** 19/9
19/10 37/21 37/25
**40 percent [10]**
36/14 36/14 37/1
38/15 38/18 38/19
38/20 39/13 40/3
50/12
**467-2337 [1]** 1/25
**4:28 [3]** 45/18
56/18 56/19
**4A [6]** 65/16
65/17 69/21 69/22
71/22 84/12
**4B [1]** 70/4
**4E [1]** 72/20

## 5

**515 [1]** 1/14
**54 [1]** 79/9
**5B [1]** 73/1
**5D [1]** 73/9

Page 97

KUPPINGER vs. JM JZ Enterprises d/b/a Coastal Health

Case 9:21-cv-80492-BER Document 136 Entered on FLSD Docket 11/30/2021 Page 97 of 108

**6**

**6:27 [1]** 84/3
**6A [3]** 66/8 66/20 66/21
**6AI [1]** 73/13

**7**

**772 [1]** 1/25
**772-467-2337 [1]** 95/8

**8**

**80 [1]** 30/6
**800 [1]** 19/5
**800,000 [1]** 19/3
**80492 [1]** 2/6

**A**

**A.M [4]** 43/21 44/1 79/24 93/10
**abandoned [2]** 69/6 71/21
**abide [1]** 90/8
**ability [10]** 12/21 32/15 32/16 33/4 33/6 33/21 39/19 66/5 67/11 81/6
**ablation [2]** 65/4 65/10
**above [2]** 62/14 95/4
**above-entitled [1]** 95/4
**absence [1]** 76/8
**absent [1]** 81/9
**absolutely [5]** 21/3 21/23 33/19 40/15 56/13
**accept [2]** 23/23 60/20
**accepted [8]** 5/11 82/23 83/3 83/9 83/15 84/1 84/9 84/13
**accepting [5]** 4/18 4/23 5/2 58/11 85/23
**access [2]** 37/24 39/5
**accord [1]** 16/12
**accordance [1]** 48/1
**accounts [8]**

17/16 18/8 19/2 28/11 31/12 32/1 32/16 33/4
**accurately [1]** 27/4
**acknowledge [1]** 81/6
**acknowledged [2]** 64/13 81/9
**act [1]** 18/12
**activities [1]** 43/24
**activity [1]** 44/11
**add [8]** 21/15 23/22 50/8 55/13 57/16 77/20 77/23 77/25
**added [12]** 64/18 64/19 65/25 66/3 66/4 66/5 66/10 66/12 66/24 67/17 67/23 75/21
**adding [1]** 64/18
**addition [4]** 8/19 45/21 65/8 75/25
**address [5]** 37/14 48/11 50/20 60/16 80/20
**addresses [1]** 56/22
**ADJOURNED [1]** 94/20
**admissible [1]** 14/9
**admission [1]** 76/22
**adopt [2]** 55/1 55/6
**adopting [1]** 57/12
**advanced [1]** 47/24
**advisers [1]** 73/25
**advocate [1]** 6/17
**affidavits [2]** 4/22 4/25
**afoul [1]** 13/12
**afternoon [9]** 2/2 2/4 2/10 2/13 2/14 2/19 3/2 45/17 64/22
**afterwards [1]**

16/17
**agents [1]** 62/12
**agreeable [1]** 6/25
**agreement [90]** 3/10 5/13 7/15 7/19 8/7 8/8 9/2 9/5 9/9 9/10 9/22 11/4 11/8 12/2 14/10 15/21 16/25 17/23 17/25 18/7 18/11 18/25 19/23 20/15 21/7 21/9 22/5 24/1 24/20 25/8 25/23 26/6 29/23 30/6 38/4 38/5 39/20 39/25 44/15 45/23 46/11 46/17 46/18 47/9 47/24 48/1 48/4 48/12 48/15 48/16 50/4 50/11 50/20 50/21 51/22 52/5 53/17 55/17 56/5 59/21 60/10 62/9 65/20 66/13 68/8 68/8 70/10 71/1 71/5 71/18 74/16 76/7 76/24 77/11 77/12 79/10 81/6 81/15 81/21 82/5 84/4 88/2 88/2 88/17 89/17 89/22 89/22 90/3 90/5 90/8
**agreements [5]** 3/17 4/17 18/5 61/4 86/17
**al [2]** 1/17 2/7
**alert [1]** 93/20
**alleged [1]** 63/7
**allocate [1]** 12/21
**allocated [3]** 11/3 12/2 12/22
**allocates [1]** 11/21
**allow [5]** 29/25 43/11 55/4 58/6 86/6
**Almost [1]** 26/15
**alpha [2]** 70/14 82/15
**although [1]**

49/24
**ambiguity [2]** 8/9 8/13
**amended [5]** 88/3 88/4 88/5 88/16 90/7
**amongst [1]** 10/1
**amount [9]** 11/24 11/24 13/3 18/24 19/6 37/19 38/4 38/22 39/13
**amounted [1]** 27/1
**amounts [5]** 10/5 38/23 39/5 39/7 51/21
**ancillary [2]** 24/19 46/22
**ANDREW [2]** 1/19 2/20
**answer [7]** 29/8 29/14 37/8 78/2 87/19 87/19 87/20
**anticipated [3]** 35/20 36/4 54/10
**apologize [2]** 45/14 87/12
**appealable [1]** 87/25
**appearances [2]** 1/12 2/8
**application [1]** 18/8
**applied [1]** 8/10
**applies [2]** 9/21 10/3
**apply [3]** 19/17 19/20 42/22
**applying [1]** 17/16
**appreciate [2]** 8/3 22/6
**approach [2]** 54/12 80/24
**approached [1]** 25/22
**approved [1]** 85/7
**arbiter [1]** 28/1
**arbitrate [4]** 10/20 13/3 24/22 27/21
**arbitrated [4]** 10/18 27/17 28/1

73/14
**arbitration [2]** 27/17 28/2
**areas [3]** 61/21 61/22 63/17
**argue [3]** 13/4 13/4 40/18
**arguing [1]** 13/16
**argument [17]** 4/12 5/4 7/7 7/15 13/24 14/25 15/1 15/4 40/6 42/21 42/24 43/1 45/15 46/4 81/25 81/25 92/11
**arguments [1]** 42/5
**arising [1]** 32/5
**assert [1]** 88/21
**asserted [1]** 34/8
**assertion [1]** 91/10
**assertions [1]** 69/5
**assets [1]** 36/5
**assignment [2]** 17/15 64/9
**assigns [1]** 74/23
**assistance [1]** 83/1
**associated [1]** 53/16
**assume [4]** 4/22 31/13 34/13 41/25
**assumed [2]** 72/22 77/15
**assuming [7]** 11/9 17/5 20/25 27/7 27/11 29/4 38/14
**assurances [3]** 45/11 45/12 47/18
**assure [2]** 24/20 45/10
**attached [3]** 3/16 4/16 84/4
**attaches [1]** 90/13
**attachments [1]** 4/16
**attorneys' [6]** 66/24 75/8 90/3 90/5 90/6 90/7

**A**
authority [2]  47/3 81/14
Avenue [1]  1/21
avoiding [1]  29/9

**B**
backtracking [1] 48/22
balance [4]  7/1 10/2 18/14 41/5
barring [1]  44/11
baseline [1]  6/19
basis [2]  33/5 33/6
BEACH [4]  1/5 1/18 1/18 1/21
bear [2]  75/8 75/9
behind [1]  84/23
belief [1]  54/22
beliefs [2]  58/25 59/3
believe I [1]  49/4
bell [1]  15/14
bench [2]  54/12 80/24
beyond [2]  16/1 31/18
billings [1]  31/14
binding [4]  27/17 81/10 81/12 81/22
black [2]  50/22 51/2
bleeds [1]  23/11
Blvd [2]  1/14 1/18
bold [2]  5/21 90/25
BOLOY [5]  1/19 1/20 2/20 2/21 22/2
book [1]  51/8
borrow [1]  35/25
bottom [4]  45/1 63/10 66/21 67/18
bound [1]  49/7
boy [4]  34/19 70/5 73/3 73/4
breach [12]  21/5 21/7 21/10 21/11 21/11 21/17 21/17 22/8 51/17 51/19 51/20 66/6
breached [3]

22/12 22/12 66/13
breakdown [1] 24/21
breaker [3]  52/25 55/19 56/8
bridge [1]  88/13
brief [2]  26/7 46/8
briefed [3]  92/3 92/4 92/5
briefings [1] 42/20
BRUCE [1]  1/10
bullet [1]  56/21
burden [1]  4/5
business [3] 31/20 31/21 72/24
buyout [1]  35/20
buyouts [2]  33/5 33/7

**C**
C-E-R-T-I-F-I-C-A-T-E [1]  94/21
calculating [1] 33/5
calendar [37] 25/3 25/5 43/20 43/22 44/15 44/18 45/5 45/10 45/16 45/22 45/23 46/3 47/15 52/20 53/1 55/24 56/1 56/7 56/8 56/17 57/3 57/4 71/6 71/12 71/15 72/1 72/4 72/21 74/4 74/6 77/5 86/15 86/19 86/20 86/22 86/23 88/20
candid [1]  52/9
cap [1]  13/7
capped [1]  10/10
caps [1]  90/25
carried [1]  63/12
carries [2]  63/16 73/17
carved [1]  54/1
cash [8]  17/21 17/22 19/1 30/23 31/23 64/13 64/15 71/9
catch [1]  92/15
category [1]

86/16
caution [1]  58/17
CC [1]  72/17
ceiling [1]  63/7
central [1]  24/19
certify [2]  31/15 95/2
cetera [2]  62/13 67/12
chance [2]  80/17 92/3
charge [3]  32/21 32/23 32/23
chart [5]  5/19 6/11 11/14 18/6 29/20
choose [1]  60/1
Christmastime [1] 94/15
circle [3]  10/24 26/3 89/9
circumstance [1] 39/17
cite [2]  46/4 81/14
CIV [1]  1/2
claim [1]  66/6
claims [14]  25/16 28/25 32/4 41/1 66/1 69/4 69/9 69/25 71/20 71/21 72/9 73/16 89/2 89/3
clarification [5] 3/3 41/13 57/11 67/19 67/22
clarifications [2] 93/15 93/19
clarified [4]  16/20 20/6 20/12 67/8
clarify [1]  18/4
clarifying [1]  3/8
clause [4]  21/17 21/20 22/13 90/4
clear [9]  4/14 4/15 15/25 44/19 57/1 57/23 67/21 69/8 94/5
clerk [1]  90/20
client [11]  12/16 29/6 38/14 53/21 75/2 75/20 76/4 77/3 77/4 77/13 77/15

clients [23]  21/10 23/23 24/4 29/12 33/20 33/22 37/10 37/10 37/21 38/23 39/3 39/7 39/8 53/2 54/2 59/13 61/1 79/8 80/6 80/7 85/5 85/5 85/7
clients' [2]  38/2 57/21
close [3]  26/20 26/23 79/8
closer [2]  6/5 23/21
closing [5]  6/23 7/2 9/20 49/20 49/22
CMS [1]  31/16
COASTAL [30] 1/7 2/23 2/24 8/19 8/24 17/15 30/21 32/9 35/20 35/24 36/6 36/12 36/23 39/21 40/18 41/3 52/15 62/9 62/10 62/11 62/15 62/18 62/19 64/15 65/3 66/13 68/20 72/14 72/24 83/7
Coastal's [3] 28/10 31/20 31/21
collateral [22]  7/5 35/6 35/15 35/19 36/1 36/9 36/16 37/11 37/12 37/13 37/17 37/24 37/24 38/7 38/14 39/24 49/24 63/22 68/12 82/20 83/8 83/9
collateralization [1]  70/22
collateralized [1] 34/13
collect [7]  32/9 32/16 33/4 33/21 37/18 37/25 39/7
collected [2]  32/3 38/22
collection [1] 28/10
color [2]  45/19 61/15

comfortable [1] 2/16
comment [3] 16/10 27/19 31/10
comments [1]  8/2
commercial [4] 36/2 36/4 36/25 37/3
communicated [1] 84/8
communications [3]  13/17 14/8 76/18
community [1] 32/24
company [8]  7/4 34/14 34/15 38/16 38/16 38/18 39/1 39/12
company's [1] 35/6
compare [1]  5/24
compel [1]  91/21
compelled [1] 94/12
compensated [1] 33/23
compensation [3] 8/11 8/12 8/12
compete [2]  8/23 52/14
complaint [6] 88/4 88/4 88/5 90/4 90/11 90/22
completed [1] 15/20
complied [1]  38/6
comply [2]  24/4 50/11
comprehensive [1]  54/21
concept [6]  27/14 65/21 67/6 67/6 67/7 72/8
concern [5]  12/24 12/25 13/10 92/25 93/5
concession [1] 22/11
concessions [2] 16/7 16/8
conclude [1]  27/8
concluded [1]

Page 99

KUPPINGER vs. JM JZ Enterprises d/b/a Coastal Health.
Case 9:21-cv-80492-BER   Document 136   Entered on FLSD Docket 11/30/2021   Page 99 of 108

## C

concluded... [1] 15/15

concludes [1] 10/3

conclusion [1] 26/22

concur [1] 57/19

condition [1] 29/23

conference [8] 15/12 32/12 32/24 43/14 44/7 54/23 56/20 73/15

conferences [1] 43/23

confidential [1] 53/23

confidentiality [1] 74/12

confirm [1] 56/15

conflict [1] 94/4

connection [1] 74/6

consensus [1] 5/10

consent [1] 14/23

consenting [1] 46/18

consistent [1] 23/25

contained [1] 47/9

contemplated [2] 60/25 79/8

contemplating [1] 73/23

contend [1] 40/4

contest [1] 83/25

context [3] 16/3 30/19 31/19

contextualizes [1] 16/17

contingent [5] 8/8 9/2 9/4 9/10 16/25

contingently [1] 8/6

continued [2] 27/1 52/16

contract [4] 81/10 81/13 81/18 81/22

contribution [1] 30/21

convenience [1] 60/16

cooperate [3] 28/10 32/17 60/1

cooperation [6] 31/10 31/16 32/10 42/14 68/21 72/20

corners [1] 14/3

corporate [3] 2/24 40/10 62/20

corporation [1] 90/10

correspondence [3] 25/21 47/7 60/19

Costal's [1] 67/11

count [12] 87/14 87/15 88/6 88/8 88/21 89/1 89/14 89/15 89/21 89/24 90/2 90/2

counteroffer [1] 80/7

counterproposal [1] 78/24

counts [4] 89/10 89/11 89/13 89/20

court [32] 1/1 1/24 1/24 4/24 6/2 7/7 7/22 10/3 10/8 13/21 14/2 14/5 23/1 24/22 48/21 52/9 53/20 54/11 57/13 57/18 59/24 61/8 81/3 84/19 84/22 85/10 88/19 89/3 92/15 93/20 95/6 95/7

Court's [1] 57/9

covenant [2] 33/3 72/22

cover [3] 34/5 37/19 38/19

coverage [1] 31/23

covered [2] 34/21 34/23

CRC [2] 1/23 95/6

credibility [1] 59/18

critical [1] 45/6

cross [2] 58/7 88/12

cross-examined [1] 58/7

crossed [3] 61/21 61/24 64/6

CRR [2] 1/23 95/6

crucial [1] 57/24

cure [1] 51/19

curing [2] 51/18 51/20

cut [1] 45/20

CUZA [46] 1/13 2/11 3/15 6/5 7/19 14/17 18/20 20/2 21/14 23/14 26/4 27/19 28/8 30/11 33/14 34/9 34/16 35/2 37/6 40/12 41/11 42/24 43/23 44/23 44/24 45/16 45/20 47/12 51/13 55/13 55/15 55/17 56/1 56/4 57/20 57/21 58/8 58/9 76/11 76/16 80/15 80/17 82/3 83/20 86/7 90/17

Cuza's [2] 26/11 43/15

## D

d/d/a [1] 1/6

David [1] 84/20

dealt [1] 81/2

debt [3] 37/19 38/19 39/22

December 13th [1] 93/2

December 16 [2] 10/22 92/24

December 16th [2] 10/4 10/8

December 17th [2] 10/5 87/5

decide [4] 9/22 11/19 26/13 28/7

decided [1] 46/22

decision [3] 27/24 86/8 87/9

decisions [1] 87/3

declarations [1]

cross [2] 58/7 88/12

45/24

declaratory [1] 87/15

defendant [4] 2/25 4/3 40/10 64/7

defendants [24] 1/8 1/17 3/6 8/18 8/20 17/10 22/9 26/16 26/25 29/1 29/13 29/25 38/24 40/10 46/4 50/25 51/18 51/19 51/20 59/4 62/5 62/16 84/8 91/1

defendants' [8] 5/13 5/20 26/20 27/15 29/22 30/19 45/24 58/25

defense [10] 2/17 6/14 10/24 16/24 24/5 34/4 85/17 92/3 92/6 93/18

defense's [1] 94/13

defenses [1] 73/16

defined [1] 62/11

definition [2] 62/9 62/12

definitive [1] 87/19

demand [1] 90/16

demanded [1] 90/24

demonstrate [1] 48/18

demonstrates [1] 81/20

Denney [1] 1/17

deny [3] 52/25 87/7 88/3

dependent [1] 11/17

deposition [2] 32/25 91/24

derived [2] 18/8 18/14

deriving [1] 32/4

description [1] 18/6

despite [1] 5/12

details [2] 21/21

48/14

determination [2] 11/17 87/16

determined [2] 22/12 63/14

detriment [1] 76/4

detrimental [1] 77/4

develop [3] 59/22 86/10 86/12

diane [4] 1/23 1/25 95/5 95/6

difference [4] 13/25 19/21 38/23 41/10

direct [2] 59/15 83/18

directed [2] 16/5 16/6

director [2] 55/21 56/3

disagree [4] 5/25 10/11 41/16 41/17

disagreeing [2] 49/24 73/20

disagreement [6] 7/14 35/7 40/8 40/12 40/15 56/25

disagreements [1] 76/16

disclosure [1] 73/24

disconnect [1] 36/15

discovery [3] 26/7 89/5 91/12

discussion [24] 11/8 24/11 24/18 24/25 26/7 27/7 64/1 67/1 68/19 69/16 69/23 70/2 70/9 70/23 72/6 72/7 72/21 72/23 73/14 74/23 75/16 76/9 76/25 77/2

discussions [6] 24/15 26/22 29/5 29/12 71/16 86/17

dismiss [2] 25/7 72/8

dismissal [4] 66/1 72/3 72/6

Page 100

KUPPINGER vs. JM JZ Enterprises d/b/a Coastal Health

Case 9:21-cv-80492-BER   Document 136   Entered on FLSD Docket 11/30/2021   Page 100 of 108

## D

**dismissal... [1]**
73/5
**dismissed [1]**
70/1
**dismissing [1]**
25/16
**disparagement**
**[8]** 21/6 21/9
21/17 21/19 22/13
23/8 42/11 74/15
**dispute [11]** 8/13
16/2 16/13 23/12
23/12 31/1 41/2
67/2 67/19 74/13
74/24
**disputed [2]**
22/22 73/22
**disputes [1]**
46/22
**disputing [1]** 8/20
**district [7]** 1/1 1/1
1/24 45/9 59/16
59/19 95/7
**divided [1]** 9/25
**division [2]** 1/2
11/16
**divvy [1]** 11/5
**docket [15]** 3/11
5/20 6/13 23/7
23/10 34/7 43/16
43/19 51/7 60/20
82/4 88/16 90/12
90/14 92/10
**Docs [1]** 69/14
**document [8]**
6/15 21/18 67/15
67/22 67/24 81/12
82/11 85/16
**documentation**
**[1]** 17/9
**documents [9]**
28/18 35/9 47/21
47/22 57/17 91/11
91/23 91/24 91/25
**dog [2]** 70/14
71/8
**dollar [2]** 19/19
63/19
**dollars [12]** 18/24
19/9 19/20 19/22
19/25 32/2 37/21

**37/22 37/25 41/7**
**49/22 67/20**
**Dr [7]** 11/3 11/3
21/16 34/14 35/21
35/21 64/12
**Dr. [32]** 2/25
17/18 17/18 18/10
18/10 21/16 30/8
30/12 30/19 32/7
32/7 32/10 32/10
34/13 40/19 43/24
44/11 52/22 53/2
53/5 53/25 55/20
62/6 62/7 64/8
64/9 65/20 66/6
66/14 73/2 73/11
73/17
**Dr. John [1]** 2/25
**Dr. Kuppinger**
**[20]** 17/18 18/10
21/16 30/8 30/12
30/19 32/7 32/10
43/24 44/11 52/22
53/2 53/5 55/20
62/6 64/8 65/20
66/6 73/2 73/11
**Dr. Kuppinger's**
**[1]** 53/25
**Dr. Molloy [8]**
17/18 18/10 32/7
34/13 40/19 62/7
64/9 66/14
**Dr. Molloy's [2]**
32/10 73/17
**draft [21]** 3/17
4/17 25/24 35/10
48/15 53/7 60/24
67/22 68/4 68/18
75/6 80/2 82/16
82/18 82/24 83/14
84/1 84/4 84/6
85/2 85/4
**drafted [2]** 48/15
85/6
**drafting [2]** 52/6
75/17
**drafts [5]** 17/20
78/22 79/12 79/14
79/15
**drill [1]** 76/5
**drops [2]** 38/16
39/12

## E

**easier [2]** 6/1
51/9
**easily [1]** 50/9
**East [1]** 1/14
**effect [1]** 49/1
**effectuated [1]**
62/23
**eight [1]** 34/8
**electronically [1]**
79/19
**email [46]** 43/15
43/21 43/22 44/1
44/5 45/17 45/21
47/25 49/25 50/1
50/3 50/4 50/22
51/1 51/5 52/17
52/18 52/21 52/22
56/17 56/18 56/19
60/21 62/2 64/21
65/19 65/20 67/9
67/16 68/3 72/13
74/10 75/1 76/5
77/25 78/1 78/2
78/11 79/5 79/10
80/10 83/23 84/3
84/9 85/2 85/3
**emails [8]** 3/17
4/16 28/14 43/7
51/9 52/4 79/4
79/13
**embedded [1]**
43/8
**employees [1]**
62/12
**encapsulate [1]**
58/25
**enforce [10]** 3/10
45/7 47/1 47/4
47/19 48/25 50/16
52/5 81/6 81/15
**enforceable [3]**
5/13 25/8 41/20
**enforced [3]**
45/13 46/12 46/18
**enforcement [1]**
75/10
**enforcing [1]**
48/3
**ensure [1]** 85/1
**Enterprises [3]**
1/6 2/7 2/22

**entitled [6]** 27/3
37/18 89/1 89/12
91/2 95/4
**entitlement [1]**
69/6
**entity [2]** 2/22
62/20
**entries [1]** 61/14
**entry [15]** 3/11
5/21 6/14 23/7
23/10 29/20 34/7
43/16 43/19 51/7
60/21 82/4 88/16
90/12 90/15
**equipment [15]**
28/25 29/23 29/24
29/25 30/7 30/12
30/20 30/21 31/3
42/13 65/5 65/6
69/13 71/9 71/18
**ESQ [4]** 1/13 1/13
1/17 1/19
**essential [7]** 8/1
32/11 34/8 54/22
67/11 72/14 75/2
**et [4]** 1/17 2/7
62/13 67/12
**et cetera [1]**
62/13
**evaluate [1]** 59/18
**event [1]** 51/17
**everybody [7]** 2/2
16/14 45/9 45/11
49/1 75/7 83/24
**everybody's [1]**
93/12
**everyone [1]**
44/12
**evidence [19]**
3/15 3/19 4/6 4/10
4/12 4/19 5/3 15/3
16/5 47/3 54/20
58/12 58/13 58/20
58/23 81/20 85/20
85/24 85/24
**evidentiary [5]**
1/10 4/19 10/4
86/5 87/24
**examined [1]**
58/7
**exception [4]**
8/24 52/15 60/11
74/12

**exchange [9]** 9/6
25/21 69/4 71/19
78/5 79/4 79/12
79/14 79/23
**exchanged [3]**
13/13 18/5 79/19
**exchanges [1]**
78/22
**exclusion [2]**
65/22 69/20
**excuse [6]** 14/19
26/25 29/25 58/3
58/22 64/7
**execute [2]** 38/14
39/20
**executed [2]** 7/24
27/12
**exercise [2]** 76/21
90/6
**Exhibit 1 [3]**
54/16 54/19 57/12
**Exhibit 2 [1]**
85/18
**Exhibit 4 [1]** 61/8
**Exhibit 5 [1]**
79/16
**Exhibit 7 [1]**
83/23
**exist [2]** 33/21
91/25
**existence [2]**
81/12 81/21
**existential [2]**
33/15 42/17
**existing [1]** 58/19
**exists [2]** 81/10
81/18
**exonerated [1]**
27/16
**exoneration [2]**
27/2 67/3
**expense [1]**
94/13
**explicit [1]** 90/9
**explicitly [1]**
75/13
**exploring [1]** 84/7
**express [5]** 13/10
22/4 69/16 70/10
81/17
**expressed [1]**
81/10
**expressly [6]** 9/6

## E

**expressly...** [5]
32/17 32/21 65/23
88/18 88/21
**extensive** [1]
42/21
**extent** [4]  16/1
16/4 16/8 62/7
**extraordinarily** [1]
59/21
**extremely** [4]
26/15 48/18 52/3
52/19

## F

**F.3d** [1]  46/6
**fact** [11]  10/19
15/15 21/12 37/11
42/9 47/24 50/3
53/12 65/25 69/25
72/6
**factor** [1]  19/8
**factored** [2]  17/21
19/1
**factoring** [13]
17/15 18/8 18/12
18/13 18/14 19/2
19/18 19/21 19/24
20/1 42/7 64/3
64/10
**facts** [5]  22/21
31/1 31/1 42/22
46/6
**factual** [4]  16/6
16/8 38/9 59/22
**factually** [1]
23/24
**failure** [2]  36/16
76/8
**faith** [9]  28/10
31/10 32/17 33/3
42/14 54/22 72/20
72/22 73/10
**fall** [2]  89/21 93/1
**falls** [1]  52/5
**farther** [1]  89/7
**fashion** [2]  55/14
55/21
**Federal** [1]  93/21
**fees** [6]  66/25
75/8 90/3 90/5
90/7 90/7
**fifth** [1]  7/4

**fight** [2]  22/13
22/13
**fighting** [1]  42/1
**figure** [4]  20/19
20/21 32/3 61/19
**figures** [2]  57/22
57/22
**file** [4]  3/22 59/20
91/2 91/5
**filings** [1]  3/11
**final** [4]  15/21
52/6 84/6 87/24
**finance** [1]  68/21
**financial** [1]
73/25
**findings** [1]  58/8
**fix** [1]  85/25
**FL** [4]  1/15 1/18
1/21 95/8
**flipping** [1]  57/17
**FLORIDA** [2]  1/1
1/5
**flow** [1]  40/22
**flowed** [1]  31/4
**flsd.uscourts.gov**
[1]  1/25
**flux** [1]  86/19
**focus** [3]  5/6
31/21 48/3
**focused** [7]  24/18
29/9 47/18 52/3
64/23 68/3 80/21
**focusing** [4]
41/23 64/20 64/21
81/4
**folks** [4]  15/13
42/16 58/10 85/22
**foregoing** [1]
95/2
**forget** [2]  36/19
40/22
**forgot** [1]  31/16
**form** [2]  29/4
31/16
**formal** [4]  81/11
81/12 81/18 81/22
**FORT** [3]  1/2 1/15
95/8
**fourth** [1]  7/1
**frame** [1]  91/3
**frankly** [1]  46/16
**free** [3]  22/2
32/23 94/7

**frequency** [2]
65/4 65/10
**front** [9]  25/12
49/2 51/10 54/6
57/18 59/19 82/11
86/16 91/19
**frustrate** [4]
11/20 32/15 33/4
33/21
**fund** [3]  33/6
35/20 35/24
**funds** [3]  40/22
68/20 68/22

## G

**general** [13]
29/24 65/9 69/6
69/9 69/11 71/13
71/19 72/8 72/23
73/19 73/21 73/23
86/25
**GERALD** [2]  1/4
2/6
**germane** [1]  86/8
**gets** [2]  12/15
41/7
**Ghislaine** [1]
93/22
**gotten** [1]  23/21
**ground** [1]  7/16
**grounds** [1]
22/18
**GROUP** [3]  1/7
62/11 62/19
**Group's** [1]  17/15
**guarantying** [1]
62/5
**guidance** [1]  87/7

## H

**happy** [10]  14/18
21/24 42/23 42/24
43/4 43/11 60/1
60/16 93/10 93/25
**hardest** [1]  43/5
**HEALTH** [6]  1/7
2/23 17/15 62/10
62/11 62/19
**healthcare** [2]
31/22 32/8
**hearing** [11]  1/10
10/4 20/12 38/12
54/6 58/6 59/1

85/18 86/6 87/24
94/7
**hearts** [2]  29/4
31/7
**helpful** [2]  5/7
88/11
**here's** [1]  85/21
92/25
**hereby** [1]  95/2
**hesitate** [2]  77/20
77/22
**Highway** [1]  95/7
**hold** [10]  16/7
16/18 18/17 35/1
43/25 54/18 57/10
64/17 75/7 94/11
**holding** [1]  30/9
**Holland** [4]  1/14
2/11 2/12 84/21
**Honor** [226]
**Honor's** [4]  10/13
13/23 19/18 60/16
**HONORABLE** [1]
1/10
**honoring** [1]  38/3
**hope** [2]  16/3
20/20
**hour** [3]  25/22
47/5 79/9
**hours** [1]  79/9
**housekeeping** [3]
85/15 92/20 93/14
**huh** [1]  63/11
**hundred** [1]  35/5
**hyper** [1]  13/11
**hypothetical** [4]
18/20 19/8 19/19
38/25
**hypothetically** [1]
37/20

## I

**imagine** [2]  33/14
93/8
**immediately** [2]
6/22 6/24
**impasse** [1]
76/14
**implicated** [1]
22/1
**implicit** [1]  72/7
**implied** [2]  33/3
72/22

**inability** [1]  76/17
**inconsistent** [1]
85/22
**incorporate** [1]
62/18
**incorporated** [3]
29/17 29/17 62/9
**incorrect** [3]
23/23 23/24 84/16
**indebtedness** [7]
12/4 13/3 19/19
36/11 62/6 62/7
68/23
**indeed** [1]  30/20
**individual** [8]
2/25 3/5 8/18
50/25 59/3 62/5
62/15 63/18
**individually** [1]
3/6
**individuals** [1]
62/19
**information** [1]
13/13
**initial** [2]  80/9
85/3
**initially** [1]  55/22
**injured** [1]  31/22
**insert** [1]  29/24
**inserted** [3]  29/22
30/5 79/3
**insertion** [1]  64/7
**instance** [1]
17/22
**insurance** [1]
31/23
**intend** [1]  21/10
**intended** [1]
58/24
**intent** [4]  38/2
58/24 81/10 81/17
**interest** [7]  35/21
36/18 36/20 37/3
39/6 41/5 72/17
**interested** [4]
33/20 50/10 66/2
86/14
**interests** [1]  3/6
**International** [1]
81/16
**interpretation** [1]
89/17
**interrupt** [1]

Page 102

KUPPINGER vs. JM JZ Enterprises d/b/a Coastal Health.

Case 9:21-cv-80492-BER   Document 136   Entered on FLSD Docket 11/30/2021   Page 102 of 108

## I

interrupt... [1] 72/15
introduce [1] 58/14
irrelevant [1] 59/14
isolated [1] 11/9
issue [65] 13/9 17/10 18/1 20/7 20/23 20/24 21/8 21/12 21/12 22/22 22/23 23/13 23/15 23/18 23/18 23/20 23/25 24/2 24/2 24/10 24/11 26/3 26/11 26/24 27/8 27/9 27/21 27/21 28/5 28/5 28/19 29/21 34/16 36/9 37/13 37/14 37/16 38/9 38/11 39/25 40/1 40/9 47/22 48/19 50/7 50/8 52/1 56/25 63/19 63/22 66/11 66/16 80/21 80/25 81/2 81/8 87/11 88/19 88/20 88/21 88/22 89/9 91/3 91/4 91/9
issued [3] 46/14 47/23 47/25
issues [29] 15/16 15/19 16/2 16/22 20/22 24/16 24/19 24/22 24/25 25/25 40/6 42/17 44/16 46/10 53/11 53/15 53/24 60/17 63/4 73/13 77/7 86/13 86/21 87/2 88/8 88/9 89/15 89/21 93/19
item [8] 6/20 6/22 6/24 7/1 7/4 8/22 9/24 28/9
items [3] 7/19 11/13 70/13

## J

JACK [2] 1/17 2/18

JESUS [2] 1/13 2/11
JJ [1] 72/17
JM.JZ [4] 1/6 2/6 2/22 3/5
John [1] 2/25
jointly [1] 40/11
JORDAN [5] 1/3 2/6 51/17 51/21 51/21
judge [42] 1/11 15/10 15/12 15/18 24/1 24/7 24/9 25/2 25/3 25/10 26/1 44/17 44/22 45/7 45/9 46/13 46/20 46/23 47/14 47/17 48/5 49/2 52/3 53/10 53/13 54/6 54/23 55/2 55/8 57/4 57/13 57/24 58/16 59/16 59/19 60/14 63/14 76/13 77/6 86/16 91/19 94/6
judgment [1] 87/15
judicial [2] 4/15 28/2
jump [1] 76/12
jurisdiction [3] 14/23 25/9 46/19
jury [16] 87/15 88/6 88/10 88/18 88/23 89/1 89/2 89/10 89/12 89/20 90/9 90/16 90/24 91/2 93/6 94/6

## K

key [2] 39/25 40/1
kicks [1] 39/12
Knight [4] 1/14 2/11 2/12 84/21
knows [1] 45/10
KUPPINGER [43] 1/3 2/6 6/21 8/23 9/21 9/22 9/25 11/3 11/16 11/19 11/21 12/4 12/9 12/20 17/18 18/10 21/16 28/24 30/8 30/12 30/19 32/7

32/10 35/21 36/10 36/11 36/13 43/24 44/11 49/14 52/14 52/22 53/2 53/5 55/20 62/6 64/8 64/12 65/20 66/6 66/9 73/2 73/11
Kuppinger's [3] 8/11 34/14 53/25

## L

lack [1] 81/11
laid [2] 5/21 92/1
Lakes [1] 1/18
language [38] 9/5 9/8 9/11 19/23 21/15 24/3 24/22 26/4 26/5 26/20 27/22 42/11 44/17 45/3 48/12 53/12 53/16 53/25 54/2 60/13 62/15 62/16 64/5 64/8 65/23 67/5 67/17 68/25 69/20 73/19 73/22 74/7 74/22 75/22 75/25 76/21 76/22 82/24
Las [1] 1/14
late [1] 91/11
Lauderdale [1] 1/15
laundry [1] 34/3
law [10] 5/14 21/8 21/12 37/18 38/7 42/8 42/21 46/5 47/1 90/20
laying [1] 47/5
lays [1] 47/2
lean [1] 6/5
learned [1] 26/6
legal [9] 38/11 40/19 41/3 41/6 41/22 41/22 41/23 42/5 42/22
legally [1] 36/19
legitimate [1] 23/12
lend [1] 36/3
lender [2] 36/3 36/4
lender's [1] 37/3
lenders [1] 73/25

letter [2] 31/25 32/6
lettering [1] 5/21
letters [4] 32/8 32/19 33/12 90/25
letting [1] 72/15
liability [1] 63/18
liable [2] 40/11 51/1
lien [4] 32/5 36/5 37/3 68/14
Life [6] 8/24 52/16 52/23 65/13 65/22 69/19
light [1] 76/16
limitation [1] 69/19
limitations [1] 84/12
limited [3] 55/21 65/21 68/20
liquidate [2] 40/1 40/2
liquidates [1] 41/5
list [6] 16/21 34/3 54/21 79/6 89/8 92/7
literally [1] 23/16
litigants [2] 31/22 32/4
litigate [1] 22/10
litigating [1] 32/4
litigation [6] 32/6 32/10 70/1 75/8 75/10 88/17
LLC [1] 81/16
loan [11] 35/19 36/1 36/25 37/4 37/9 40/22 41/4 41/5 68/12 70/22 83/9
local [2] 13/18 13/24
locations [1] 63/1
logical [1] 37/8
Lustig [1] 1/20

## M

M-U-R-C-H-I-S-O-N [1] 46/5
M.D [2] 1/3 1/4
machine [2] 65/4

65/11
magistrate [9] 1/11 14/23 25/9 25/10 25/18 46/19 46/23 63/14 76/13
main [1] 43/5
manner [1] 85/6
market [1] 35/25
masks [1] 2/15
material [35] 6/18 11/22 12/16 12/19 21/6 21/10 21/11 21/17 22/8 22/10 22/14 22/18 22/21 22/21 28/17 44/24 45/2 46/21 47/16 47/19 48/3 49/6 51/20 54/7 54/8 55/8 57/14 58/20 59/19 77/3 77/6 77/13 77/14 81/4 81/7
materially [1] 60/24
matter [10] 4/5 5/14 14/5 26/19 37/18 38/7 42/8 42/9 63/17 95/4
matters [5] 13/16 15/5 15/6 25/9 93/14
Maxwell [1] 93/22
McClellan [1] 3/1
meantime [1] 87/6
mediating [1] 40/5
mediation [19] 3/7 13/2 13/9 13/13 13/18 13/21 14/2 14/4 14/9 14/10 15/3 15/7 15/7 16/19 23/19 30/11 31/3 91/10 93/3
medical [9] 28/25 31/14 31/15 42/13 55/21 56/2 69/12 71/9 71/18
meeting [1] 35/12
memorialize [2] 20/25 27/14
memory [2] 30/10

Page 103

KUPPINGER vs. JM JZ Enterprises d/b/a Coastal Health,
Case 9:21-cv-80492-BER   Document 136   Entered on FLSD Docket 11/30/2021   Page 103 of 202

## M

memory... [1]
57/2
Messrs [1]  2/21
MICHAEL [2]  1/20
2/20
microphone [3]
6/2 22/25 24/14
mics [1]  6/4
middle [1]  87/12
Middlebrooks
[30]  15/11 15/12
15/18 24/2 24/8
25/2 25/3 44/17
44/22 45/8 45/9
46/13 46/20 47/14
47/17 48/5 49/2
53/11 53/13 54/6
54/24 55/3 55/8
57/14 57/24 58/16
60/14 77/6 86/16
91/20
Middlebrooks' [1]
52/3
miller [4]  1/23
1/25 95/5 95/6
million [27]  6/20
9/17 10/2 12/9
12/18 13/7 18/24
18/25 19/8 19/9
19/10 19/19 19/20
19/22 19/24 32/2
32/3 37/21 37/22
37/25 41/7 49/14
49/21 63/19 66/22
66/23 67/19
millions [1]  32/1
misrepresent [1]
56/11
miss [1]  90/25
missing [1]  3/12
misunderstandin
g [3]  12/7 20/5
35/14
misunderstood
[1]  57/6
Mobile [1]  69/14
MOLLOY [32]  1/4
2/6 9/17 9/17 9/22
10/1 11/3 11/17
11/18 11/20 11/20
11/21 12/3 12/3

12/5 12/6 12/9
12/22 17/3 17/18
18/10 21/16 32/7
34/13 35/21 36/10
36/13 40/19 62/7
64/9 66/9 66/14
Molloy's [4]  8/11
32/10 36/11 73/17
moment [4]  22/5
37/11 59/14 87/22
Monday [3]  25/11
25/13 93/2
monetary [1]
57/22
monies [2]  69/13
69/13
monthly [3]  6/24
9/24 49/21
months [3]  7/2
10/6 49/22
mooted [1]  20/24
motion [23]  3/9
4/8 42/19 42/23
44/3 44/7 46/25
47/2 49/11 81/15
87/8 88/3 88/13
91/3 91/5 91/21
91/21 92/1 92/2
92/6 92/7 92/10
92/12
motions [2]  89/5
92/14
Mr [42]  7/10 7/12
7/18 20/2 21/14
23/14 26/4 26/11
27/19 28/8 30/11
33/14 34/9 34/16
35/2 37/6 40/12
42/24 43/15 43/23
44/23 44/24 45/16
45/20 47/12 51/13
55/17 55/20 56/1
56/4 57/20 58/8
76/11 76/16 80/15
80/17 82/3 83/20
84/24 86/7 90/17
92/18
Mr. [86]  2/25 3/8
3/14 3/15 5/18 6/5
7/10 7/18 7/19 9/1
9/1 14/17 18/2
18/20 18/24 21/1
21/23 22/2 22/2

22/2 22/25 23/10
24/10 26/14 29/15
38/8 39/11 40/14
41/11 42/25 43/2
43/21 43/23 44/1
44/16 45/2 45/17
45/21 46/13 47/25
52/21 52/24 53/4
53/10 54/6 54/8
54/19 55/1 55/4
55/6 55/13 55/15
56/10 56/11 56/23
57/11 57/19 57/20
57/21 58/1 58/9
58/18 58/19 58/24
59/10 60/3 60/14
60/19 61/13 77/6
77/25 80/2 80/10
80/18 82/8 83/13
83/23 84/2 84/9
85/3 85/3 86/7
89/7 90/16 91/8
92/6
Mr. Boloy [1]  22/2
Mr. Cuza [10]
3/15 6/5 7/19
14/17 18/20 41/11
55/13 55/15 57/21
58/9
Mr. Newman [4]
80/2 83/23 84/2
85/3
Mr. Newman's [1]
85/3
Mr. Pike [30]  7/18
9/1 22/2 22/25
23/10 43/23 44/16
45/2 45/17 47/25
52/24 53/4 53/10
54/6 54/8 55/1
55/4 55/6 56/10
56/11 56/23 57/11
58/1 58/19 59/10
60/3 60/14 77/6
86/7 92/6
Mr. Pike's [5]
43/21 44/1 45/21
52/21 58/24
Mr. Rothschild [8]
3/14 5/18 21/23
42/25 43/2 89/7
90/16 91/8
Mr. Scarola [26]

3/8 7/10 9/1 18/2
18/24 21/1 22/2
24/10 26/14 29/15
38/8 39/11 40/14
46/13 54/19 57/19
57/20 58/18 60/19
61/13 77/25 80/10
80/18 82/8 83/13
84/9
Mr. Webster [1]
2/25
Ms [1]  69/13
Murchison [1]
46/5
mutual [2]  69/4
73/23
mutually [1]  7/20
my stack [1]  4/1

## N

nailing [1]  9/11
narrow [1]  20/22
Nathan [1]  94/6
nature [3]  3/18
31/20 85/25
necessary [4]
37/19 39/6 39/21
68/22
negate [1]  81/12
negotiate [3]
20/21 42/18 50/15
negotiated [4]  8/5
26/4 31/6 31/8
negotiation [2]
29/7 74/7
negotiations [5]
8/6 11/7 81/11
81/18 81/22
neighborhood [1]
32/2
neither [3]  33/20
60/25 79/7
net [2]  19/18
19/21
Newman [6]  80/2
83/23 84/2 84/20
84/24 85/3
Newman's [1]
85/3
news [2]  37/6
37/7
nice [1]  5/21
nine [2]  6/14 44/7

non [9]  13/21
21/6 21/9 21/17
21/19 22/13 23/8
42/11 74/15
non-court [1]
13/21
non-disparageme
nt [8]  21/6 21/9
21/17 21/19 22/13
23/8 42/11 74/15
noncompete [1]
53/25
noncompetition
[2]  55/17 65/22
noncomplete [1]
10/18
none [1]  42/17
nonessential [3]
17/3 17/7 24/21
noninterference
[1]  72/24
nonissue [1]
33/24
nonjury [5]  87/16
87/23 88/23 89/11
89/23
nonsolicitation
[5]  44/14 53/7
53/7 53/17 71/23
noon [3]  15/18
25/5 25/22
North [1]  1/21
notice [1]  4/15
November 1st [2]
79/24 79/24
number [15]  2/5
3/23 8/18 8/23
23/16 34/20 34/23
35/2 52/6 63/1
78/25 79/2 86/18
86/21 88/8
numbers [2]  3/12
61/18

## O

o'clock [1]  87/4
oath [5]  57/25
59/6 59/17 85/24
85/24
object [6]  15/14
22/17 50/2 50/23
51/25 84/10
objected [2]  79/2

Page 104

KUPPINGER vs. JM JZ Enterprises d/b/a Coastal Health

Case 9:21-cv-80492-BER   Document 136   Entered on FLSD Docket 11/30/2021   Page 104 of

**O**

95/6

**objected... [1]**
79/3

**objecting [1]** 66/3

**objection [2]** 4/24
14/24

**objectionable [1]**
75/19

**obligated [2]**
17/22 51/21

**obligation [3]**
18/13 19/24 64/2

**obligations [3]**
32/18 38/3 66/14

**obliged [1]** 19/20

**obtained [1]**
19/25

**obtaining [1]**
35/20

**October 19 [1]**
17/24

**October 19th [10]**
15/22 43/14 47/23
48/2 49/25 50/1
50/3 50/22 51/1
51/5

**October 20th [13]**
46/15 47/25 50/2
50/4 50/23 51/25
52/17 52/18 52/21
56/17 56/18 56/19
87/23

**October 22nd [3]**
78/8 80/2 84/3

**October 25th [2]**
80/3 85/2

**October 26 [1]**
80/4

**October 26th [4]**
80/13 83/10 84/8
84/16

**October 27th [1]**
78/8

**October 28 [2]**
65/19 72/12

**October 28th [6]**
60/22 74/10 78/10
78/11 84/10 84/13

**offer [5]** 3/15 3/20
4/3 4/10 86/6

**offers [1]** 79/11

**Official [2]** 1/24

**Olas [1]** 1/14

**Olive [1]** 1/21

**omission [2]** 76/9
77/4

**omitted [15]**
67/10 67/15 68/4
68/18 68/24 69/17
72/13 74/19 74/20
75/1 75/12 76/4
77/12 82/16 82/18

**open [1]** 93/4

**opportunity [5]**
34/6 34/9 80/20
86/9 86/12

**opposed [1]**
62/10

**opposition [2]**
23/6 83/22

**option [2]** 25/15
46/18

**order [12]** 24/20
25/2 25/3 28/16
31/19 32/9 35/20
39/7 39/22 46/14
49/6 68/22

**organically [1]**
30/16

**original [1]** 62/12

**Originally [1]**
92/23

**outline [2]** 58/24
81/20

**outrageous [1]**
48/21

**overlap [1]** 34/4

**oversight [1]** 14/3

**overview [1]** 33/9

**owe [7]** 12/9
12/17 12/22 19/8
37/21 40/4 40/19

**owed [10]** 11/21
12/3 12/6 13/3
13/5 18/24 39/7
39/14 41/4 64/8

**owing [1]** 18/25

**ownership [3]**
36/20 39/6 73/17

**owns [1]** 40/25

**P**

**P-R-O-C-E-E-D-I-
N-G-S [1]** 2/1

**p.m[18]** 43/15
45/18 60/22 79/24
84/3 85/13 85/14
94/20

**page [24]** 5/20
23/3 23/7 23/8
23/10 23/11 34/17
34/19 44/7 45/1
45/1 47/2 49/11
54/9 57/20 60/21
61/18 61/20 62/25
63/8 81/14 82/14
90/19 90/20

**pages [3]** 1/7
6/14 34/7

**Pain [1]** 69/14

**PALM [4]** 1/5 1/18
1/18 1/21

**paper [1]** 4/2

**paperless [1]**
25/3

**papers [1]** 92/12

**paperwork [4]**
21/14 22/1 31/17
33/12

**paragraph [25]**
51/15 51/16 62/17
63/1 63/8 64/6
65/3 65/13 65/14
66/7 66/8 66/25
67/17 67/18 68/9
69/21 70/4 70/13
74/1 74/2 75/5
75/9 75/18 76/13
84/12

**parallel [2]** 73/1
73/9

**part [9]** 4/22
17/17 29/6 30/20
33/2 69/6 71/13
72/22 83/8

**parties [44]** 5/10
8/6 15/16 17/6
24/19 25/14 25/14
27/12 28/4 29/4
30/17 31/6 38/3
46/3 46/15 47/15
47/18 47/23 48/16
49/7 51/3 52/4
52/6 52/8 62/10
62/15 62/18 65/3
66/13 66/16 71/1
71/21 71/23 73/16

73/23 81/5 81/10
81/17 83/7 84/2
86/6 86/15 86/24
88/17

**parties' [1]** 27/23

**partnership [1]**
89/17

**party [5]** 16/6
46/7 66/24 68/15
70/22

**pasted [1]** 45/20

**patient [1]** 64/14

**pause [3]** 10/23
37/5 48/24

**pay [19]** 11/23
12/13 17/22 18/13
19/5 19/9 19/21
19/24 30/20 31/23
31/23 32/5 36/9
37/9 38/4 39/3
40/24 51/21 68/22

**payable [4]** 6/22
6/24 7/2 11/18

**payment [8]** 8/19
11/5 12/12 18/9
62/6 64/8 64/14
64/15

**payments [4]**
8/10 11/1 17/17
71/9

**pending [5]** 25/16
25/25 66/1 69/25
92/14

**penny [1]** 38/17

**people [1]** 86/7

**percentage [1]**
39/6

**perfect [1]** 31/17

**period [4]** 51/18
51/20 64/14 78/9

**permissible [1]**
17/16

**permission [2]**
54/11 80/23

**person [1]** 59/16

**perspective [3]**
9/10 33/2 62/4

**Phil [2]** 2/10
14/19

**PHILLIP [1]** 1/13

**phone [4]** 56/14
56/14 76/10 76/15

**phrase [2]** 8/3

36/19

**phrases [1]** 15/17

**pick [4]** 6/3 6/6
76/10 76/15

**picked [1]** 25/14

**PIERCE [2]** 1/2
95/8

**PIKE [34]** 1/20
2/20 2/21 7/10
7/18 9/1 22/2
22/25 23/10 43/23
44/16 45/2 45/17
47/25 52/24 53/4
53/10 54/6 54/8
55/1 55/4 55/6
56/10 56/11 56/23
57/11 58/1 58/19
59/10 60/3 60/14
77/6 86/7 92/6

**Pike's [5]** 43/21
44/1 45/21 52/21
58/24

**place [5]** 31/19
38/5 44/2 45/19
63/16

**plaintiff [5]** 4/5
4/7 9/15 30/3
93/15

**plaintiffs [24]** 1/5
1/13 2/9 3/19 5/5
5/23 16/23 18/12
22/11 22/17 26/6
26/25 28/9 29/21
30/5 34/3 41/6
81/9 84/21 88/24
90/2 91/2 91/12
92/13

**plaintiffs' [10]** 3/9
5/12 8/16 9/6 11/4
32/12 42/23 64/7
80/9 89/10

**planning [1]** 87/6

**platforms [1]**
5/24

**pleading [2]**
59/20 84/16

**pleadings [3]**
3/13 3/17 14/16

**pledge [4]** 36/25
68/11 82/20 83/9

**plenty [1]** 33/12

**plus [2]** 12/9
12/17

KUPPINGER vs. JM JZ Enterprises d/b/a Coastal Health

Case 9:21-cv-80492-BER   Document 136   Entered on FLSD Docket 11/30/2021   Page 105 of

Page 105

## P

**pocket [1]** 31/3
**point [24]** 4/13
6/17 8/17 9/18
11/7 12/1 13/18
17/13 21/25 27/7
29/18 34/20 34/23
35/2 35/12 46/15
56/21 56/23 60/19
60/20 63/15 80/4
89/4 91/8
**points [1]** 9/16
**position [50]** 4/4
5/12 5/14 7/22
10/14 11/14 11/20
13/1 13/2 13/16
14/7 14/13 15/7
15/20 17/5 18/1
18/2 19/2 19/4
19/5 19/15 21/1
23/25 26/11 27/1
27/4 27/23 28/15
29/18 30/12 30/19
36/11 36/17 41/4
41/19 41/22 41/24
44/10 46/11 47/8
47/21 52/11 55/16
56/7 56/22 70/15
74/19 76/23 83/24
89/10
**positions [2]**
16/15 41/23
**possession [2]**
28/25 29/22
**possibility [1]**
91/7
**post [1]** 36/1
**potential [1]**
86/18
**potentially [1]**
88/20
**precisely [1]**
54/11
**predicate [1]**
66/15
**predicates [1]**
32/18
**preface [1]** 8/2
**prefatory [1]**
62/14
**prejudice [8]** 29/3
42/4 66/1 70/1

70/7 72/3 72/7
73/5
**preliminarily [1]**
71/25
**preliminary [1]**
71/25
**prepared [3]** 34/3
59/7 60/3
**present [2]** 4/6
4/13
**preserve [2]** 41/6
73/16
**preserved [1]**
16/14
**preserving [2]**
42/5 67/11
**prevailing [2]**
66/24 90/7
**prevented [1]**
55/17
**primary [1]** 31/21
**principle [3]** 9/10
65/21 71/25
**principles [1]**
42/22
**problem [4]** 52/10
53/5 53/9 83/2
**problematic [1]**
39/11
**procedural [2]**
24/6 27/6
**procedurally [1]**
28/5
**proceed [4]** 60/2
72/14 88/22 93/1
**proceeding [3]**
28/2 59/25 93/22
**proceedings [6]**
25/7 85/13 93/7
93/8 94/20 95/3
**proceeds [9]**
17/17 18/8 18/14
19/18 19/21 19/22
32/5 32/6 42/7
**process [3]** 20/1
75/17 83/1
**production [1]**
91/11
**productions [1]**
91/23
**promptly [1]**
93/10
**proof [1]** 4/5

**properties [1]**
72/18
**property [2]**
70/11 87/1
**proposal [8]**
17/20 18/21 19/13
21/14 21/15 60/24
60/24 79/7
**proposed [7]**
5/11 18/12 19/23
39/20 47/9 52/21
67/5
**protection [5]**
31/25 32/6 32/9
32/19 33/13
**providers [1]**
32/8
**provision [23]** 9/3
21/6 21/25 22/4
22/16 24/11 32/21
52/1 65/22 66/17
66/25 68/9 73/1
73/2 73/9 73/10
73/24 76/7 76/7
76/12 83/3 83/6
84/10
**provisions [17]**
10/25 45/3 60/6
67/11 67/14 68/4
72/13 72/19 75/1
77/11 77/11 77/16
77/19 77/21 77/23
82/15 83/13
**publicly [1]** 53/22
**purposes [1]**
85/18
**pursuant [2]**
31/25 90/7

## Q

**qualification [1]**
8/2
**quantum [1]** 15/2
**quasi [1]** 28/2
**quasi-judicial [1]**
28/2
**question [21]**
20/10 22/10 23/2
24/6 24/7 27/6
33/20 37/10 47/13
47/17 54/11 55/5
68/1 78/3 87/14
87/20 88/5 88/12

89/19 89/20 92/21
**questions [7]**
10/13 43/4 52/3
80/16 82/8 83/19
93/15
**quickly [2]** 51/11
89/4
**quote [9]** 18/9
36/8 45/3 46/22
57/14 57/15 60/23
79/6 79/8

## R

**radio [2]** 65/4
65/10
**raise [2]** 66/6
68/22
**raised [12]** 22/17
28/17 29/16 29/16
29/18 29/21 52/1
63/4 86/21 86/22
87/3 89/21
**raises [1]** 88/8
**rate [1]** 32/24
**reach [2]** 26/12
27/7
**reached [10]** 24/1
46/2 47/23 48/1
48/16 50/5 56/5
71/1 71/5 86/17
**realized [1]** 80/4
**receivable [8]**
17/16 18/9 19/2
28/11 31/12 32/1
32/16 33/4
**receivables [1]**
42/14
**recently [1]** 92/9
**recess [6]** 58/6
59/24 85/12 85/13
86/1 93/16
**recollection [6]**
10/19 16/11 68/1
70/9 71/7 72/16
**reconstruct [1]**
43/9
**reconstructing [1]**
43/6
**record [16]** 4/14
4/18 4/19 6/13
23/10 43/25 51/11
57/11 57/17 58/19
59/22 85/18 86/10

86/11 86/13 91/17
**records [3]** 31/15
56/14 56/14
**red [7]** 35/10
35/10 35/11 56/21
61/14 61/23 61/25
**reduce [3]** 11/24
17/17 19/18
**reduced [5]** 7/24
12/5 81/11 81/18
81/22
**reduction [6]**
10/3 10/7 10/8
18/9 63/8 63/13
**reference [5]**
21/19 24/8 26/5
44/17 83/19
**referenced [5]**
44/7 65/3 67/9
80/10 83/13
**references [2]**
51/3 51/4
**referencing [8]**
54/8 55/7 57/13
61/5 62/2 63/20
67/16 72/12
**reflected [4]**
62/25 63/5 69/20
79/15
**refresh [2]** 30/10
91/14
**regrettable [1]**
48/20
**reinforces [1]**
50/4
**REINHART [8]**
1/2 1/10 24/9
25/10 26/1 46/23
57/5 63/14
**relationship [1]**
29/9
**release [14]** 29/24
37/12 65/9 65/10
69/7 69/9 69/12
71/13 72/8 73/19
73/21 73/23 86/25
93/10
**releases [2]** 69/4
71/19
**relief [1]** 90/5
**relinquish [1]**
28/25
**relinquishment
[1]** 29/22

Page 106

KUPPINGER vs. JM JZ Enterprises d/b/a Coastal Health.
Case 9:21-cv-80492-BER   Document 136   Entered on FLSD Docket 11/30/2021   Page 106 of

## R

relying [3]  4/11
15/10 81/15
remain [1]  81/7
remained [3]
25/17 79/3 81/4
remaining [3]
10/5 18/13 89/11
remains [1]  27/13
remedies [1]
76/21
rendered [1]
31/25
reply [11]  3/22
3/24 5/18 6/12
43/19 49/12 49/13
57/21 61/9 81/9
92/4
reporter [6]  1/24
23/1 84/19 84/22
85/10 95/6
representation [5]
2/22 3/5 45/7
59/15 60/20
representations
[6]  15/10 15/11
47/14 48/21 58/11
85/23
representative [1]
2/24
reputation [4]
26/16 26/18 26/21
27/15
requested [3]
68/5 74/9 74/10
requested prior
[1]  74/9
required [2]
28/10 28/24
requirement [3]
30/6 31/10 62/5
reschedule [1]
94/7
reserve [2]  13/4
84/5
resolution [3]
24/16 26/12 26/19
resolve [12]
15/19 24/2 27/9
29/14 42/2 45/12
50/9 56/8 66/11
76/17 87/11 91/3

resolved [25]
11/2 17/7 17/9
20/7 23/19 24/21
26/24 27/8 27/9
28/6 29/17 29/19
34/8 42/7 42/8
42/9 44/11 45/4
45/4 46/21 46/21
66/17 72/1 77/5
77/7
respectfully [2]
48/21 52/2
respectively [1]
71/20
response [12]
4/22 23/6 26/21
28/21 34/18 50/1
51/25 52/18 61/10
78/25 80/8 83/22
responsibility [2]
2/21 3/4
rest [2]  19/11
86/11
restated [1]  88/16
rested [1]  4/9
resting [1]  4/11
restored [3]
26/16 26/18 26/20
restrict [1]  14/7
restrictions [1]
13/12
rests [1]  4/5
result [3]  10/3
55/19 71/19
resumed [1]
85/14
retroactively [1]
46/1
return [3]  60/16
65/3 87/1
reverts [1]  37/25
review [6]  3/24
4/2 9/5 21/18
25/24 89/24
revised [1]  85/4
revision [1]  84/1
revisions [9]
60/23 78/5 79/6
80/2 80/3 80/3
80/5 80/9 80/9
rise [2]  32/8
84/22
RMR [2]  1/23 95/6

road [1]  58/9
Rolsafe [1]  81/16
ROTHSCHILD
[11]  1/13 2/11
3/14 5/18 14/20
21/23 42/25 43/2
89/7 90/16 91/8
round [1]  32/2
rule [11]  13/18
13/24 14/1 14/7
14/15 16/5 20/22
42/19 43/9 88/13
92/11
rules [3]  7/16
13/18 16/5

## S

sake [1]  27/7
sale [2]  17/15
64/9
sanctions [2]
91/22 92/7
satisfied [1]  64/9
satisfy [2]  39/22
64/2
SCAROLA [31]
1/17 2/18 3/8 7/10
7/12 7/18 9/1 18/2
18/24 21/1 22/2
24/10 26/14 29/15
38/8 39/11 40/14
46/13 54/19 57/19
57/20 58/18 60/19
61/13 77/25 80/10
80/18 82/8 83/13
84/9 92/18
scenario [1]
39/12
scheduled [2]
10/4 10/22
scope [1]  73/13
scratching [1]
62/17
screen [1]  82/13
sealed [1]  43/16
Searcy [1]  1/17
seat [1]  2/2
second [12]  6/22
7/17 10/23 35/22
36/8 48/23 55/9
55/11 56/21 81/8
85/16 89/7
section [3]  23/8

34/19 82/14
secure [3]  37/9
68/12 83/9
secured [1]  36/12
security [3]  36/9
36/13 36/18
seeking [1]  90/2
self [1]  46/1
self-serving [1]
46/1
semantics [1]
60/12
sense [1]  28/1
sentence [3]
23/22 67/10 78/2
serious [1]  59/22
seriously [1]  58/5
services [14]
31/22 31/23 31/24
31/24 32/8 32/22
33/23 33/24 52/16
52/23 53/5 55/22
56/2 56/3
serving [1]  46/1
session [1]  15/15
settle [2]  93/3
93/3
settled [1]  25/15
settlement [43]
3/10 3/17 5/13
11/24 12/8 12/13
14/10 15/21 17/17
17/23 18/5 18/7
18/9 18/11 18/25
19/23 21/7 25/23
25/24 26/6 30/5
34/12 35/24 40/11
43/14 46/2 47/9
47/20 48/4 48/12
48/14 48/15 49/6
52/5 62/17 64/8
78/22 80/1 81/15
84/4 85/4 88/1
88/2
seven [17]  5/20
6/14 8/23 34/7
45/1 49/11 57/20
59/20 73/19 87/15
88/6 88/8 88/21
89/14 89/15 89/21
89/24
shape [1]  29/3
share [2]  2/21 3/4

shareholder [7]
35/21 66/13 88/17
90/3 90/5 90/8
90/9
shares [19]  7/3
7/4 10/6 34/14
34/15 35/6 37/17
37/21 37/21 37/23
38/21 39/2 39/3
39/4 39/21 39/21
40/24 49/23 49/24
short [1]  44/20
side [14]  5/11
5/11 15/14 25/22
42/4 46/17 46/25
47/7 54/5 54/13
55/15 77/20 77/22
82/16
side's [1]  77/4
sides [8]  4/16
11/14 14/23 46/19
69/5 81/5 81/21
88/11
sign [4]  27/5
31/15 31/16 53/21
signed [1]  14/23
silence [1]  14/13
simple [1]  37/14
situation [1]
48/20
slip [1]  93/1
small [2]  66/20
66/21
solely [1]  4/11
sorting [1]  5/15
sounds [2]  20/10
23/12
South [1]  95/7
SOUTHERN [1]
1/1
specific [21]  9/5
21/19 23/2 23/22
26/3 27/16 33/18
43/4 55/19 57/18
68/1 69/22 70/2
70/23 71/16 72/6
72/16 72/21 73/14
74/7 76/25
specificity [2]
33/18 89/24
specifics [1]  34/1
specify [1]  36/16
spent [1]  47/5

KUPPINGER vs. JM JZ Enterprises d/b/a Coastal Health.

**S**

split [1]  9/23
spoke [2]  48/5
48/5
stack [1]  4/1
stake [1]  42/22
stand [3]  59/9
59/19 94/8
standard [8]
74/12 76/7 76/11
77/11 77/16 77/19
77/21 77/23
starting [2]  9/17
82/14
state [4]  5/3 50/2
57/21 90/4
stated [2]  9/6
16/12
statement [9]
53/21 53/23 55/1
55/2 55/7 55/19
57/12 57/24 65/19
states [6]  1/1
1/11 1/24 59/15
65/23 95/7
stay [3]  6/1 19/7
35/23
stock [4]  36/6
36/12 36/23 73/17
stood [1]  49/1
stopped [1]  72/11
straightforward
[1]  27/22
strictly [2]  88/23
89/1
Stryker [2]  65/4
65/10
stuck [1]  46/16
sub [4]  62/17
70/14 82/20 83/7
subjective [2]
58/24 58/25
submission [2]
24/25 81/19
submit [2]  25/8
27/22
submitted [3]
4/21 6/12 26/12
submitting [2]
24/16 25/17
subordinate [2]
37/3 37/11

subordinated [1]
36/24
subparagraph [4]
63/13 64/12 65/2
73/18
subpoenaed [2]
93/21 94/8
subpoenas [1]
32/11
subsequent [3]
56/5 56/6 78/4
substantial [3]
60/11 60/12 68/19
substantive [1]
24/7
substantively [1]
21/2
successful [1]
32/4
successors [1]
74/22
sufficient [7]  39/3
45/6 45/8 45/12
46/17 47/19 52/4
suggest [1]  15/19
suggesting [1]
59/24
Suite [1]  1/15
summary [1]  81/3
support [1]  4/7
supports [1]  17/9
surprised [4]
93/23 94/1 94/2
94/3
suspect [1]  37/8
sworn [3]  55/1
59/25 60/4
system [2]  6/2
62/10

**T**

tab [2]  79/15
79/15
table [1]  31/7
targeted [1]  24/12
Taylor [1]  69/13
team [1]  55/18
technical [1]
13/11
telephone [3]
43/23 44/6 57/3
tentative [2]  9/4
44/23

term [0]  7/11 9/2
11/9 22/7 22/8
33/15 71/2
terms [51]  5/9
5/10 5/16 5/17
6/18 7/20 8/5 8/7
11/9 17/3 17/7
18/11 34/8 44/24
45/2 46/21 47/4
47/9 47/16 47/19
47/20 48/4 48/20
48/25 49/4 49/6
49/8 49/9 49/19
50/15 53/24 54/7
54/8 54/22 55/8
57/14 58/20 59/19
60/8 60/11 60/12
60/24 67/9 76/24
77/1 79/1 79/3
79/7 81/4 81/7
86/18
testimony [6]
57/25 59/11 59/25
60/4 85/23 86/6
thank [28]  2/18
3/7 6/9 13/20 23/9
26/2 28/23 30/4
51/13 57/8 61/12
63/25 67/8 69/17
69/18 70/5 70/7
72/14 80/23 82/2
82/10 84/24 89/7
91/4 93/13 94/9
94/17 94/19
thereafter [1]
72/2
thinking [3]  59/17
88/14 91/7
thought [5]  5/22
12/8 59/13 59/14
93/2
thread [1]  43/18
threads [1]  43/8
Thursday [2]
14/22 93/6
tie [1]  93/5
time [28]  4/13
12/12 23/20 30/6
39/25 46/12 48/5
49/1 52/8 54/23
59/1 59/25 64/14
68/18 69/1 69/3
70/17 73/15 78/9

86/20 87/12 90/22
91/6 91/20 93/12
94/14 94/15 94/16
timeframe [1]
71/24
timeline [5]  43/6
43/9 43/10 46/8
57/17
times [3]  52/7
79/20 79/21
timestamp [2]
79/17 79/18
topic [2]  9/7 31/5
topics [3]  29/5
80/18 86/8
towards [2]  45/1
63/10
tracing [1]  57/17
traditional [1]
28/2
transaction [1]
64/10
transcript [5]
1/10 44/20 45/5
45/13 54/9
transcription [1]
95/3
transfer [3]  10/6
49/23 83/8
transferring [1]
7/2
trial [27]  21/22
25/11 25/13 45/10
48/14 56/9 86/3
87/8 88/4 88/5
88/18 88/23 88/23
89/1 89/3 89/10
89/11 89/12 89/23
90/9 90/16 90/24
91/2 92/7 93/2
93/6 94/6
triggered [2]
18/13 19/24
trust [1]  3/13
truth [1]  56/11
truthful [2]  53/13
54/3
truthfully [1]  27/4
turning [2]  3/14
92/13
twice [1]  47/25

**U**

U.S [1]  95/7
Uh [1]  63/11
Uh-huh [1]  63/11
ultimately [3]
15/5 26/12 46/24
unacceptable [2]
80/6 80/7
underlined [7]
61/16 61/22 61/25
67/18 68/10 69/20
90/25
understanding [8]
13/24 16/2 16/24
44/12 45/6 71/3
72/1 84/15
undo [1]  46/7
unfortunately [2]
38/9 48/13
unique [1]  13/16
UNITED [5]  1/1
1/11 1/24 59/15
95/7
unless [6]  25/24
32/16 38/16 45/10
59/5 60/3
unnecessary [1]
22/18
unquote [1]  36/8
unresolved [5]
13/8 25/17 34/16
81/5 81/7
unring [1]  15/14
unsworn [1]
58/11
us [10]  25/23
29/25 37/7 50/11
60/25 75/6 78/1
78/13 79/8 92/23

**V**

validity [1]  10/18
value [7]  38/15
38/16 39/1 39/12
39/24 59/2 59/6
versus [1]  2/6
violation [1]  22/7
virtue [1]  14/12
voice [2]  6/3 6/6
voluntarily [2]
25/7 25/16
vs [1]  1/5

KUPPINGER vs. JM JZ Enterprises d/b/a Coastal Health

Case 9:21-cv-80492-BER   Document 136   Entered on FLSD Docket 11/30/2021   Page 108 of 108

## W

**waiver [3]** 75/24
76/7 90/9
**walk [4]** 17/11
43/10 43/11 82/7
**waste [1]** 93/12
**Webster [1]** 2/25
**WEST [3]** 1/5
1/18 1/21
**whatever it [1]**
54/13
**whichever [1]**
60/1
**white [2]** 50/23
51/2
**willing [1]** 29/12
**wishing [1]** 90/6
**witching [1]**
25/22
**withdrawn [1]**
79/11
**wonderful [2]** 5/3
81/24
**wordsmithing [2]**
24/18 73/21
**worst [2]** 41/7
41/9
**worth [5]** 19/1
30/7 37/22 39/13
45/25

## Y

**York [4]** 93/21
94/6 94/13 94/16

## Z

**Zativa [18]** 8/24
9/3 43/24 44/11
44/14 52/15 52/23
53/6 54/1 55/14
55/14 55/16 55/21
57/9 65/13 65/22
69/19 84/13
**zero [3]** 12/10
12/17 13/5